**FILED**

LAL

JUN 1 3 2005

JUN 13 2005

MICHAEL W. DOBBINS

CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DONALD P. WILSON, JR., LAURIE
WILSON, DRWJ NO. CLEVELAND
TRUST, KENNETH S. BRODY, and
KSB HENDERSON TRUST,

Plaintiffs,

vs.

DEUTSCHE BANK AG; DEUTSCHE
BANK SECURITIES, INC., D/B/A
DEUTSCHE BANK ALEX. BROWN, a
DIVISION OF DEUTSCHE BANK
SECURITIES, INC; DAVID PARSE;
CRAIG BRUBAKER; BANC ONE
INVESTMENT ADVISORS
CORPORATION; BANK ONE
CORPORATION n/k/a JP MORGAN
CHASE & CO.; AMERICAN
NATIONAL BANK AND TRUST
COMPANY OF CHICAGO; SCOTT
DEICHMANN; JEFFREY CONRAD;
WHITE & CASE, LLP; JOHN OHLE,
III; AMERICAN EXPRESS
COMPANY; AMERICAN EXPRESS
TAX AND BUSINESS SERVICES,
INC.; AND ARTHUR ANDERSON,
LLP,

Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Case No. **05C 3474**

**JUDGE GETTLEMAN**

**MAGISTRATE JUDGE DENLOW**

## NOTICE OF FILING

**TO: All Counsel on Service List:**

**PLEASE TAKE NOTICE** that on June 13, 2005, Defendants Deutsche Bank AG,
Deutsche Bank Securities, Inc., David Parse and Craig Brubaker's Notice of Removal was filed
with the Clerk of the United States District Court, Northern District of Illinois, Eastern Division,
a copy of which is attached and hereby served upon you.

**DATED: June 13, 2005**

Respectfully submitted,

_____

One of the Attorneys for Defendants
Deutsche Bank AG, Deutsche Bank
Securities, Inc. David Parse and Craig Brubaker

Jerrold E. Salzman
Joseph P. Adamczyk
Richard P. Campbell
FREEMAN, FREEMAN & SALZMAN, P.C.
401 North Michigan Avenue, Suite 3200
Chicago, Illinois 60611-4207
Telephone: 312-222-5100
Facsimile: 312-822-0870

Lawrence M. Hill
Seth C. Farber
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: 212-259-8000
Facsimile: 212-259-6333

Donald R. Wilson, Jr.; Laurie Wilson; DRWJ No. Cleveland Trust; Kenneth S. Brody; and KSB Henderson Trust *v.* Deutsche Bank AG; Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc.; David Parse; Craig Brubaker; Banc One Investment Advisors Corporation; Bank One Corporation n/k/a JP Morgan Chase & Co.; American National Bank and Trust Company of Chicago; John Ohle, III; Scott Deichmann; Jeffrey Conrad; White & Case, LLP; American Express Company; American Express Tax and Business Services, Inc.; and Arthur Andersen, LLP Court Case No.:

## SERVICE LIST

| Local Attorney for Plaintiffs | Attorneys for Plaintiffs |
|---|---|
| Robert J. Weber<br>Law Office of Robert J. Weber<br>30 N. LaSalle Street<br>Suite 2900<br>Chicago, Illinois 60602<br>Tel: 312-499-4500<br>Fax:<br><br>**Lead Attorneys for Plaintiffs**<br>David R. Deary<br>W. Ralph Canada, Jr.<br>Stewart Clancy<br>Jeven R. Sloan<br>Deary Montgomery Defeo & Canada, L.L.P.<br>Chateau Plaza, Suite 1565<br>2515 McKinney Avenue<br>Dallas, Texas 75201<br>Tel: 214-292-2600<br>Fax: 215-739-3879<br><br>**Attorneys for Plaintiffs**<br>Joe R. Whatley, Jr.<br>Othni Lathram<br>Whatleydrake, LLC<br>2323 2nd Avenue North<br>Birmingham, Alabama 35203<br>Tel: 205-328-9576<br>Fax: 205-328-9669 | Ernest Cory<br>Cory Watson Crowder & Degaris<br>2131 Magnolia Avenue<br>Birmingham, Alabama 35205<br>Tel: 205-328-2200<br>Fax: 205-324-7896<br><br>**ATTORNEYS FOR DEFENDANTS:**<br><br>**Attorneys for American Express Co.;**<br>**American Express Tax and Business**<br>Lynne Uniman<br>Andrews Kurth LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Tel: 212-850-2814<br>Fax: 212-850-2929<br><br>**Attorneys for Banc One Investment**<br>**Advisors n/k/a JPMorgan Chase; Bank One**<br>**Corp. n/k/a JPMorgan Chase; and**<br>**American National Bank & Trust, n/k/a**<br>**JPMorgan Chase**<br>Thomas M. Durkin<br>Daniel G. Hildebrand<br>J. Gregory Deis<br>Mayer, Brown, Rowe & Maw LLP<br>71 S. Wacker Drive<br>Chicago, Illinois 60606<br>Tel: 312-706-0600<br>Fax: 312-701-7711 |

**Attorneys for Arthur Andersen, LLP**
Brian L. Crowe
John F. Kennedy
Heather A. Jackson
Shefsky & Froelich Ltd.
111 E. Wacker Drive
Suite 2700
Chicago, Illinois 60601
Tel: 312-527-4000
Fax: 312-527-5921

**Attorneys for Scott Deichmann, Jeffrey Conrad, and Jeff Ohle, III**
David J. Stetler
Stetler & Duffy, Ltd.
11 S. LaSalle Street
Suite 1200
Chicago, Illinois 60603
Tel: 312-338-0200
Fax: 312-338-0070

**Attorneys for White & Case LLP**
David J. Bradford
David C. Layden
Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611-7603
Tel: 312-923-2975
Fax: 312-840-7375

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DONALD R. WILSON, JR., LAURIE WILSON, DRWJ NO. CLEVELAND TRUST, KENNETH S. BRODY, and KSB HENDERSON TRUST,<br><br>Plaintiffs,<br><br>vs.<br><br>DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC; DAVID PARSE; CRAIG BRUBAKER; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; JOHN OHLE, III; AMERICAN EXPRESS COMPANY; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.; AND ARTHUR ANDERSON, LLP,<br><br>Defendants. | Case No.<br><br>**05C 3474**<br><br>JUDGE GETTLEMAN<br><br>MAGISTRATE JUDGE DENLOW<br>LAL<br><br>**FILED**<br>JUN 13 2005<br><br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT |

### DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., DAVID PARSE AND CRAIG BRUBAKER'S NOTICE OF REMOVAL

NOTICE IS HEREBY GIVEN that Defendants Deutsche Bank AG, Deutsche Bank Securities Inc. ("DBSI"), d/b/a Deutsche Bank Alex. Brown Inc. ("DB Alex. Brown"), David Parse and Craig Brubaker (collectively, "Deutsche Bank" or the "Deutsche Bank Defendants"), hereby remove to this Court the State Court action described below pursuant to 9 U.S.C. § 205, because it relates to an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral

Awards (the "Convention"), and 28 U.S.C. § 1441, because the Plaintiffs' asserted right to relief necessarily depends on the resolution of a substantial federal question.

## I. BACKGROUND

1. On or about May 9, 2005, a complaint captioned *Donald R. Wilson, Jr., Laurie Wilson, DRWJ No. Cleveland Trust, Kenneth S. Brody, and KSB Henderson Trust. v. Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc., David Parse, Craig Brubaker, Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc., and Arthur Anderson, LLP*, Case No. 2005CH08002, was filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division ("Complaint" or "Compl.").

2. The Deutsche Bank Defendants received the Complaint on or about May 13, 2005. Copies of the Summonses, the Complaint and all process, pleadings and orders that have been served on or received by Deutsche Bank in this action are attached hereto as Exhibit 1, as required by 28 U.S.C. § 1446(a).

3. On information and belief, Defendants Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc. and Arthur Andersen, LLP were served or otherwise received the Complaint at or about the same time as the Deutsche Bank Defendants.

2

4.      The consents of Defendants Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc. and Arthur Andersen, LLP are attached hereto as Exhibit 2.

5.      The Deutsche Bank Defendants will file promptly a copy of this Notice of Removal with the clerk of the state court where the action has been pending.

## II.     THE COMPLAINT

6.      This action is brought by three individuals, Donald R. Wilson, Jr., Laurie Wilson and Kenneth S. Brody, and their related entities, who, according to the Complaint,[1] conferred with Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago (collectively, "Banc One") regarding wealth management products. Compl. ¶¶ 55, 56, 58. The Complaint alleges that Plaintiffs met and had phone calls with Paul Daugerdas and John Beery of Jenkens & Gilchrist, defendants John Ohle, III, Scott Deichmann and Jeffrey Conrad, all employees of Banc One at the time, and Craig Brubaker and David Parse, both employees of Deutsche Bank at the time, to discuss a tax-advantaged investment strategy involving two pairs of offsetting European-style digital foreign options (the "Strategy"). *Id.* ¶¶ 55-62, 67. According to the Complaint, Plaintiffs implemented the Strategy which allegedly allowed them to utilize the losses generated by the Strategy for the tax year 2001. *Id.* ¶¶ 63, 108-11.

---

[1]     The Deutsche Bank Defendants do not admit any of the factual allegations in the Complaint and expressly reserve the right to contest those allegations at the appropriate time.

3

7.     Plaintiffs allege that the Defendants failed to inform them of the IRS Amnesty Program offered in 2002 and, therefore, they did not participate in the Amnesty Program. Plaintiffs further allege that they learned of the "fraud and illegality" of the Strategy after retaining new tax and legal advisors, *id.* ¶ 117, though they do not specify when that occurred.

8.     Subsequently, Plaintiffs filed this lawsuit, alleging in their Complaint the following causes of action against the Deutsche Defendants: violation of the Illinois Consumer Fraud and Deceptive Business Act (815 Ill. Comp. Stat. 505/2 (1993)) against all Defendants (Count I); breach of contract/breach of the duty of good faith and fair dealing against the Deutsche Bank Defendants only (Count II); breach of fiduciary duty against all Defendants except White & Case (Count III); fraud against all Defendants (Count IV); negligent misrepresentation against all Defendants (Count V); breach of contract/professional malpractice against all Defendants except the Deutsche Bank Defendants and White & Case (Count VI); declaratory judgment against all Defendants (Count VII); and civil conspiracy against all Defendants (Count VIII). Plaintiffs allege that they paid "substantial fees" in connection with the Strategy, *id.* ¶¶143, 149, and seek actual, punitive and exemplary damages, as well as attorneys' fees, costs and interest. Prayer for Relief, ¶ I.

### III.   JURISDICTION AND VENUE

9.     This Court has jurisdiction over this lawsuit for two reasons.

10.    First, this Court has jurisdiction under 9 U.S.C. § 203, because "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States

4

(including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." *Id.*

11.     Under 9 U.S.C. § 205, "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending." *Id.*

12.     Pursuant to 9 U.S.C. § 202, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title [9 U.S.C. § 2], falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States." *Id.*

13.     Second, this Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, because substantial disputed issues of federal tax law are necessary elements of Plaintiffs' claims. This court also has supplemental jurisdiction over any other state law claims pursuant to 28 U.S.C. § 1367.

5

14. Venue is proper in this district under 9 U.S.C. § 205 and 28 U.S.C. § 1441(a) because this Court is the United States District Court for the district and division embracing the place where the removed action has been pending.

## IV. GROUNDS FOR REMOVAL

### A. Removal Is Proper Pursuant To 9 U.S.C. § 205

15. To implement the Strategy, Plaintiffs opened securities brokerage accounts with DB Alex. Brown[2] for the purpose of trading German Government Bond options. According to the Complaint, the digital foreign options generated losses that, as part of the Strategy, were used to offset gains on Plaintiffs' personal tax returns. *See* Compl. ¶¶ 70, 76-77.

16. To implement the Strategy, in or about November 2001, Plaintiffs Kenneth S. Brody, the KSB Henderson Trust, Donald R. Wilson, Jr. and the DRWJ No. Cleveland Trust entered into Account Agreements with DB Alex. Brown governing Plaintiffs' relationship with DB Alex. Brown. Each of the Account Agreements that Plaintiffs and the Trustee for the KSB Henderson Trust and the DRWJ No. Cleveland Trust executed with DB Alex. Brown contains the same mandatory arbitration clause at Paragraph 20. This provision not only encompasses disputes relating to the activity in these accounts, but also is broadly written to cover all disputes with DB Alex. Brown and its affiliates, including disputes based on prior events or related to other accounts. Specifically, the clause provides that Plaintiffs:

> agree to arbitrate with you any controversies which may
> arise, whether or not based on events occurring prior to the
> date of this agreement, including any controversy arising
> out of or relating to any account with you, to the
> construction, performance or breach of any agreement with

---

[2] DB Alex. Brown merged into, and later changed its name to, Deutsche Bank Securities, Inc.

> you, or to transactions with or through you, only before the
> New York Stock Exchange or the National Association of
> Securities Dealers Regulation, Inc., at my election.

Account Agreement between DB Alex. Brown and Kenneth S. Brody, executed by

Kenneth S. Brody on November 26, 2001, ¶ 20, attached hereto as Exhibit 3.[3] Thus, the

arbitration agreement covers "any controversies which may arise," and, accordingly, all

of Plaintiffs' claims against DB Alex. Brown must be arbitrated.

      17.    The non-signatory Plaintiff, Laurie Wilson, is also bound by the

arbitration clause because of the agency relationship with her signatory spouse, Donald

R. Wilson, Jr., and because the Amended Complaint makes no distinction between her

claims and those of her spouse. *See In re Oil Spill by Amoco Cadiz*, 659 F.2d 789, 795-

96 (7th Cir. 1981) (co-plaintiff asserting claims based on relationship to plaintiff was

bound by arbitration agreement signed by plaintiff; it would undermine judicial economy

and purposes of the FAA if signatory plaintiff could defeat effect of arbitration agreement

simply by joining a non-signatory co-plaintiff). Laurie Wilson benefited from and is

bound by the arbitration provision contained in the Account Agreements under an agency

relationship with her husband, who signed an account agreement. *See Washington Mut.*

*Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267-68 (5th Cir. 2004) (non-signatory wife

equitably estopped from avoiding arbitration agreement signed by husband where, *inter*

*alia*, wife's claims arose directly from transactions governed by the agreement);

*Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*, No. 99C 4704, 2003 WL 164220, at

*4 (N.D. Ill. Jan. 23, 2003) ("A party is estopped from denying its obligation to arbitrate

when it receives a 'direct benefit' from a contract containing an arbitration clause.")

---

[3]    The other Account Agreements entered into between DB Alex. Brown and
Plaintiffs KSB Henderson Trust, Donald R. Wilson, Jr. and DRWJ No. Cleveland Trust,
which contain identical arbitration clauses, are attached as Exhibits 4-6, respectively.

(quoting *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999); *Dietz v. Northeast Ill. Reg'l Commuter R.R. Corp.*, No. 00C 0889, 2000 WL 1809969, at *1 (N.D. Ill. Dec. 11, 2000) (third-party beneficiary of contract cannot disavow arbitration clause).

18.    Deutsche Bank AG, Deutsche Bank Securities Inc.'s ultimate parent corporation, can also enforce the arbitration agreements against Plaintiffs for at least three independent reasons.

19.    *First,* Plaintiffs agreed to arbitrate with Deutsche Bank AG. Under the terms of the Account Agreements, Plaintiffs agreed to arbitrate with "you" which is defined, *inter alia,* as the "affiliates" of DB Alex. Brown. *See* Account Agreements, Introductory Paragraph, Exs. 3-6. A parent is an affiliate of any of its subsidiaries. BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "affiliate" as "1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, *parent* or sibling corporation.") (emphasis added); *see also Harold Ives Trucking Co. v. Pickens*, 139 S.W. 3d 471, 473-74 (Ark. 2003) (citing Black's definition with approval in finding that the "ordinary and usually accepted meaning" of the term "affiliate" includes a parent company). Moreover, the Account Agreements define "affiliate of Deutsche Bank" as "Deutsche Bank AG and its subsidiaries," *see* Account Agreements, Introductory Paragraph, Exs. 3-6, and thus expressly identify DB Alex. Brown and Deutsche Bank AG as affiliates.

20.    *Second,* principles of equitable estoppel prevent Plaintiffs from suing Deutsche Bank AG and DB Alex. Brown as a single integrated entity while at the same time arguing that they are distinct for purposes of the arbitration agreement.

*Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*, No. 99 C 4704, 2001 WL 40900, at
*3 (N.D. Ill. Jan. 11, 2001) ("[I]f claims against two affiliated companies are based on the
same facts and are inherently inseparable, the claims against both may be referred to
arbitration even though just one of the companies is a party to the arbitration
agreement."), *citing J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textiles, S.A.*, 863 F.2d 315,
320-21 (4th Cir. 1988) ("When the charges against a parent company and its subsidiary
are based on the same facts and are inherently inseparable, a court may refer claims
against the parent to arbitration even though the parent is not formally a party to the
arbitration agreement."). The Complaint itself does not distinguish between Deutsche
Bank AG and Deutsche Bank Alex. Brown. *See, e.g.*, Compl. ¶ 8. Moreover, the
Complaint alleges that all Defendants "knowingly acted in concert to market and
implement the fraudulent and illegal" tax shelter strategies. *Id.* ¶ 181. As a result of the
Plaintiffs' allegations of substantially interdependent and concerted misconduct, the
arbitration agreement with DB Alex. Brown estops Plaintiffs from avoiding arbitration
with Deutsche Bank AG, as well. *See Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp.
2d 995, 1005 (N.D. Ill. 2001) (equitable estoppel allows a non-signatory to compel
arbitration when the signatory raises allegations of substantially interdependent and
concerted misconduct by both the nonsignatory and one or more of the signatories to the
contract) (citation omitted).

21.     *Third*, the Account Agreements specifically state that DB Alex.
Brown was empowered to engage in foreign options transactions with Deutsche Bank AG
(or an affiliate) and that Deutsche Bank AG would earn its normal commissions, spread
or fees for those services. *See* Account Agreements ¶ 17 and Introductory Paragraph,

9

Exs. 3-6. Thus, the Agreements expressly contemplated a role for Deutsche Bank AG in the foreign options transactions and addressed the nature of the compensation that Deutsche Bank AG would receive for its participation. *See id.* ¶ 17, Exs. 3-6. As a result, Deutsche Bank AG, as an intended beneficiary of the agreement, should be permitted to enforce the arbitration clause. *See Hoffman* 143 F. Supp. 2d at 1004 (third-party beneficiary could enforce arbitration clause).

22. Moreover, defendants Craig Brubaker and David Parse may also enforce the arbitration clause in the Account Agreements. The Amended Complaint alleges that Defendants Craig Brubaker and David Parse "were during the relevant period each an employee of Deutsche Bank and/or DB Alex. Brown," Compl. ¶ 8, and, in those capacities, spoke with Wilson and Brody and confirmed the legitimacy of the HOMER Strategy and the opportunity to make a profit. *See id.* ¶ 62. In addition, Plaintiffs allege that Mr. Parse instructed Wilson and Brody to pick German Government bonds in connection with the foreign options positions. *See id.* ¶ 74, 90. As a matter of agency law, "an agent may invoke an arbitration agreement entered into by its principal." *Messing v. Rosenkrantz*, 872 F. Supp. 539, 541 (N.D. Ill. 1995) (non-signatory defendant entitled to compel arbitration based on, *inter alia,* agency relationship with signatory). Moreover, the Account Agreements *explicitly apply* to DB Alex. Brown and "its subsidiaries, affiliates, officers, directors, *agents and employees.*" Account Agreements, Introductory Paragraph, Exs. 3-6 (emphasis added). Messrs. Brubaker and Parse may, therefore, enforce the arbitration clauses in the Account Agreements.

23. The above-referenced arbitration provisions contained in the Account Agreements fall under the Convention because they arise out of a relationship

10

that "involve[d] property located abroad, envisage[d] performance or enforcement abroad, or ha[d] some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.

24.     First, the relationship between Plaintiffs and Deutsche Bank involved property located abroad. As part of the Strategy, Plaintiffs entered into a series of transactions with a foreign entity, *i.e.*, the London branch of Deutsche Bank AG, a German corporation.[4] For example, on November 23, 2001, Wilson and Brody borrowed $137,137,500 and $45,712,500, respectively, from Deutsche Bank AG's London branch. *See* Compl. ¶¶ 77, 93; *see also* Promissory Note of Donald R. Wilson, Jr. and Promissory Note of Kenneth S. Brody, attached hereto as Exs. 7-8.

25.     Second, the relationship between Plaintiffs and Deutsche Bank envisaged performance abroad because the Account Agreement specifically authorizes DB Alex. Brown to engage in foreign securities transactions with an affiliate of Deutsche Bank AG. *See* Account Agreements ¶ 17, Exs. 3-6.

26.     Further, Deutsche Bank AG acted as a counterparty, through its London branch, to trades with Plaintiffs as part of the Strategy. *See* Confirmations issued by Deutsche Bank AG London to Kenneth S. Brody and Donald R. Wilson, Jr., attached hereto as Exs. 9-16.

27.     Third, the relationship between Plaintiffs and Deutsche Bank had a reasonable relation with Germany. As previously discussed, Plaintiffs agreed to arbitrate with "you" -- a term defined to include, among other things, "affiliates" -- and "affiliates of Deutsche Bank" in turn is defined to include Deutsche Bank AG. As such, Deutsche

---

[4]     The Complaint alleges that Deutsche Bank AG is a German corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany. *See* Compl. ¶ 6.

Bank AG, a German corporation, is made a party to the Account Agreements and arbitration provision. In addition, the transactions at issue involved the value of bonds issued by the German government as determined at specified times in Frankfurt by reference to prices on the stock exchange where those bonds are issued.

28. Because the Account Agreements containing the arbitration clauses arise out of this relationship, the arbitration clauses fall within the Convention, and removal of this action is, therefore, proper under 9 U.S.C. § 205. *See Keeter, et al. v. KPMG LLP, et al.*, No. 1:04-cv-3759-WSD, slip op. 4-5 (N.D. Ga. May 16, 2005) (attached hereto as Exhibit 17); *Hansen v. KPMG, LLP*, et al., SA CV 04-10525-GLT (MANx), slip op. at 2-4 (C.D. Cal. Mar. 29, 2005) (attached hereto as Exhibit 18); *Chew, et al. v. KPMG, LLP, et al.*, No. 3:04CV748BN, slip op. at 11-12 (S.D. Miss. Jan. 6, 2005) (attached hereto as Exhibit 19); *Reddam, et al. v. KPMG, LLP, et al.*, No. SA CV 04-1227-GLT (MANx), slip op. at 2-6 (C.D. Cal. Dec. 15, 2004) (attached hereto as Exhibit 20).

**B. Removal Is Proper Pursuant To 28 U.S.C. § 1441 Because Resolution Of Plaintiffs' Claims Requires Interpretation Of The Federal Tax Code**

29. This Court also has jurisdiction over this case because Plaintiffs' right to relief necessarily depends on the resolution of a substantial federal question.

30. In a case necessarily involving the resolution of a disputed issue of federal tax law, the Supreme Court issued an opinion today holding that "the national interest in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal question jurisdiction over the disputed issue on removal … ." *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, No. 04-603, slip op. at 1 (June 13, 2005) (attached hereto as Exhibit 21). The Supreme Court recognized a

12

circuit split regarding the necessity of a federal private right of action for removal based on federal question jurisdiction, and decided that the existence of a federal private right of action is not a prerequisite for federal question jurisdiction. *Id.* at 9. Indeed, the Court reasoned that "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court." *Id.* at 6.

31. Under the holding in *Grable*, there is clearly federal subject matter jurisdiction here. This action is premised on allegations that "Defendants were illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Plaintiffs, and that the purported losses arising from the Strategy were not properly allowable for Federal and State income tax purposes." *See* Compl. ¶ 104. Plaintiffs allege that Defendants provided an overview of the strategy's federal tax benefits; suggested that the strategy was legitimate under federal law; and represented that Plaintiffs could rely on tax opinions "to satisfy the IRS as to the propriety of the HOMER Strategy if audited." *Id.* ¶¶ 66, 130(16), (17), (52).

32. According to the Complaint, Defendants made numerous misrepresentations regarding the tax treatment of HOMER under the Internal Revenue Code. *See, e.g., id.* ¶¶ 130, 104, 107, 112. Plaintiffs allege that Defendants sold "an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS" (*id.* ¶ 130(18)); that Defendants misrepresented "that the losses created by the HOMER strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations" (*id.* ¶ 130(22)); and that Defendants provided "erroneous tax, legal, investment, and accounting opinions and advice" (*id.* ¶ 130(55)) in connection with what was in fact a "sham transaction" which "violated the step transaction, sham transaction,

13

and economic substance doctrines." *Id.* ¶ 130(65)). As a result, Plaintiffs claim to have suffered injury in fees paid to Defendants, federal income tax penalties and interest incurred, the lost opportunity to avail themselves of other legitimate tax-saving strategies, additional costs in hiring new tax and legal advisors and "an actual amount to be proven at trial." *Id.* ¶¶ 174, 175.

33. Plaintiffs allege that Defendants marketed tax products that violated complicated components of federal tax law. *See, e.g., id.* ¶ 181. For example, they allege that Defendants breached their fiduciary duties by advising, recommending, instructing and assisting plaintiffs in engaging in tax strategies "that, unbeknownst to the Plaintiffs, were illegal and improper," (*id.* ¶ 148(65)) and "that the Defendants knew or should have known, before Jenkens issued the Opinion Letters, and before the Accountant Defendants prepared the Plaintiffs' tax returns, that the IRS would contend that the purported losses arising from the Strategy were not properly allowable for Federal or State income tax purposes." *Id.* ¶ 114.

34. Resolution of their allegations necessarily involves questions of undecided federal law. The success of Plaintiffs' claims is dependent upon a determination that the tax strategies violated federal law, and Plaintiffs do not allege that any federal court has ruled on the merits of the tax strategy at issue. Their state law claims, including claims for damages sought under state law, necessarily turn on the interpretation of the federal tax code and thus cannot be maintained absent the interpretation of federal tax law. This Court has jurisdiction under 28 U.S.C. § 1331 to consider these hotly disputed questions of federal tax law. *See Grable*, slip op. at 1, Ex.

14

21; *see also, Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 13 (1983).

35. Based on the foregoing, this Court has federal question jurisdiction over the entirety of Plaintiffs' cause of action pursuant to 28 U.S.C. § 1331. To the extent this Court does not have federal question jurisdiction over any particular claim, it has supplemental jurisdiction over such claim pursuant to 28 U.S.C. § 1367. Accordingly, removal of this action to this Court is proper pursuant to 28 U.S.C. § 1441, as well.

Dated: June 13, 2005

By: _Richard P. Campbell_

One of Their Attorneys.

Jerrold E. Salzman
Joseph P. Adamczyk
Richard P. Campbell
FREEMAN, FREEMAN & SALZMAN, PC
401 N. Michigan Avenue
Suite 3200
Chicago, Illinois 60611-4207
Telephone: 312-222-5100
Facsimile: 312-822-0870

Lawrence M. Hill
Seth C. Farber
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: 212-259-8000
Facsimile: 212-259-6333

Attorneys for Defendant Deutsche Bank AG
and Deutsche Bank Securities Inc., d/b/a
Deutsche Bank Alex. Brown, David Parse and
Craig Brubaker

16

## CERTIFICATE OF SERVICE

The undersigned counsel for Defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., David Parse and Craig Brubaker hereby certifies that on June 13, 2005, true and correct copies of the foregoing **NOTICE OF FILING** and **NOTICE OF REMOVAL** were served by Messenger or Federal Express to all counsel on the attached Service List.

*Richard A Campbell*

# Exhibit 1

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/20/2005
Log Number 510229781

**TO:** Lars Stevens
Deutsche Bank AG New York
60 Wall Street
New York, NY, 10005

**RE:** **Process Served in Illinois**

**FOR:** Deutsche Bank Securities Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Donald R. Wilson, Pltf. vs. Deutsche Bank, AG, et al, including Deutsche BankSecurities, Inc., Dfts.<br>Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Cook County, County Department, Chancery Division, IL<br>Case # 05CH08002 |
| **NATURE OF ACTION:** | Monies Due and Owing - Claims arising out of tax Strategies. Seeking unspecified amounts |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 05/20/2005 at 10:50 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days |
| **ATTORNEY(S) / SENDER(S):** | Robert J. Weber<br>30 North LaSalle Street<br>Suite 2900<br>Chicago, IL 60602<br>312-499-4500 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex Priority Overnight, 790519954324<br>Email Notification, Lars Stevens lars.stevens@db.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Tawana Carter |
| **ADDRESS:** | 208 South LaSalle Street<br>Suite 814<br>Chicago, IL, 60604 |
| **TELEPHONE:** | 312-263-1414 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action.

Arrow

Page 1 of 1

FROM: Dawn Schutz (312)263-1414
CT - Chicago SOP Team
208 South LaSalle Street
Suite 814
Chicago, IL 60604





TO: **Lars Stevens (212)250-5306**
**Deutsche Bank AG New York**
**60 Wall Street**

**New York, NY 10005**
Ref: SOP/0406900/510229781/Dawn Schutz

FedEx Revenue Barcode

CAD#: 6323339
SHIP DATE: 20MAY05
WEIGHT: 1 LB



DELIVERY ADDRESS (FedEx-EDR)

**PRIORITY OVERNIGHT**

**MON**
**A1**
Deliver by:
**23MAY05**

TRK # 7905 1995 4324     FORM
0201

EWR

**10005**  -NY-US

# NE FIDA



CL8122904

5-20-05
10:50

| 2120 | Served | 2121 | Served |
|------|--------|------|--------|
| 2220 | Not Served | 2221 | Not Served |
| 2320 | Served by Mail | 2321 | Served by Mail |
| 2420 | Served by Publication | 2421 | Served by Publication |
| **SUMMONS** | | **ALIAS SUMMONS** | (Rev. 12/22/92) CCG-1 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

Donald R. Wilson, et al.

     Plaintiff,  RECEIVED BY LEGAL DEPARTMENT

v.

         MAY 1 3 2005

Deutsche Bank, AG, et al. DEUTSCHE BANK AG NY BRANCH

     Defendant.

No. 05 CH 08002

**Please Serve:**
 Deutsche BankSecurities, Inc.
 d/b/a Deutsche Bank Alex. Brown, a
 Division of Deutsche Bank Securities, Inc.
 c/o CT Corporation System
 208 South LaSalle Street - Suite 814
 Chicago, Illinois 60604

### SUMMONS

  YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file appearance, and pay the required fee, in the Office of the Clerk of this Court (located in the Richard J. Daley Center, Room 802, Chicago, Illinois 60602) within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

To the officer:

  This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

WITNESS, MAY 1 7 2005 _____, 2004

DOROTHY BROWN
CLERK _____ Clerk of the Court

Date of service: _____, 2004
  (To be inserted by officer on copy left
  with defendant or other person)

[SEAL]

| | |
|---|---|
| **Name** | Robert J. Weber |
| **Attorney for** | Plaintiffs |
| **Address** | 30 N. LaSalle St. - Suite 2900 |
| **City** | Chicago, Illinois 60602 |
| **Telephone** | 312/499-4500 |
| **Atty. No.** | 25892 |

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| | |
|---|---|
| *Law Division | Room 801 |
| Chancery-Divorce | Room 802 |
| County Division | Room 801 |
| Probate Division | Room 1202 |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

**05CH08009**

| | | |
|---|---|---|
| DONALD R. WILSON, JR., LAURIE WILSON, DRWJ NO. CLEVELAND TRUST, KENNETH S. BRODY, and KSB HENDERSON TRUST, | § § § § | NO. _____ |
| **PLAINTIFFS,** | § § § | **PLAINTIFFS' ORIGINAL COMPLAINT** |
| vs. | § § § | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC.; DAVID PARSE; CRAIG BRUBAKER; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; JOHN OHLE, III; AMERICAN EXPRESS COMPANY; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.; AND ARTHUR ANDERSON, LLP, | § § § § § § § § § § § § § § § § § § § | |
| **DEFENDANTS.** | § | |



## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Donald R. Wilson, Jr. ("Wilson"), Laurie Wilson, DRWJ No. Cleveland Trust (sometimes collectively referred to as the "Wilson Plaintiffs"); Kenneth S. Brody ("Brody") and KSB Henderson Trust (sometimes collectively referred to as the "Brody Plaintiffs") (all of the plaintiffs are hereinafter sometimes collectively referred to as the "Plaintiffs") bring this action against Defendants Deutsche Bank AG; Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc.; David Parse; Craig Brubaker; Banc

One Investment Advisors Corporation; Bank One Corporation n/k/a JP Morgan Chase & Co.; American National Bank and Trust Company of Chicago ("American National Bank"); John Ohle, III; Scott Deichmann; Jeffrey Conrad; White & Case, LLP; American Express Company; American Express Tax and Business Services, Inc.; and Arthur Anderson, LLP (all defendants are sometimes collectively referred to as the "Defendants"), seeking damages for claims arising out of tax strategies of the type further described herein, and state:

## I.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 735 ILCS 5/2-209 in that the Defendants are present and transact business in this State and committed tortious acts within this State, all as more fully described herein below.

2.      Venue is proper under 735 ILCS 5/2-101 in that numerous of the Defendants are residents of Cook County and Cook County is where a substantial part of the transactions occurred out of which this cause of action arose.

3.      This Court has personal jurisdiction over each of the Defendants.  Each of the Defendants either has its principal place of business in the State of Illinois, has committed a tort in whole or in part in Illinois, or has otherwise done business in Illinois, all as more fully described herein below.

## II.

## PARTIES

4.      Plaintiffs Donald R. Wilson, Laurie Wilson and Kenneth S. Brody are individuals and citizens of Illinois.

5.      Plaintiffs DRWJ No. Cleveland Trust and KSB Henderson Trust are grantor trusts governed by the laws of the State of Illinois.

2

6.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German corporation with its principal place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This Defendant may be served with process through its registered agent, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

7.     Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown ("DB Alex Brown") is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York, 10019. Deutsche Bank Securities, Inc. is a member of the New York Stock Exchange. This Defendant may be served with process through its registered agent, CT Corporation System, 208 So. LaSalle Street, Suite 814, Chicago, Illinois 60604.

8.     Defendants David Parse ("Parse") and Craig Brubaker ("Brubaker") are an individual and citizen of Illinois and Texas, respectively. These Defendants were during the relevant period each an employee of Deutsche Bank and/or DB Alex. Brown. Deutsche Bank, DB Alex. Brown, Parse, and Brubaker are sometimes collectively referred to herein as the "Deutsche Defendants".

9.     Defendant Banc One Investment Advisors Corporation merged into and was succeeded by JP Morgan Chase & Co. effective on or about July 1, 2004. Defendant Bank One Corporation merged into and was succeeded by JP Morgan Chase & Co. effective on or about September 29, 2004.    JP Morgan Chase & Co. is a Delaware corporation with its principal office located at 270 Park Avenue, New York, New York. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This

3

Defendant may be served with process through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. American National Bank, Banc One Investment Advisors Corporation, Bank One Corporation and JP Morgan Chase & Co. herein collectively referred to as "Bank One".

10. Defendant American National Bank was, at the time of the events set forth herein, an Illinois Corporation, with its principal office located at 120 LaSalle Street, Chicago, Illinois 60603. Defendant American National Bank subsequently merged into and was succeeded by Bank One Corporation and/or Banc One Investment Advisors Corporation.

11. Defendant John Ohle, III ("Ohle") is an individual and citizen of Illinois. This Defendant is, or was during the relevant period, an employee of American National Bank and Bank One.

12. Defendant Scott Deichmann ("Deichmann") is an individual and citizen of Illinois. This Defendant is, or was during the relevant period, an employee of Bank One.

13. Defendant Jeffrey Conrad ("Conrad") is an individual and citizen of Illinois. This Defendant is, or was during the relevant period, an employee of Bank One. Ohle, Deichmann, Conrad and Bank One are collectively referred to as the Bank One Defendants.

14. Defendant White & Case, LLP ("White & Case") is a Delaware corporation with its principal place of business at 1155 Avenue of Americas, New York, New York 10036. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. This Defendant may be served with process through its registered agent The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

4

15. Defendant American Express Company is a New York Corporation with its principal place of business in New York, New York. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. American Express Company may be served through its counsel, Lynne Uniman, Andrews Kurth, LLP, 450 Lexington Avenue, New York, NY 10017.

16. Defendant American Express Tax and Business Services, Inc. is a Minnesota Corporation with its principal place of business in Minneapolis, Minnesota. This Defendant is continuously and systematically engaged in business in the State of Illinois, as further described herein, and thus may be found in the State of Illinois, and has agents doing business in the State of Illinois. American Express Company and American Express Tax and Business Services, Inc. are sometimes collectively referred to herein as "American Express". American Express Tax and Business Services, Inc. may be served through its counsel, Lynne Uniman, Andrews Kurth, LLP, 450 Lexington Avenue, New York, NY 10017.

17. Defendant Robert Goldstein ("Goldstein") is an individual and citizen of Illinois. Goldstein is an employee, representative or agent of American Express. American Express and Goldstein are sometimes collectively referred to herein as the "American Express Defendants". Goldstein may be served through his counsel, Lynne Uniman, Andrews Kurth, LLP, 450 Lexington Avenue, New York, NY 10017.

18. Defendant Arthur Anderson, LLP is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

5

**III.**

**BACKGROUND FACTS**

A. **THE DEVELOPMENT OF THE SCHEME TO SELL DIGITAL OPTIONS**

    **1.** **About Deutsche Bank, DB Alex Brown, Jenkens & Gilchrist, American Express and Bank One n/k/a JPMorgan Chase**

    19.    Deutsche Bank, founded in 1870, is a joint stock company principally dedicated to financing foreign trade.[1] Deutsche Bank does business in major financial and banking markets in Germany, Europe and the rest of the world; and, as of December 31, 2002, had total assets of approximately $1.25 trillion. Deutsche Bank offers various investment, financial and related products and services to consumer and corporate clients worldwide. Deutsche Bank has roughly 67,700 employees and more than 13 million customers in 76 countries worldwide; more than half of Deutsche Bank's staff works outside of Germany.

    20.    Deutsche Bank claims to provide its private clients with all-round service extending from account-keeping and cash and securities investment advice to asset management. In addition, Deutsche Bank claims to have a leading position in international foreign exchange, fixed-income and equities trading.

    21.    Deutsche Bank holds itself out to be a pre-eminent provider of liquidity in the world's foreign exchange markets and a recognized leader in all aspects of foreign exchange. According to its website, it is consistently ranked as one of the top three global foreign exchange providers by *Euromoney* Magazine's industry standard annual Foreign Exchange Poll, both in terms of client perception and market share.

---

[1] All of the information set forth in this section is taken from the websites of Deutsche Bank, Jenkens & Gilchrist, Amex and Bank One. *See* <http://www.db.com/>*Welcome to Deutsche Bank* (last visited February 27, 2004); http:\www.jenkens.com\jenkens\aboutjenkens.asp>*About Jenkens* (last visited May 16, 2003; <www.americanxpress.com> (last visited July 24, 2004); www.jpmorganchase.com; and www.bankone.com.

22.    Deutsche Bank's Foreign Exchange claims to be committed to the core values of client focus and innovation that allegedly characterize all its wholesale client businesses. It emphasizes its ability to find the most creative solution available to *individual* client problems.

23.    Deutsche Bank claims that its foreign exchange options franchise is unsurpassed among major players. It further states that its options desk is fully integrated with all parts of its global foreign exchange operations, giving clients 24-hour access to a world of *speculative and hedging* opportunities.

24.    At the time of the events in question, Jenkens & Gilchrist, P.C. ("Jenkens")[2] was a large law firm with over six hundred (600) attorneys and offices in nine (9) major cities throughout the United States, including Chicago, Illinois. It claims expertise in a variety of industries and market segments, including Anti-Trust, Bankruptcy, Construction, Securities, Financial Institutions, Financial Services, Environmental, Franchise and Distribution, Health, Immigration, Intellectual Property, International Tax, Litigation, Technology, and Real Estate Law.

25.    American Express is a global travel, financial and network services provider and is both a member of and is traded on the New York Stock Exchange. The company has three operating segments, one of which is American Express Financial Advisors (AEFA), and over 78,000 employees. AEFA is one of the leading financial planning companies in the United States, with over 12,000 financial advisors nationwide. AEFA offers a wide range of products and services, including financial planning, brokerage services, mutual funds, insurance and other investment products.

---

[2] Jenkens is not a Defendant in this case due to the approval of an $81.55 million class action settlement against them in the Southern District of New York.

26.    At the time in question, Bank One was one of the nation's largest banks and the world's largest Visa card issuer. In 2002, Bank One had $290 billion in assets, $3.3 billion in net income, and 71,200 employees. Bank One marketed its family wealth (including tax strategies) through Banc One Investment Advisors. In July 2004, Bank One merged with JPMorgan Chase to form this nation's second largest bank, with $1.1 trillion in assets and 2,300 branches in seventeen states.

### 2.    About Options

27.    An option gives a buyer the right to buy or sell something at a definite price for a definite period of time, regardless of that something's then market price on the open market. That "something" may be stock, bonds, commodities (such as coffee or pork bellies), or intangible market valuations such as the Standard & Poors composite value. Options are said to be "in the money" if the price of the underlying "something" makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or a loss. While options were originally primarily developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which sometimes hang by only a slender thread from any underlying investment or in some cases not at all.

28.    Options may be either "American-style" or "European-style," depending upon whether the option purchaser has the right to exercise the option at any time before expiration or *only upon* the designated expiration date. For example, assume an investor buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1000 shares of ABC for $100. Under an American-style option, the option holder can exercise the option by purchasing the shares at

8

any time he chooses prior to July 16, 2003. Under a European-style option, however, the option holder can only elect to exercise the option on July 16, 2003.

29. Digital Options are "digital" in the sense that the investor wins or loses a predetermined amount in full, *but only* if the strike price is met—thus, the option is either on or off, like a digital (binary) 1 or 0. As a result, Digital Options provide an investor with the same payout no matter how far above the strike price the underlying price goes. For example, a Digital Option may look as follows: an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on June 24, 2003. If the price of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, however, stock in ABC Corp. never changes hands. Digital Options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.

30. Digital Options are ordinarily less expensive to purchase than standard options. A Digital Option price is influenced by many of the same factors as any other option, such as the price of the underlying commodity, the exercise price, the time to maturity, the volatility of the underlying commodity, and short-term interest rates. A key disadvantage of Digital Options is a limited profit potential.

### 3. Defendants Develop a Plan to Market Options as a Tax Strategy

31. A plan to market options—initially digital options on foreign currency[3]—as a tax strategy was developed by the Deutsche Defendants, Jenkens, Ernst & Young, BDO Seidman

---

[3] As explained below, Plaintiffs purchased options on the bonds of foreign governments—denominated of course in the foreign currency of that foreign government—instead of directly on foreign currency itself.

and others[4] (collectively, the "COBRA Participants") in the mid-to-late-90s. Upon information and belief, the participants included Paul Daugerdas, a partner at Jenkens, and Parse, Dan Brooks, and certain other unknown individuals with the Deutsche Defendants. Prior to 1994, Daugerdas was employed by Arthur Anderson as *inter alia* the Partner in charge of the Futures and Options Tax Practice. From 1994 to December 28, 1998, he was a partner at the law firm of Altheimer & Gray in Chicago, Illinois, where he was Chairman of its Tax Department. Since December 29, 1998, Daugerdas has been a Partner in Jenkens' Chicago office (he continues to be "of counsel" to that firm). Upon information and belief, Parse and Daugerdas had a professional and social relationship for many years before the HOMER[5] Strategy at issue in this case was designed and marketed.

32.     From 1991 until October 1999, Daugerdas apparently marketed a tax strategy in which a prospective client borrows a treasury security, sells the security short, and then contributes the proceeds to a partnership in exchange for a partnership interest. Although the issue is hotly contested,[6] Daugerdas contends that he independently developed the idea of substituting options in place of treasuries sometime in 1995 or 1996. He claims that after the House Ways and Means Committee of the United States Congress proposed legislation in October of 1999 that would, if passed, adversely impact the use of treasuries in the short-sale strategy, he began to employ various option strategies for his clients.

33.     The initial option strategy sold by Daugerdas is where the taxpayer would purchase and sell options, and then transfer the option positions to a partnership. As a result, the

---

[4] To the best of Plaintiffs' information and belief, the Bank One Defendants were not involved in the COBRA and related strategies.

[5] Homer is the acronym for "Hedge Option Monetization of Economic Remainder", which is the tax strategy engaged in by Plaintiffs. According to Daugerdas, he came up with this acronym as a corollary to BART, Bank One's original name.

[6] *See The Diversified Group, Inc vs. Daugerdas and Jenkens & Gilchrist*, 139 F. Supp.2d 445 (S.D.N.Y. 2001).

taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of the purchased options, but is not reduced by the taxpayer's obligation with regard to the options written. The use of European-style digital options in this transaction is essential because it permits significant leverage to be obtained at relatively modest cost and minimum risk.

34.     Indeed, to hold the risk and the resulting profit potential to a minimum in those early transactions, the COBRA Participants structured the FX Contracts as follows: Each client entered into two opposing transactions[7] - one where the client would be PAID if the spot rate on a particular foreign currency[8] was at or above a certain rate, and one where the client would have to PAY OUT if the spot rate was at or above a certain rate. The two rates that were set (one where the client would be PAID and one where the client would PAY OUT) were different by only *fractions of a penny*. On all of the FX Contracts, the trigger[9] occurred when the spot rate on the underlying currency pair (Japanese Yen vs. U.S. Dollar, Euro vs. U.S. Dollar, or Canadian Dollar vs. U.S. Dollar) was at or above a specific spot rate *on a certain date at a certain time*. Thus, there was almost no chance of only one position being acted upon. Either the spot rate would be above both, so both were acted upon, or the spot rate would be below both, so neither were acted upon.

35.     To further ensure control of the transaction (that either both or neither one were acted upon), the ability to determine when and if the event was triggered was retained by

---

[7] The two transactions, although purportedly independent, were actually neither independent nor even transactions. Each client and the Deutsche Defendants entered into one form contract memorializing both what was bought and what was sold, and without providing further collateral the client could not transfer the positions separately. Further, the FX Contracts were not something traded on any recognized exchange but were simply a matter of private contract between the participants. Finally, neither party had any rights to take possession of the "underlying currency." As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a "bet") based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties.
[8] Foreign currency was used so that the loss claimed could be either capital or ordinary, depending on the need, under § 988 of the Internal Revenue Code.
[9] The "trigger" is an event that causes a payoff with respect to digital options.

Deutsche Bank, with the stipulation that Deutsche Bank, as the "calculation agent", could choose to accept or disregard any spot rate. When you combine these two elements - the incredibly close proximity of the trigger spot rates (hundredths of a penny apart) and the ability to choose the spot rate that determines if the trigger occurred - the transactions had virtually no risk of just one of the paired transactions being exercised. Buried in a footnote in some, but not all, of Jenkens' opinion letters issued after the transaction was completed, Jenkens referred to the small chance of this occurring as "lottery-type" winnings.

36. The participants in these early strategies structured the tax strategies so that the total of fees to them and others was between five and one-half percent (5.5%) and nine and one-half percent (9.5%) of the tax savings the client desired to achieve. Of this amount, between one percent (1%) and five percent (5%) went to the Deutsche Defendants as the "spread" between the two positions in the FX Contract (i.e., the difference between what was paid for buying one position and what was received for selling the other), three percent (3%) went to Jenkens for having "developed" the FX Contract as a tax strategy and writing an opinion letter on the transaction,[10] and one and one-half percent (1.5%) went to others (the "Marketing Participants"), who participated in the transaction by introducing and recommending the FX Contracts, as part of various tax strategies, to long-time clients who trusted them. The Marketing Participants included *inter alia* Ernst & Young, BDO Seidman, and many others. (Indeed, in some instances, the tax strategies were marketed and promoted directly by Jenkens and sometimes by Deutsche Bank as its proprietary strategy.) The FX Contract tax strategy was sometimes marketed under *inter alia* the name "COBRA" (i.e., Currency Options Bring Reward Alternatives).

---

[10] Exclusive of any amount paid for an opinion letter from someone other than Jenkens. Jenkens paid roughly twenty percent (20%) of every dollar it was paid to various other participants in the transaction; often, these payments were *not* disclosed to the client.

4.    **IRS Notice 1999-59: Transactions Lacking in "Economic Substance" are Illegal**

37.    On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS stated that "[t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for Federal income tax purposes. . . . Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes." The clear message from the IRS to Defendants was that purported losses arising from transactions wholly lacking in "economic substance" (e.g., the COBRA Strategy) are not properly allowable for Federal income tax purposes. This was hardly "news," in that the case of *ACM v. Commissioner*, 157 F.3d 237 (3rd Cir. 1998) (hereafter, the "ACM Case"), decided over a year earlier, had held *inter alia* that a loss must reflect *actual* economic consequences (and not, for example, simply a loss bifurcated from an offsetting gain).

5.    **IRS Notice 2000-44: The IRS Contends that the COBRA Strategy is Illegal**

38.    In August 2000, the IRS once again clearly and unequivocally informed accountants and tax attorneys across the country that they believed the COBRA Strategy was illegal. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the COBRA Strategy in Notice 1999-59.

13

39.    Notice 2000-44 specified the precise transactions marketed by the COBRA Participants, under which the taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation." The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to the COBRA Participants was that the purported losses arising from the COBRA Strategy were not properly allowable for Federal income tax purposes.

40.    The COBRA Participants represented that the COBRA Strategy was a legal tax shelter despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that the type of transaction their clients undertook, based on the advice and recommendation of the COBRA Defendants, was illegal. The COBRA Participants simply ignored the clearly stated implications of IRS Notices 1999-59 and 2000-44 and, therefore, knowingly deceived and misled their own clients to their detriment.

41.    The COBRA Participants also represented that the COBRA Strategy was not required to be disclosed on the Plaintiffs' respective federal tax returns pursuant to Treas. Reg. § 1.6011-4(a). Further, the COBRA Participants failed to register the COBRA Strategy as a tax shelter with the Internal Revenue Service pursuant to Treas. Reg. § 301.6111-2 and did not advise their clients that registration of the COBRA Strategy was required.

14

42.     Unbelievably, the COBRA Participants actually promoted and implemented the Strategy **after** Notice 2000-44 was issued[11] expressly stating that these transactions were illegal and invalid. Unfortunately, the COBRA Participants did not disclose this important development to their clients because the COBRA Participants knew the Plaintiffs would either request a refund of their fees and end their relationships with the COBRA Participants (for those who entered the Strategy in 1999), or refuse to participate in the Strategy. Clearly, the COBRA Participants placed their greed over the Plaintiffs' best interest.

### 6.     The COBRA Participants Market Variations of the COBRA Strategy

43.     After Notice 2000-44 was issued, the COBRA Participants began marketing variants of COBRA, all still involving the identical, or almost identical, FX Contracts as before. These new transactions involved such obvious ruses as tying the FX Contracts to a certificate of deposit (referred to as a "market-linked-deposit"), having the client be "redeemed" out of the partnership and receive assets with an allegedly stepped up basis, and renaming the FX Contracts as "swaps" instead of options. In many of these variations, a different type and organization of entities was also utilized. However, Jenkens & Gilchrist marketed far fewer of these transactions than they had of the COBRAs.

### 7.     The Defendants Develop and Market "BART" and "HOMER"

44.     During this period (when far fewer of these COBRA-derived strategies were being marketed), Bank One approached Jenkens about a transaction they had developed in-house (in their "Innovative Strategies Group") called a "Basis Adjusted Remainder Trust" or "BART." Specifically, in January 2001, Trey Die of Bank One approached Daugerdas at the Fountainbleau Hotel in Miami Beach, Florida, during the annual Heckerling Institute on Estate Planning, and he

---

[11] The Defendants continued to reassure Plaintiffs, even those who entered the Strategy in 1999, that the COBRA Strategy was valid.

and Ohle met with Daugerdas and explained how BART worked. On information and belief, Bank One approached the Jenkens lawyers because Jenkens could not only write an opinion letter purportedly legitimizing the transaction, but also already had a tremendous marketing machine in place to help promote the transaction.

45. In summary, Die and Ohle explained that BART worked by contributing two pairs of options—one pair destined to make money and one pair destined to lose money--to a Grantor Retained Annuity Trust, or "GRAT", and then manipulating the GRAT structure so as to increase basis in an asset the taxpayer wished to sell in the future *without* incurring any actual economic loss. After a number of meetings in which Conrad[12] and others at Bank One fully described the BART strategy, the Jenkens lawyers concluded that the BART strategy was attractive because *inter alia* it was not covered by Notice 2000-44 or any listing requirements. However, they did not believe it was particularly marketable, in that it required the taxpayer to engage in the transaction *prior* to selling the asset giving rise to the gain.

46. As a result, Jenkens and Bank One, over the next few months, reworked the BART strategy, in conjunction with the Deutsche Defendants and their lawyers White & Case,[13] into one that could be used to generate a loss to offset gains that had already occurred, even those involving ordinary losses. The result was a strategy that had the loss from the pair of options that lost money flow out to the taxpayer and the gain from the pair of options that made money flow out to a third party; the mechanics of the HOMER strategy are more fully described in paragraph 67 of this Complaint. Daugerdas named this new strategy "HOMER," in reference to BART and the popular "Simpsons" television cartoon show.

---

[12] Both Ohle and Conrad had previously been part of KPMG's National Tax Office.

[13] A major focus of the reworking was the design of the options to be used, and White & Case was heavily involved in this along with Deutsche Bank.

16

47.     Ultimately, Jenkens, Bank One, and Deutsche did only one BART transaction together, but approximately 40 HOMERs, including the ones sold to the Plaintiffs in this case. Jenkens charged a flat fee for each transaction, and then paid Bank One pursuant to a "Service Agreement"; the Deutsche Defendants charged for the options that were integral to the strategy.

48.     Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the purchase and sale of the HOMER Contracts (as hereafter defined and described), pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs.  Further, Defendants made various false statements of material fact, and omitted to state material facts that made statements misleading, to Plaintiffs.

49.     The purpose and effect of Defendants' plan, transaction, and course of conduct was to generate huge fees by co-promoting and serving as a counter-party (with respect to the Deutsche Defendants) for the HOMER Contracts as part of an alleged tax-savings strategy.

50.     As a result of and in reliance on these misrepresentations, omissions, and promises, the Plaintiffs purchased the HOMER Contracts and engaged in the HOMER Strategy.

51.     Had Plaintiffs known of the material adverse information which Defendants did not disclose, they would not have purchased the HOMER Contracts or engaged in the HOMER Strategy.

52.     The Defendants owed duties to the Plaintiffs.  These duties included the duty to:

•       Exercise prudence, caution and care in recommending and entering into the HOMER Contracts for and with the Plaintiffs; and

•       Exercise their responsibility to deal fairly and in good faith and their fiduciary responsibilities of care and loyalty to the Plaintiffs.

17

53.     Defendants intended to deceive the Plaintiffs, as evidenced by the aggressive push the Defendants took to convince the Plaintiffs to enter into the HOMER Contracts and engage in the HOMER Strategy.  In combination with the relatively short time the Plaintiffs were given to consider the transactions and the transactions' complete failure to achieve their intended purpose, there is no possible explanation for the Defendants' behavior other than intentional deceit.

54.     It is evident that Defendants chose to defraud the Plaintiffs for personal gain in the form of outrageous fees from unsuspecting "clients."  These transactions to defraud were perpetrated through Defendants' discrete acts of misrepresentations, representatives of which are herein alleged.

**B.      DEFENDANTS SOLICIT THE PLAINTIFFS**

**1.      Defendants Sell the Strategy to Plaintiffs**

55.     In late October of 2001, without any prompting from Wilson, John Manella introduced Wilson to Ohle, who at that time was with American National Bank.  Ohle suggested that they meet at American National Bank to discuss wealth management products offered by Bank One.

56.     On or about November 5, 2001, Wilson met with Ohle, Deichmann and Conrad at American National Bank to discuss their wealth management products.  At this time, Ohle gave Wilson a Bank One brochure titled "Family Wealth Services" (the "Brochure").  According to the Brochure, "[T]he best measure of financial success is ... how much you are able to shelter from taxes ..."; "[O]nce your plan is complete, they [Bank One Advisors] will work with the other members of your financial advisory team—your attorney, accountant ..."; and "[O]ur [Bank One's] Advisors are 'impartial advocates' for your ongoing financial success.  They do not work on commission and are not affiliated with any products or product sales."

18

57. During the November 5, 2001 meeting, despite the representations made in the Brochure, Ohle told Wilson that Wilson could not have his own attorney review the details of HOMER because the idea "might be stolen".

58. After the November 5, 2001 meeting, Wilson shared the information he received from the Bank One Defendants with Brody, his business associate. Brody wanted his uncle to review the transaction, but, like Wilson, Brody was told that he could not have outside counsel review the transaction. Although Brody again expressed his frustration with Conrad regarding this issue and Conrad relented, Conrad never sent the proper information regarding the transaction to Brody's uncle for review.

59. On November 9, at the direction of the Bank One Defendants, Wilson met with Daugerdas at the Jenkens & Gilchrist offices in Chicago, Illinois. During this meeting, Daugerdas provided an initial explanation of the HOMER Strategy. During the weeks of November 12 and November 19, 2001, additional meetings and phone calls to discuss the HOMER occurred between Wilson, Brody, Daugerdas, John Beery of Jenkens, Ohle, Deichmann and Conrad.

60. During these meetings, Wilson and Brody were told that that the HOMER Strategy took advantage of a legal "loophole" in the tax code to reduce tax liability, and Jenkens, Bank One and Deutsche Bank had performed many of these identical transactions. Ohle, in the presence of Deichmann, Conrad and the Jenkens' representatives, told Wilson and Brody that it did not matter whether Plaintiffs had an economic motive to engage in the HOMER strategy because the transaction involved estate-planning issues. Also, Conrad told Wilson and Brody that the fees they paid for the HOMER strategy would not be considered in determining whether there was actually economic purpose to the transaction, because the fees paid to the Bank One Defendants and Jenkens would be ignored as consulting and legal fees.

19

61.     In fact, regardless of whether economic motive was necessary, Wilson and Brody were told that, in the event the IRS challenged the Strategy, the Jenkens' "independent" opinion letter would uphold the validity of the Strategy, protect these Plaintiffs from the IRS, and would prevent the assessment of penalties.

62.     At some point in mid-November, the Bank One Defendants and Daugerdas set up a phone call with the Deutsche Bank Defendants, including Parse and Brubaker. Parse and Brubaker confirmed the legitimacy of the HOMER strategy, and specifically discussed the options on German bonds that were involved. Importantly, Parse and Brubaker informed Wilson that the Options provided an opportunity to make a profit on the investment. Wilson pointed out that it would be difficult to make a profit when taking into account the fees paid on the transaction. Again, Ohle assured Wilson that since the HOMER Strategy was an estate planning strategy involving a charitable trust, the economic analysis excluded the amount paid in fees. In other words, the economic substance test is met because there was a chance to make a profit on the Options.

63.     Based on the foregoing representations and assurances, the Plaintiffs agreed to engage in the HOMER Strategy.

### 2.     The Plaintiffs Relied On The Defendants' Expertise

64.     The Plaintiffs are successful business people; however, they do not have knowledge about complex tax and legal matters. The Plaintiffs relied on the Defendants for their "expertise" in this regard.

65.     None of the Defendants ever told the Plaintiffs that Jenkens was providing a legal opinion as to the validity of *a tax shelter it helped develop,* which as a result was not in fact an "independent" opinion letter.

20

66.     The Defendants' role in the scheme (including, in certain instances, the Deutsche Defendants) was not limited to investment advice.  To the contrary Defendants discussed all aspects of the HOMER Strategy with the Plaintiffs, including the alleged tax benefits of the strategy.  For instance, the Defendants informed the Plaintiffs that by forming a grantor retained remainder trust to engage in the HOMER Strategy, it was possible to create large losses for tax purposes that would largely eliminate or offset their expected substantial income.  The Defendants informed the Plaintiffs that economic motive was not a factor in the HOMER Strategy because it was an estate-planning device.

C.     THE FEATURES OF THE HOMER STRATEGY

67.     According to a print-out furnished by Jenkens & Gilchrist to Plaintiffs, the steps of the HOMER Strategy were as follows:

"a.     Client purchases a balanced financial position comprised of two partially offsetting European-style digital foreign currency options (the "Options"), each of which hedges the other, with a slight market bias, and each which has a premium cost in an amount roughly equal to the Target tax mitigation amount; Client borrows most funds necessary to enter into the Options (the "Loan");

b.     Client contributes the Options to a newly formed Grantor Retained Remainder Trust (the "Trust"), gifting a small unitrust interest (the "Unitrust Interest") to a relative and retaining the remainder interest in the Trust.  The Trust should be a "grantor trust" by virtue of Client's having retained the Trust's remainder interest (the "Remainder Interest").  However, the Trust provides for the creation of a power, on some subsequent date, permitting Client to reacquire Trust assets by substituting

21

assets of equal value. Client secures the Loan with the Remainder Interest;

c. Client sells the Remainder Interest to an unrelated third party (the "Partnership"), for its fair market value, which should roughly equal the Loan. Since Client's basis in the remainder interest is roughly equal to its value, Clients should recognize no material gain or loss upon this disposition. This payment is made with a promissory note (the "Note"). Since Client now does not own a remainder interest in the Trust, the Trust is no longer a grantor trust as to Client. Client secures the Loan with the Note. The Partnership secures the Note with the Remainder Interest;

d. Client's power to reacquire Trust assets by substituting assets of equal value springs into existence. The Trust is therefore now a grantor trust as to Client;

e. The loss portion of the Options expires, and this loss flows through to Client;

f. Client waives the right to reacquire Trust assets by substituting assets of equal value. The Trust is therefore again treated as an independent taxable entity;

g. The trust terminates, because the Unitrust Interest is purchased by the Partnership, and the Trust is collapsed. Upon termination, the Trust distributes its remaining assets (i.e., the remaining Option) to the Partnership;

h. The Partnership liquidates, distributing its assets (i.e, the remaining Option) and the obligation on the Note to its partners in liquidation of their

22

interests. This should result in the partners of the Partnership holding the remaining Option with a basis roughly equal to the fair market value of the remaining Option; and

i.    The partners of the Partnership terminate the remaining Option, and use the proceeds to repay the Note."

68.    Each of the steps proposed by the Defendants were fully planned in advance to reduce or eliminate tax liability for the Plaintiffs' substantial income or gain.

69.    The Defendants further advised the Individual Plaintiffs that the precise amount of loss to be generated by the Strategy would be chosen beforehand, but should not be a loss so large that it would offset the income entirely.

70.    The Defendants further advised the Individual Plaintiffs that if the Internal Revenue Service (the "IRS") audited their tax returns as a result of the Strategy, the Jenkens' "independent" opinion letter would confirm the propriety of the Strategy and of claiming the resulting losses on their tax returns. This "independent" opinion letter would enable the Plaintiffs to satisfy the IRS auditors as to the propriety of the tax returns.

71.    The Defendants advised the Individual Plaintiffs that the losses created by the Strategy were legitimate and in accordance with all applicable tax laws, rules, and regulations. In particular, the Defendants advised the Individual Plaintiffs that the Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letter from Jenkens would confirm this.

D.    THE WILSON PLAINTIFFS ENGAGE IN THE HOMER STRATEGY IN 2001

72.    In approximately November 2001, the Wilson Plaintiffs agreed to engage in the HOMER Strategy. Their decision was based in large measure upon the Defendants' advice, the promised "independent" opinion letter of Jenkens confirming the propriety of the HOMER

23

Strategy, and the representations and recommendations of the Defendants during the initial HOMER Strategy presentation and thereafter.

### 1. The Wilson Plaintiffs Form the HOMER Strategy Entity

73. In November 2001, the Wilson Plaintiffs formed DRWJ No. Cleveland Trust for the purpose of carrying out the HOMER Strategy. The Defendants instructed, advised, and orchestrated the formation of this entity.

### 2. The Foreign Bond Options

74. David Parse and others at Deutsche Bank advised and instructed the Wilson Plaintiffs to pick the German Government Bonds as the foreign bonds.

75. On or about November 20, 2001, in accordance with the HOMER Strategy, the Wilson Plaintiffs entered into four private contracts with Deutsche Bank involving foreign options positions on German Government Bonds. These private contracts with Deutsche Bank required the Wilson Plaintiffs to purchase (1) a reset bonus knock-out put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 35,474,214.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $34,120,845.00 ("Option A"); (2) a reset bonus knock-in put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 35,474,214.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $34,189,155.00 ("Option B"); (3) a reset bonus knock-out call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 35,474,214.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $34,879,845.00 ("Option C"); and (4) a reset bonus knock-in call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of

24

35,474,214.00 Euros of 2 year German Government Bonds – 3.75% Sept. 12, 2003, and paid a premium of $34,810,155.00 ("Option D") (Options A, B, C and D are collectively referred to as the "Wilson Options"). The Options, which had a settlement date of November 23, 2001, were pledged as collateral on the Loan, described below.

76.     In the purchase of the Wilson Options, the Wilson Plaintiffs actually paid a net amount to Deutsche Bank of at least $821,673, consisting of the difference between the premiums paid for the Wilson Options and the amount received by the Wilson Plaintiffs through the Wilson Loan (defined below), *minus* the amount earned by Wilson on the difference between the amount Wilson was paid based on the Wilson Note (defined below) and the amount Wilson paid to Deutsche for repayment of the Wilson Loan.

### 3.     The Remaining Steps of the HOMER Strategy

77.     On or about November 23, 2001, pursuant to the instructions and assistance of the Defendants and in accordance with the HOMER Strategy, the Wilson Plaintiffs borrowed $137,137,500 (the "Wilson Loan") from Deutsche Bank AG, and used the proceeds of the Wilson Loan to pay for the Options.

78.     On or about November 26, 2001, the Wilson Plaintiffs transferred the Options and cash to the Trust. The Trust was formed under an irrevocable trust agreement, dated November 14, 2001 (the "Wilson Trust Agreement") with American National Bank as the Trustee (the "Trustee"). The Wilson Trust Agreement provided that the Wilson Plaintiffs retained a non-contingent remainder interest (the "Wilson Remainder Interest") in the Wilson Trust; the Wilson Plaintiffs made a gift of a three-year 0.00241% unitrust interest (the "Wilson Unitrust Interest") to Victor Manuel Leal (the "Wilson Unitrust Beneficiary"). No other interests in the Wilson Trust were held by any persons.

25

79.     On or about December 7, 2001, the Wilson Plaintiffs sold the Wilson Remainder Interest to Whittaker Financial Partners ("Wilson Buyer") in return for an installment note obligation with a principal amount of $137,287,536 (the "Wilson Note"). The Wilson Note was due and payable on September 7, 2002. The Wilson Note was pledged as collateral on the Wilson Loan and the Wilson Options were released as collateral.

80.     Starting on or about December 10, 2001, pursuant to the terms of the Wilson Trust Agreement, the Wilson Plaintiffs possessed the power to reacquire the Wilson Trust corpus by substituting other property of an equivalent value (the "Wilson Substitution Power").

81.     On or about December 13, 2001 (the "Wilson Barrier Observation Date"), Wilson Options A and D expired pursuant to their terms; these options expired worthless, with the premium paid being totally lost. At the time of this expiration, the Wilson Trust remained a "grantor trust" under sec. 671 *et seq.* of the Internal Revenue Code (the "Code") because of the Wilson Substitution Power.

82.     On or about December 14, 2001, the Wilson Unitrust Interest was acquired by the Wilson Buyer from the Wilson Unitrust Beneficiary.

83.     On or about December 14, 2001, the Wilson Trust terminated with the consent of all beneficial interest holders and the Wilson Plaintiffs as Settlor of the Wilson Trust, and the Wilson Trust assets, consisting of Wilson Options B and C and cash, were distributed to the Wilson Buyer as the holder of the Wilson Remainder Interest and Unitrust Interest.

84.     On or about December 17, 2001, the Wilson Buyer liquidated the Wilson Trust and the Wilson Note was assumed by the Partners of the Wilson Buyer (the "Wilson Buyer Successors"), each of which was a corporation neither owned nor controlled by the Wilson Plaintiffs, and all assets of the Wilson Buyer, including Wilson Options B and C and the cash received upon termination of the Wilson Trust, were distributed to the Wilson Buyer Successors.

26

85.     On or about December 19, 2001, Wilson Options B and C expired pursuant to their terms. On such date, Wilson Options B and C were held by the Wilson Buyer Successors.

86.     On or about December 21, 2001, the Wilson Note was paid by the Wilson Buyer Successors with a payment to the Wilson Plaintiffs in the amount of $137,396,985.13.

87.     On or about December 21, 2001, the Wilson Plaintiffs repaid the Loan by making a payment to Deutsche Bank in the amount of $137,356,158.13.

E.     THE BRODY PLAINTIFFS ENGAGE IN THE HOMER STRATEGY

88.     In approximately November 2001, the Brody Plaintiffs agreed to engage in the HOMER Strategy. Their decision was based in large measure upon the Defendants' advice, the promised "independent" opinion letter of Jenkens confirming the propriety of the HOMER Strategy, and the representations and recommendations of the Defendants during the initial HOMER Strategy presentation and thereafter.

### 1.     The Brody Plaintiffs Form the HOMER Strategy Entity

89.     In November 2001, the Brody Plaintiffs formed KSB Henderson Trust for the purpose of carrying out the HOMER Strategy. The Defendants instructed, advised, and orchestrated the formation of this entity.

### 2.     The Foreign Bond Options

90.     David Parse and others at Deutsche Bank advised and instructed the Brody Plaintiffs to pick German Government Bonds as the foreign bonds and the exact amounts to be invested in each option.

91.     On or about November 20, 2001, in accordance with the HOMER Strategy, the Brody Plaintiffs entered into four private contracts with Deutsche Bank involving foreign options positions on German Government Bonds. These private contracts with Deutsche Bank required the Brody Plaintiffs to purchase (1) a reset bonus knock-out put option with a strike price of

102.85, a cap of 98.45, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 11,824,738.00 Euros of 2 year German Government Bonds – BKO 3.75% Sept. 12, 2003, and paid a premium of $11,373,615.00 ("Option A"); (2) a reset bonus knock-in put option with a strike price of 102.85, a cap of 98.45, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 11,824,738.00 Euros of 2 year German Government Bonds – BKO 3.75% Sept. 12, 2003, and paid a premium of $11,396,385.00 ("Option B"); (3) a reset bonus knock-out call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-out barrier of 100.72, a notional entitlement of 11,824,738.00 Euros of 2 year German Government Bonds – BKO 3.75% Sept. 12, 2003, and paid a premium of $11,626,615.00 ("Option C"); and (4) a reset bonus knock-in call option with a strike price of 98.45, a cap of 102.85, a reset strike price of 100.77, a knock-in barrier of 100.72, a notional entitlement of 11,824,738.00 Euros of 2 year German Government Bonds – BKO 3.75% Sept. 12, 2003, and paid a premium of $11,603,385.00 ("Option D") (Options A, B, C and D are collectively referred to as the "Brody Options"). The Options, which had a settlement date of November 23, 2001, were pledged as collateral on the Loan, described below.

92.     In the purchase of the Brody Options, the Brody Plaintiffs actually paid a net amount to Deutsche Bank of at least $273,891, consisting of the difference between the premiums paid for the Brody Options and the amount received by the Brody Plaintiffs through the Brody Loan, *minus* the amount earned by Brody on the difference between the amount Brody was paid on the Brody Note (defined below) and the amount Brody paid to Deutsche for repayment of the Brody Loan.

### 3.     The Remaining Steps of the HOMER Strategy

93.     On or about November 23, 2001, pursuant to the instructions and assistance of the Defendants and in accordance with the HOMER Strategy, the Brody Plaintiffs borrowed

28

$45,712,500 (the "Brody Loan") from Deutsche Bank and used the proceeds of the Brody Loan to pay for the Options.

94.     On or about November 26, 2001, the Brody Plaintiffs transferred the Options and cash to the Trust. The Trust was formed under an irrevocable trust agreement, dated November 20, 2001 (the "Brody Trust Agreement") with the Trustee (defined above). The Brody Trust Agreement provided that the Brody Plaintiffs retained a non-contingent remainder interest (the "Brody Remainder Interest") in the Brody Trust; the Brody Plaintiffs made a gift of a three-year 0.00616% unitrust interest (the "Brody Unitrust Interest") to Nick Wishart (the "Brody Unitrust Beneficiary"). No other interests in the Brody Trust were held by any persons.

95.     On or about December 7, 2001, the Brody Plaintiffs sold the Brody Remainder Interest to Lexington Financial Partners ("Brody Buyer") in return for an installment note obligation with a principal amount of $45,762,512 from the Brody Buyer ( the "Brody Note"). The Brody Note was due and payable on September 7, 2002. The Brody Note was pledged as collateral on the Brody Loan and the Brody Options were released as collateral.

96.     Starting on or about December 10, 2001, pursuant to the terms of the Brody Trust Agreement, the Brody Plaintiffs possessed the power to reacquire the Brody Trust corpus by substituting other property of an equivalent value (the "Brody Substitution Power").

97.     On or about December 13, 2001 (the "Brody Barrier Observation Date"), Brody Options A and D expired pursuant to their terms; these options expired worthless, with the premium paid being totally lost. At the time of this expiration, the Wilson Trust remained a "grantor trust" under sec. 671 *et seq.* of the Code because of the Wilson Substitution Power.

98.     On or about December 14, 2001, the Brody Unitrust Interest was acquired by the Brody Buyer from the Brody Unitrust Beneficiary.

29

99. On or about December 14, 2001, the Brody Trust terminated with the consent of all beneficial interest holders and the Brody Plaintiffs as Settlor of the Brody Trust, and the Brody Trust assets, consisting of Brody Options B and C and cash, were distributed to the Brody Buyer as the holder of the Brody Remainder Interest and Unitrust Interest.

100. On or about December 17, 2001, the Brody Buyer liquidated the Trust and the Brody Note was assumed by the Partners of the Brody Buyer (the "Brody Buyer Successors"), each of which was a corporation neither owned nor controlled by the Brody Plaintiffs, and all assets of the Brody Buyer, including Brody Options B and C and the cash received upon termination of the Brody Trust, were distributed to the Brody Buyer Successors.

101. On or about December 19, 2001, Brody Options B and C expired pursuant to their terms. On such date, Brody Options B and C were held by the Brody Buyer Successors.

102. On or about December 21, 2001, the Brody Note was paid by the Brody Buyer Successors with a payment to the Brody Plaintiffs in the amount of $45,798,995.04.

103. On or about December 21, 2001, the Brody Plaintiffs repaid the Loan by making a payment to Deutsche Bank in the amount of $45,785,386.04.

F. THE DEFENDANTS' REPEATED FAILURE TO GIVE FULL DISCLOSURE TO PLAINTIFFS

104. As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, if not earlier, the Defendants knew or should have known, that the Defendants were illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to the Plaintiffs, and that the purported losses arising from the Strategy were not properly allowable for Federal and State income tax purposes; however, the Defendants intentionally failed to inform Plaintiffs of this and, in fact, advised them to the contrary. Simply stated, the Defendants repeatedly deceived and knowingly misled the Plaintiffs and placed their greed over the best interest of their clients.

**G.    THE OPINION LETTERS FOR THE PLAINTIFFS' 2001 TAXES**

105.    In early March 2002, Jenkens sent the Plaintiffs virtually identical opinion letters regarding the propriety of the HOMER Strategy (the "Opinion Letters"). These Plaintiffs were still under the mistaken belief that the Opinion Letters set forth "independent" opinions of a law firm on the propriety of the HOMER Strategy.

106.    The Opinion Letters were authored and prepared based, in large part, on representations made by Defendants. The Opinion Letters advised these Plaintiffs that, among other things:

(1)    The Trust should be classified as a trust for federal income tax purposes;

(2)    The Options should be treated as separate instruments for federal income tax purposes; Plaintiffs' adjusted tax basis in each Option should be the premium Plaintiffs paid for such Option;

(3)    The Trust should be treated as a grantor trust and, while Plaintiffs owned the Remainder Interest, Plaintiffs should be treated as the owner of the Trust for purposes of § 671 of the code;

(4)    The creation and initial funding of the Trust should not cause Plaintiffs to recognize any taxable income; the adjusted tax basis of each Option should continue to equal the premium Plaintiffs paid for such Option;

(5)    The sale of the Remainder Interest should be a taxable transaction to Plaintiffs; the Trust should cease to be treated as a grantor trust upon the sale of the Remainder Interest; the adjusted tax basis of each Option should continue to equal the premium Plaintiffs paid for such Option;

(6)    The beginning of the term of the Substitution Power should not be a taxable event; for the duration of the Substitution Power, the Trust should be treated as a

grantor trust, and Plaintiffs should be treated as the owner of the Trust for purposes of Code § 671;

(7)     The expiration of Options A and D on the Barrier Observation Date should cause Plaintiffs to recognize a loss on such expiration;

(8)     Plaintiffs should not recognize any taxable income on the Barrier Observation Date with respect to Options B and C;

(9)     The termination of the Trust and the related distribution of Trust assets to the Buyer, including Options B and C, should not cause Plaintiffs to recognize any taxable income;

(10)    The expiration of Options B and C should not cause Plaintiffs to recognize any taxable income on such expiration;

(11)    The step transaction, sham transaction, and economic substance doctrines should not apply to disallow the results of the HOMER Strategy; and

(12)    Code sections 165, 465, and 469 should not apply to the HOMER Strategy.

107.    Tellingly, the Jenkens opinion letters relating to other tax strategies, which were issued in 2000, stated that IRS Notice 1999-59 had no effect on Jenkens' opinion, while the Jenkens opinion letters issued in 2001 and 2002 (including Plaintiffs' Opinion Letters) failed to mention IRS Notice 1999-59 at all. While Plaintiffs' Opinion Letters did discuss IRS Notice 2000-44, it opined that Notice 2000-44 should have no substantive effect on the Homer Transaction. Based on information and belief, the Defendants were aware of the existence and effect of Notices 1999-59 and 2000-44, but intentionally failed to fully discuss, analyze, or apply the guidelines and standards set forth in these Notices on the HOMER Strategy.

32

**H.** **THE ACCOUNTANT DEFENDANTS[14] GIVE TAX ADVICE AND PREPARE SOME OF THE PLAINTIFFS' TAX RETURNS**

108.    Arthur Andersen prepared the 2001 tax returns, as applicable, for the Brody Plaintiffs. Arthur Andersen advised these Plaintiffs that these returns were properly prepared in accordance with professional standards. Arthur Andersen utilized the losses generated by the HOMER Strategy in these tax returns.

109.    The American Express Defendants prepared the 2001 tax returns, as applicable, for the Wilson Plaintiffs. The American Express Defendants advised these Plaintiffs that these returns were properly prepared in accordance with professional standards. The American Express Defendants utilized the losses generated by the HOMER Strategy in these tax returns.

110.    The Accountant Defendants reiterated to the Plaintiffs that the Strategy was a legal tax shelter (despite the import of IRS Notices 1999-59 and 2000-44). These Defendants advised the Plaintiffs that as a result of the above-described series of steps taken by them in the HOMER Strategy, the Plaintiffs could properly claim losses on their individual tax returns for 2001.

111.    Relying on the representations made to the Plaintiffs by the Defendants, including the Accountant Defendants, both orally and in the prepared tax returns, and in reasonable reliance on the tax advice and professional services rendered by the Accountant Defendants, these Plaintiffs signed and filed their 2001 income tax return.

**I.**    **THE DEFENDANTS FAIL TO GIVE PLAINTIFFS FULL DISCLOSURE**

112.    At no time prior to their implementation of the HOMER Strategy were the Plaintiffs informed that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the Defendants were therefore illegally

---

[14] The "Accountant Defendants" are Arthur Andersen and the American Express Defendants.

33

promoting an unregistered tax shelter by marketing the Strategy to the Plaintiffs. The Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary.

113. Between the time the Defendants advised, recommended, and pressured the Plaintiffs to enter into the HOMER Strategy and the time the Plaintiffs' respective tax returns were prepared, signed and filed, the Defendants never disclosed to Plaintiffs the significance of IRS Notices 1999-59 and 2000-44. The Defendants failed to advise Plaintiffs that the Strategy lacked a business purpose and economic substance and, in fact, advised Plaintiffs to the contrary. Based on information and belief, Defendants intentionally failed to disclose this material information to the Plaintiffs.

114. As a result of IRS Notice 1999-59 issued on December 27, 1999, and IRS Notice 2000-44 issued on August 11, 2000, and otherwise, the Defendants knew or should have known, before Jenkens issued the Opinion Letters, and before the Accountant Defendants prepared the Plaintiffs' tax returns, that the IRS would contend that the purported losses arising from the Strategy were not properly allowable for Federal or State income tax purposes. However, the Defendants intentionally failed to inform Plaintiffs of this and, indeed, informed them to the contrary.

115. The Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the HOMER Strategy.

1. **The Defendants Fail to Advise the Plaintiffs to Enter the IRS Amnesty Program.**

116. In 2002, the IRS offered the "Tax Amnesty Program", a voluntary disclosure program for individuals and entities that participated in tax strategies like the HOMER Strategy. Under the Amnesty Program, taxpayers who disclosed their involvement in such strategies would avoid any liability for penalties for underpayment of taxes without conceding liability for

34

back-taxes or interest. Each Defendant had knowledge of the Amnesty Program and its applicability to the Plaintiffs. The Defendants failed to inform Plaintiffs of the Amnesty Program. Accordingly, to their detriment, the Plaintiffs did not participate in the Amnesty Program. In connection with such advice, Defendants again failed to inform Plaintiffs of the existence and/or significance of Notices 1999-59 and 2000-44.

### 2. Plaintiffs Learn of Fraud and Illegality

117. After retaining new tax and legal advisors and at substantial expense, Plaintiffs discovered for the first time that the Defendants had, among other things:

a) Fraudulently induced them to participate in a bogus tax transaction that could succeed only if the IRS and state tax authorities neglected to audit their tax returns or otherwise failed to discover that they had engaged in the HOMER Strategy;

b) Abused their fiduciary relationship with Plaintiffs and committed professional malpractice by providing advice that they knew or should have known was wrong and directly contradicted by published IRS positions and case law;

c) Exposed Plaintiffs to substantial additional tax liability including interest and penalties due to the filing of inaccurate returns based on the HOMER Strategy;

d) Caused the Plaintiffs to pay a substantial amount of money in fees to the Defendants for their false and fraudulent advice, to incur substantial additional costs and expenses for engaging in unnecessary options transactions, and for retaining new tax and legal advisors to investigate and rectify the situation; and

e) Caused Plaintiffs to forego other legitimate tax saving opportunities.

### J. THE CONSPIRACY AMONG JENKENS AND THE DEFENDANTS

118. On information and belief, the Defendants (along with Jenkens) conspired to devise and promote the HOMER Strategy for the purpose of receiving and splitting millions of

dollars in fees (the "Defendants' Arrangement"). The receipt of those fees was the primary, if not sole, motive in the development and execution of the transaction. Further, the amount of fees earned by the Defendants was not tied to or reflective of the amount of time and effort they expended in providing tax or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on its tax returns. Indeed, Defendants devised the transaction and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the HOMER Strategy by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

119.     Based on information and belief, before meeting with the Plaintiffs, the Defendants devised a game plan that included soliciting clients for the HOMER Strategy. The game plan also included a scheme wherein the Defendants identified potential clients and made the aggressive presentation. The Defendants would contact their clients and make one or more presentations to them. The Defendants would then set up additional meetings to allow the Deutsche Defendants and Jenkens to meet with the potential "targets". During these meetings, the Deutsche Defendants, along with Jenkens and the other Defendants, would each promote and market the HOMER Strategy as a completely legitimate tax-savings strategy. The Defendants would each assure the "target" that a major law firm, Jenkens, would prepare an "independent" opinion letter confirming the propriety and legality of the Strategy. The Defendants would tout the reputations of Jenkens, Deutsche Bank, Bank One and others as a means to assure the "target" that the Strategy was completely legal. The Defendants would not disclose the fact that Jenkens would be providing a legal opinion as to the propriety and legality of a tax transaction

36

created, designed, and implemented in large part by Jenkens itself. This scheme was carried out with the Plaintiffs.

120. The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants a significant pecuniary interest in the advice and professional services they would render.

121. The Defendants had a financial, business and property interest in inducing Plaintiffs, as well as other clients, to enter into the HOMER Strategy, and to do so, promised, opined and assured that the transactions would enable Plaintiffs to have a reasonable opportunity to make a profit and at the same time legally reduce their taxes. The Accountant Defendants never disclosed to Plaintiffs that their representation of them and their objectivity, integrity and professional care would be materially impaired by their own interest in the transactions in violation of the American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct, including Sections 53, 54 and 55.

122. Based on information and belief, the Defendants entered into the Defendants' Arrangement, whereby they agreed they would solicit each other's clients.

123. Such solicitations violated the applicable rules of conduct for accountants in that the Accountant Defendants conspired with and assisted Jenkens in their violation of codes of professional conduct. In so acting, the Accountant Defendants violated Section 53 of the AICPA Code of Professional Conduct.

124. Based on information and belief, pursuant to the Defendants' Arrangement, the Defendants split the fee to be charged clients that did the HOMER Strategy, including Plaintiffs. Such conduct on the part of the Accountant Defendants violated the applicable rules of conduct

37

for accountants, including Section 53 of the AICPA Code of Professional Conduct.

125. Based on information and belief, a portion of the fee the Accountant Defendants actually received for the HOMER Strategy was dependent on the results of their services and was a contingent fee within the meaning of Section 302 of the AICPA Code of Professional Conduct.

K. **THE COST OF THE STRATEGIES**

126. The Plaintiffs lost a significant amount of money in carrying out the HOMER Strategy. For the HOMER Strategy and tax returns in connection therewith:

- the Wilson Plaintiffs paid fees (not including amounts paid to the Deutsche Defendants, such as the cost of the Options and the Loans) to the Defendants and others of at least $3,287,000; and

- the Brody Plaintiffs paid fees (not including amounts paid to the Deutsche Defendants, such as the cost of the Options and the Loans) to the Defendants and others of at least $1,012,000.

127. The Plaintiffs also incurred and are continuing to incur significant legal, accounting, and other advisory fees in connection with rectifying the wrongs that have been perpetrated against them.

L. **IRS REACTION TO THE HOMER STRATEGY**

128. Plaintiffs were thereafter notified of audit by the IRS for the 2001 tax year. Under threat of being assessed even more, they ultimately paid the IRS:

- the Wilson Plaintiffs paid $1,850,741.26 in interest and $2,741,782.60 in penalties; and

- the Brody Plaintiffs paid approximately $700,000 in interest.

38

## IV.

## CAUSES OF ACTION

### COUNT I
(VIOLATION OF THE CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT)
(AGAINST ALL DEFENDANTS)

129.     Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-128 as if fully set forth herein.

130.     In order to induce Plaintiffs to pay them millions of dollars in fees, Defendants and Jenkens made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs, including but not limited to:

(1)     Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the HOMER Strategy;

(2)     Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3)     Pressuring Plaintiffs to engage in the HOMER Strategy by *inter alia* informing Plaintiffs that engaging in the HOMER Strategy was time-sensitive;

(4)     Advising and recommending that Plaintiffs engage in the HOMER Strategy;

(5)     Charging and collecting unreasonable, excessive, and unethical fees;

(6)     Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7)     Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)     Failing to advise the Plaintiffs that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

39

(9)     Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to the Plaintiffs;

(11)    Failing to fully explain the details of the HOMER Strategy and assure Plaintiffs understood the HOMER Strategy before inducing Plaintiffs to enter into the Strategy;

(12)    Representing to Plaintiffs that the tax savings of the HOMER Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13)    Improperly using the position of Bank One as a multibillion dollar, federally regulated financial instruction in order to foster a relationship of trust and confidence;

(14)    Advising Plaintiffs that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

(15)    Failing to advise Plaintiffs that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16)    Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to protect Plaintiffs from incurring penalties if audited;

40

(17)   Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18)   Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)   Failing to advise Plaintiffs that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)   Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Plaintiffs;

(21)   Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the HOMER Strategy they could be liable for penalties and interest;

(22)   Advising Plaintiffs that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23)   Failing to advise, recommend, and instruct Plaintiffs to amend their tax returns;

(24)   Representing and advising Plaintiffs that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(25)   Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(26)  Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens, in Defendants' oral advice, instructions, recommendations, and in the tax returns prepared by the Defendants;

(27)  Failing to advise Plaintiffs of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Plaintiffs to engage in HOMER;

(28)  Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the HOMER Strategy;

(29)  Recommending that Plaintiffs purchase the Options;

(30)  Recommending, advising, instructing, and assisting Plaintiffs in the Options;

(31)  Enticing, recommending, advising, assisting and directing Plaintiffs to enter into a transaction that, unbeknownst to the Plaintiffs, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(32)  Advising Plaintiffs that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

(33)  Failing to advise Plaintiffs that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(34)  Advising Plaintiffs that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(35)  Advising Plaintiffs that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other

42

promoters and attacked by the IRS;

(36) Advising Plaintiffs that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(37) Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and the ACM Case and their implications on the HOMER Strategy;

(38) Failing to advise Plaintiffs that IRS Notice 1999-59 and the ACM Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39) Advising Plaintiffs that IRS Notice 1999-59 and the ACM Case did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(40) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59 and the ACM Case;

(41) Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the losses generated by the HOMER Strategy;

(42) Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(43) Advising Plaintiffs that their tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44) Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-

43

44 and its implications on the Strategy;

(45) Advising Plaintiffs that their HOMER transaction and/or all of the transaction's related information and data would be protected from an IRS summons or request and failing to disclose that similar and potentially compromising files would be held in the custody of the Defendants, would not be protected by the attorney-client privilege, and would be provided to the IRS;

(46) Failing to fully explain the details of the HOMER Strategy marketed by the Defendants before inducing Plaintiffs to enter into such scheme, including: 1) failing to identify the various parties involved in the scheme, 2) failing to reveal to the Plaintiffs the number of other participants in the scheme, and 3) failing to reveal the collective number of the strategies and/or transactions that the Defendants designed, created, engineered, implemented, marketed, promoted and/or sold, which, in fact, compromised the viability of all of the HOMER Strategies sold, as the sheer volume of transactions caused a cascading effect upon the outcome of each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

(47) Advising Plaintiffs that IRS Notice 2000-44 did not apply to the HOMER Strategy and/or impact the propriety of the HOMER Strategy;

(48) Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS Notice 1999-59 and the ACM Case;

(49) Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS Notice 2000-44;

(50) Failing to disclose existing published authority that purported losses for transactions such as the HOMER Strategy were improper and not allowable for

44

Federal and/or State income tax purposes;

(51)    Failing to recommend and advise the Plaintiffs to enroll in the Amnesty Program in order to prevent penalties and interest;

(52)    Failing to ensure that the transactions into which Defendants advised each Plaintiff to enter complied with the applicable State and Federal Rules and regulations;

(53)    Failing to comply with their ethical obligations to Plaintiffs;

(54)    Violating their respective professional rules of conduct;

(55)    Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56)    Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57)    Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

(58)    Advising, recommending, instructing, and assisting Plaintiffs in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(59)    Advising Plaintiffs that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(60)    Informing the Plaintiffs that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)    Informing the Plaintiffs that the Opinion Letters would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax

45

purposes;

(62) Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(63) Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(64) Recommending, instructing, and advising Plaintiffs to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(65) Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(66) Failing to advise Plaintiffs of other legitimate tax-savings and investments opportunities available to them.

131. Defendants, through the use of the mails and other means and in connection with the sale of securities, did knowingly, willfully or recklessly:

a. Make untrue statements of materials facts upon which Plaintiffs relied and omitted to state material facts necessary to make the statements made not misleading, in light of the circumstances under which they were made;

b. Employ manipulative, deceptive and fraudulent devices, schemes and artifices to defraud Plaintiffs; and

c.   Engage in acts, practices, and a course of conduct which operated as a fraud and

deceit upon Plaintiffs, and which were unfair or deceptive.

132.   The representations and omissions made by Defendants and Jenkens were false

and misleading when made.

133.   Defendants and Jenkens acted with the intent to deceive Plaintiffs in order to

obtain millions of dollars in fees, or with reckless disregard of the true facts.

134.   Defendants' and Jenkens' material misrepresentations, omissions, and acts in

furtherance of their scheme to defraud plaintiffs did deceive Plaintiffs and induced them to pay

millions in fees to defendants.

135.   Plaintiffs relied on Defendants' and Jenkens' material misrepresentations and

omissions of material fact in deciding to pay them millions in fees and other charges.

136.   Plaintiffs have suffered injury and damages as a proximate result of the fraudulent

actions of Defendants and Jenkens.

137.   The material misrepresentations or omissions described above amounted to acts or

practices that were unfair or deceptive, which deception Defendants and Jenkens intended

Plaintiffs to rely upon, and which deception occurred in a course of conduct involving trade or

commerce.

138.   The above-described course of conduct by Defendants and Jenkens violated the

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (1993).

139.   As a result of such violations, Plaintiffs have suffered injury and damages.

## COUNT II
### (BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING)
### (AGAINST THE DEUTSCHE DEFENDANTS ONLY)

140.   Plaintiffs reallege each and every allegation set forth in Paragraphs 1-139 and

incorporate them by reference herein as if fully set forth.

141. Plaintiffs entered into agreements with the Deutsche Defendants with respect to the HOMER Contracts. As a result, the Deutsche Defendants owed the Plaintiffs a duty of good faith and fair dealing.

142. The Deutsche Defendants breached their agreements with Plaintiffs (including but not limited to, the HOMER Contracts), and their duty of good faith and fair dealing, by, among other things,

- Failing to disclose the true relationship between the Deutsche Defendants, Jenkens, and the other Defendants with respect to the HOMER Strategy;

- Affirmatively giving improper and incorrect tax advice in connection with the tax strategy (as fully discussed previously in the Complaint); and

- Failing to disclose the existence and significance of the IRS Notices (as discussed previously in this Complaint).

143. As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants substantial fees, (2) they unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

144. By reason of the foregoing acts and conduct, Plaintiffs are entitled to recover from the Deutsche Defendants all actual damages sustained by them as a result of these Defendants' acts as alleged above, to be proven at trial, plus consequential damages, punitive damages in accordance with the evidence, interest, costs, and a reasonable attorneys' fee.

## COUNT III
### (BREACH OF FIDUCIARY DUTY)
### (AGAINST ALL DEFENDANTS EXCEPT WHITE & CASE)

145.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-144 as if fully set forth herein.

146.    The Defendants, as the Plaintiffs' attorneys, accountants, and investment advisors, were Plaintiffs' fiduciaries, and thus owed Plaintiffs the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.

147.    These Defendants breached their fiduciary duties to Plaintiffs by advising Plaintiffs to engage in the HOMER Strategy and to sign and file the tax returns prepared by the Accountant Defendants in reliance on the Defendants' advice, representations, recommendations, instructions, and opinions, which the Defendants knew or should have known to be improper and illegal, for the purpose of generating huge fees for the Defendants.

148.    The Defendants breached their fiduciary duties to Plaintiffs by, among others, the following acts and/or omissions:

(1)    Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the HOMER Strategy;

(2)    Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3)    Pressuring Plaintiffs to engage in the HOMER Strategy by *inter alia* informing Plaintiffs that engaging in the HOMER Strategy was time-sensitive;

(4)    Advising and recommending that Plaintiffs engage in the HOMER Strategy;

(5)    Charging and collecting unreasonable, excessive, and unethical fees;

(6)    Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

49

(7)     Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)     Failing to advise the Plaintiffs that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9)     Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to the Plaintiffs;

(11)    Failing to fully explain the details of the HOMER Strategy and assure Plaintiffs understood the HOMER Strategy before inducing Plaintiffs to enter into the Strategy;

(12)    Representing to Plaintiffs that the tax savings of the HOMER Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13)    Improperly using the position of Bank One as a multibillion dollar, federally regulated financial instruction in order to foster a relationship of trust and confidence;

(14)    Advising Plaintiffs that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

50

(15)   Failing to advise Plaintiffs that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16)   Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to protect Plaintiffs from incurring penalties if audited;

(17)   Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18)   Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)   Failing to advise Plaintiffs that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)   Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Plaintiffs;

(21)   Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the HOMER Strategy they could be liable for penalties and interest;

(22)   Advising Plaintiffs that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23)   Failing to advise, recommend, and instruct Plaintiffs to amend their tax returns;

51

(24)     Representing and advising Plaintiffs that the various entities formed to carry out
         the HOMER Strategy had sufficient business purpose and economic substance
         under the Code;

(25)     Making and endorsing the statements and representations in the opinion letters
         authored and signed by Jenkens;

(26)     Making and endorsing the statements and representations contained in the written
         promotional materials provided by Defendants and Jenkens, in Defendants' oral
         advice, instructions, recommendations, and in the tax returns prepared by the
         Defendants;

(27)     Failing to advise Plaintiffs of Bank One's actual role in HOMER and the fee Bank
         One received for assisting in persuading Plaintiffs to engage in HOMER;

(28)     Recommending, advising, instructing, and assisting Plaintiffs in carrying out each
         of the steps of the HOMER Strategy;

(29)     Recommending that Plaintiffs purchase the Options;

(30)     Recommending, advising, instructing, and assisting Plaintiffs in the Options;

(31)     Enticing, recommending, advising, assisting and directing Plaintiffs to enter into a
         transaction that, unbeknownst to the Plaintiffs, would likely be deemed abusive
         and improper and likely would be disallowed and held invalid by the IRS;

(32)     Advising Plaintiffs that the Options did not need to have business purpose and
         economic substance because the HOMER Strategy was designed for "estate tax"
         purposes;

(33)     Failing to advise Plaintiffs that the design of the HOMER Strategy and the
         Options made no economic or investment sense and had no business purpose or
         economic substance;

(34)   Advising Plaintiffs that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(35)   Advising Plaintiffs that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(36)   Advising Plaintiffs that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(37)   Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and the ACM Case and their implications on the HOMER Strategy;

(38)   Failing to advise Plaintiffs that IRS Notice 1999-59 and the ACM Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39)   Advising Plaintiffs that IRS Notice 1999-59 did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(40)   Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59;

(41)   Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the losses generated by the HOMER Strategy;

(42)   Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

53

(43)     Advising Plaintiffs that their tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44)     Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45)     Advising Plaintiffs that their HOMER transaction and/or all of the transaction's related information and data would be protected from an IRS summons or request and failing to disclose that similar and potentially compromising files would be held in the custody of the Defendants, would not be protected by the attorney-client privilege, and would be provided to the IRS;

(46)     Failing to fully explain the details of the HOMER Strategy marketed by the Defendants before inducing Plaintiffs to enter into such scheme, including: 1) failing to identify the various parties involved in the scheme, 2) failing to reveal to the Plaintiffs the number of other participants in the scheme, and 3) failing to reveal the collective number of the strategies and/or transactions that the Defendants designed, created, engineered, implemented, marketed, promoted and/or sold, which, in fact, compromised the viability of all of the HOMER Strategies sold, as the sheer volume of transactions caused a cascading effect upon the outcome of each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

(47)     Advising Plaintiffs that IRS Notice 2000-44 did not apply to the HOMER Strategy and/or impact the propriety of the HOMER Strategy;

(48)     Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS Notice 1999-59 and the ACM Case;

54

(49) Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS Notice 2000-44;

(50) Failing to disclose existing published authority that purported losses for transactions such as the HOMER Strategy were improper and not allowable for Federal and/or State income tax purposes;

(51) Failing to recommend and advise the Plaintiffs to enroll in the Amnesty Program in order to prevent penalties and interest;

(52) Failing to ensure that the transactions into which Defendants advised each Plaintiff to enter complied with the applicable State and Federal Rules and regulations;

(53) Failing to comply with their ethical obligations to Plaintiffs;

(54) Violating their respective professional rules of conduct;

(55) Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56) Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57) Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

(58) Advising, recommending, instructing, and assisting Plaintiffs in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(59) Advising Plaintiffs that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

55

(60)    Informing the Plaintiffs that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61)    Informing the Plaintiffs that the Opinion Letters would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(62)    Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(63)    Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(64)    Recommending, instructing, and advising Plaintiffs to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(65)    Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(66)    Failing to advise Plaintiffs of other legitimate tax-savings and investments opportunities available to them.

149.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants substantial fees, (2) they unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to

avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

150. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT IV
### (FRAUD)
#### (AGAINST ALL DEFENDANTS)

151. Plaintiffs repeat and reallege each and every prior allegation of Paragraphs 1-150 as if fully set forth herein.

152. In order to induce the Plaintiffs to pay them substantial fees, the Defendants made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs, including but not limited to:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the HOMER Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3) Pressuring Plaintiffs to engage in the HOMER Strategy by *inter alia* informing Plaintiffs that engaging in the HOMER Strategy was time-sensitive;

(4) Advising and recommending that Plaintiffs engage in the HOMER Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

57

(7)    Failing to disclose that the Defendants were splitting and/or sharing fees;

(8)    Failing to advise the Plaintiffs that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9)    Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

(10)    Soliciting, assembling and paying allegedly independent third parties to review and advise as to the legitimacy of the tax strategies at issue and, as a result, substantially compromising such third parties so that they could not and did not fulfill their fiduciary and other good faith obligations to the Plaintiffs;

(11)    Failing to fully explain the details of the HOMER Strategy and assure Plaintiffs understood the HOMER Strategy before inducing Plaintiffs to enter into the Strategy;

(12)    Representing to Plaintiffs that the tax savings of the HOMER Strategy to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(13)    Improperly using the position of Bank One as a multibillion dollar, federally regulated financial instruction in order to foster a relationship of trust and confidence;

(14)    Advising Plaintiffs that the Jenkens' opinion letters were "independent" legal opinions from an "independent" law firm;

58

(15)  Failing to advise Plaintiffs that the Jenkens' opinion letters were not "independent" legal opinions from an "independent" law firm;

(16)  Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to protect Plaintiffs from incurring penalties if audited;

(17)  Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to satisfy the IRS as to the propriety of the HOMER Strategy if audited;

(18)  Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)  Failing to advise Plaintiffs that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)  Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Plaintiffs;

(21)  Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the HOMER Strategy they could be liable for penalties and interest;

(22)  Advising Plaintiffs that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23)   Failing to advise, recommend, and instruct Plaintiffs to amend their tax returns;

(24)   Representing and advising Plaintiffs that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(25)   Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(26)   Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens, in Defendants' oral advice, instructions, recommendations, and in the tax returns prepared by the Defendants;

(27)   Failing to advise Plaintiffs of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Plaintiffs to engage in HOMER;

(28)   Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the HOMER Strategy;

(29)   Recommending that Plaintiffs purchase the Options;

(30)   Recommending, advising, instructing, and assisting Plaintiffs in the Options;

(31)   Enticing, recommending, advising, assisting and directing Plaintiffs to enter into a transaction that, unbeknownst to the Plaintiffs, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(32)   Advising Plaintiffs that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

60

(33) Failing to advise Plaintiffs that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(34) Advising Plaintiffs that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(35) Advising Plaintiffs that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

(36) Advising Plaintiffs that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(37) Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and the ACM Case and their implications on the HOMER Strategy;

(38) Failing to advise Plaintiffs that IRS Notice 1999-59 and the ACM Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39) Advising Plaintiffs that IRS Notice 1999-59 did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(40) Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59;

(41)   Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the losses generated by the HOMER Strategy;

(42)   Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(43)   Advising Plaintiffs that their tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44)   Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45)   Advising Plaintiffs that their HOMER transaction and/or all of the transaction's related information and data would be protected from an IRS summons or request and failing to disclose that similar and potentially compromising files would be held in the custody of the Defendants, would not be protected by the attorney-client privilege, and would be provided to the IRS;

(46)   Failing to fully explain the details of the HOMER Strategy marketed by the Defendants before inducing Plaintiffs to enter into such scheme, including: 1) failing to identify the various parties involved in the scheme, 2) failing to reveal to the Plaintiffs the number of other participants in the scheme, and 3) failing to reveal the collective number of the strategies and/or transactions that the Defendants designed, created, engineered, implemented, marketed, promoted and/or sold, which, in fact, compromised the viability of all of the HOMER Strategies sold, as the sheer volume of transactions caused a cascading effect upon the outcome of each individual transaction, invariably causing each one of them to be deemed potentially illegal and/or abusive;

62

(47)   Advising Plaintiffs that IRS Notice 2000-44 did not apply to the HOMER
        Strategy and/or impact the propriety of the HOMER Strategy;

(48)   Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS
        Notice 1999-59 and the ACM Case;

(49)   Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS
        Notice 2000-44;

(50)   Failing to disclose existing published authority that purported losses for
        transactions such as the HOMER Strategy were improper and not allowable for
        Federal and/or State income tax purposes;

(51)   Failing to recommend and advise the Plaintiffs to enroll in the Amnesty Program
        in order to prevent penalties and interest;

(52)   Failing to ensure that the transactions into which Defendants advised each
        Plaintiff to enter complied with the applicable State and Federal Rules and
        regulations;

(53)   Failing to comply with their ethical obligations to Plaintiffs;

(54)   Violating their respective professional rules of conduct;

(55)   Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56)   Engaging in professional relationships that violated their respective professional
        and ethical rules of conduct;

(57)   Advising the Plaintiffs that the step transaction, sham transaction, and economic
        substance doctrines would not apply to disallow the results of the HOMER
        Strategy;

(58)   Advising, recommending, instructing, and assisting Plaintiffs in entering into a
        transaction in which they were advised that the step transaction, sham transaction,

63

and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(59) Advising Plaintiffs that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(60) Informing the Plaintiffs that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(61) Informing the Plaintiffs that the Opinion Letters would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(62) Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(63) Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(64) Recommending, instructing, and advising Plaintiffs to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(65) Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(66) Failing to advise Plaintiffs of other legitimate tax-savings and investments opportunities available to them.

153. The above intentional omissions of material fact and/or affirmative representations made by each Defendant were false when made and the Defendants knew these representations to be false when made with the intention that Plaintiffs rely upon them in entering into the HOMER Strategy and pay them substantial fees. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Defendants, also with the intent to induce Plaintiffs to enter into the Strategy and pay them substantial fees.

154. In reasonable reliance on the Defendants' false affirmative representations and intentional omissions of material facts regarding the HOMER Strategy, Plaintiffs paid substantial fees to Defendants for tax and investment advice, paid additional amounts to execute the Strategy, they unnecessarily purchased the HOMER Contracts and took out the HOMER Loans to effectuate the HOMER Strategy, did not disclose the transaction on their federal tax returns as a tax shelter, filed federal and state tax returns that reflected improper deductions for losses resulting from the HOMER Strategy, and did not amend those returns.

155. But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs would never have hired Defendants for advice on the HOMER Strategy, engaged in the HOMER Strategy, claimed the purportedly resulting losses on their income tax returns, filed and signed their tax returns as prepared by the Defendants and in reliance on the Defendants' advice and/or not disclosed the transaction on their federal tax returns as a tax shelter. After discovering the Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

156. As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants substantial fees, (2) they unnecessarily purchased the HOMER

Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

157.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## COUNT V
### (NEGLIGENT MISREPRESENTATION)
### (AGAINST ALL DEFENDANTS)

158.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-157 as if fully set forth herein.

159.    As lawyers, tax advisers, investment advisors, and accountants for Plaintiffs (or on whom Plaintiffs were justifiably relying, directly or indirectly), these Defendants owed Plaintiffs duties of care, loyalty and honesty, a duty to comply with the applicable standards of care, and a duty to comply with the applicable provisions of their codes of professional responsibility.

160.    These Defendants also had a duty to Plaintiffs to meet the applicable standard of care for accountants, lawyers, and investment advisors. These Defendants failed to meet those applicable standards of care. The Defendants' failure to meet the standard of care caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

161.    As to the Defendants with whom Plaintiffs had no contractual relationship, these Plaintiffs (including White and Case) were aware that the transaction and Options that were designed, marketed and promoted by the Defendants (including the Deutsche Defendants) would be used for the purpose of the HOMER Strategy. These Defendants also knew that

Plaintiffs would rely on the HOMER Strategy, and the Defendants were linked to the Plaintiffs by their conduct.

162. During the course of their representation of Plaintiffs, the Defendants each made numerous knowingly or negligently false affirmative representations, and intentional or negligently misleading omissions of material fact, and gave numerous recommendations, advice, instructions, and opinions to Plaintiffs, including but not limited to:

(1) Taking advantage of a relationship of trust and confidence and using their knowledge of Plaintiffs' finances to solicit Plaintiffs for the HOMER Strategy;

(2) Taking advantage of a relationship of trust and confidence in recommending the HOMER Strategy;

(3) Pressuring Plaintiffs to engage in the HOMER Strategy by *inter alia* informing Plaintiffs that engaging in the HOMER Strategy was time-sensitive;

(4) Advising and recommending that Plaintiffs engage in the HOMER Strategy;

(5) Charging and collecting unreasonable, excessive, and unethical fees;

(6) Failing to disclose the actual roles and relationships of each Defendant in the Strategy;

(7) Failing to disclose that the Defendants were splitting and/or sharing fees;

(8) Failing to advise the Plaintiffs that the HOMER Strategy was created, designed, and implemented by Jenkens, Bank One, Deutsche and White & Case, in conjunction with one another;

(9) Misrepresenting the volume of HOMER and related transactions originated by the Defendants, as well as the volume of transactions that Jenkens provided the tax legal opinions for;

67

(10)    Soliciting, assembling and paying allegedly independent third parties to review
and advise as to the legitimacy of the tax strategies at issue and, as a result,
substantially compromising such third parties so that they could not and did not
fulfill their fiduciary and other good faith obligations to the Plaintiffs;

(11)    Failing to fully explain the details of the HOMER Strategy and assure Plaintiffs
understood the HOMER Strategy before inducing Plaintiffs to enter into the
Strategy;

(12)    Representing to Plaintiffs that the tax savings of the HOMER Strategy to
Plaintiffs would be significant and far outweigh the amount of fees and costs
incurred by Plaintiffs;

(13)    Improperly using the position of Bank One as a multibillion dollar, federally
regulated financial instruction in order to foster a relationship of trust and
confidence;

(14)    Advising Plaintiffs that the Jenkens' opinion letters were "independent" legal
opinions from an "independent" law firm;

(15)    Failing to advise Plaintiffs that the Jenkens' opinion letters were not
"independent" legal opinions from an "independent" law firm;

(16)    Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to
protect Plaintiffs from incurring penalties if audited;

(17)    Advising Plaintiffs that the Jenkens' opinion letters could be relied upon to satisfy
the IRS as to the propriety of the HOMER Strategy if audited;

68

(18)   Creating, designing, implementing, promoting, advising, recommending, and/or selling an illegal, improper, and invalid tax shelter that is disallowed and/or prohibited by the IRS;

(19)   Failing to advise Plaintiffs that Jenkens had already prepared a "form" opinion letter approving the HOMER Strategy and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters across the country;

(20)   Illegally promoting an unregistered tax shelter by marketing the HOMER Strategy to Plaintiffs;

(21)   Failing to disclose to Plaintiffs that if they filed tax returns claiming losses based on the HOMER Strategy they could be liable for penalties and interest;

(22)   Advising Plaintiffs that the losses created by the HOMER Strategy were legitimate, proper, and in accordance with all applicable tax laws, rules, and regulations;

(23)   Failing to advise, recommend, and instruct Plaintiffs to amend their tax returns;

(24)   Representing and advising Plaintiffs that the various entities formed to carry out the HOMER Strategy had sufficient business purpose and economic substance under the Code;

(25)   Making and endorsing the statements and representations in the opinion letters authored and signed by Jenkens;

(26)   Making and endorsing the statements and representations contained in the written promotional materials provided by Defendants and Jenkens, in Defendants' oral

advice, instructions, recommendations, and in the tax returns prepared by the Defendants;

(27)    Failing to advise Plaintiffs of Bank One's actual role in HOMER and the fee Bank One received for assisting in persuading Plaintiffs to engage in HOMER;

(28)    Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the HOMER Strategy;

(29)    Recommending that Plaintiffs purchase the Options;

(30)    Recommending, advising, instructing, and assisting Plaintiffs in the Options;

(31)    Enticing, recommending, advising, assisting and directing Plaintiffs to enter into a transaction that, unbeknownst to the Plaintiffs, would likely be deemed abusive and improper and likely would be disallowed and held invalid by the IRS;

(32)    Advising Plaintiffs that the Options did not need to have business purpose and economic substance because the HOMER Strategy was designed for "estate tax" purposes;

(33)    Failing to advise Plaintiffs that the design of the HOMER Strategy and the Options made no economic or investment sense and had no business purpose or economic substance;

(34)    Advising Plaintiffs that the design of the HOMER Strategy and the Options had economic and investment sense and had business purpose and economic substance;

(35)    Advising Plaintiffs that the design of the HOMER Strategy and the Options were unique and/or distinct from those tax strategies previously designed by other promoters and attacked by the IRS;

70

(36)    Advising Plaintiffs that the Defendants would prepare and provide an initial defense of the HOMER Strategy should an IRS inquiry ensue;

(37)    Failing to fully and properly inform and advise Plaintiffs of IRS Notice 1999-59 and the ACM Case and their implications on the HOMER Strategy;

(38)    Failing to advise Plaintiffs that IRS Notice 1999-59 and the ACM Case identified transactions lacking in "economic substance" (like the HOMER Strategy) as improper and illegal and purported to disallow any losses generated through such transactions;

(39)    Advising Plaintiffs that IRS Notice 1999-59 did not apply to the HOMER Strategy and/or did not impact the propriety of the HOMER Strategy;

(40)    Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs, orally or in opinion letters, regarding the propriety of the HOMER Strategy in light of IRS Notice 1999-59;

(41)    Advising, instructing, and assisting in the preparation of filing of Plaintiffs' tax returns, utilizing the losses generated by the HOMER Strategy;

(42)    Advising, confirming, and/or ratifying that the Jenkens' opinion letters were accurate and correct;

(43)    Advising Plaintiffs that their tax returns, which utilized the losses generated by the HOMER Strategy, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(44)    Failing to fully and properly inform and advise the Plaintiffs of IRS Notice 2000-44 and its implications on the Strategy;

(45)     Advising Plaintiffs that their HOMER transaction and/or all of the transaction's
related information and data would be protected from an IRS summons or request
and failing to disclose that similar and potentially compromising files would be
held in the custody of the Defendants, would not be protected by the attorney-
client privilege, and would be provided to the IRS;

(46)     Failing to fully explain the details of the HOMER Strategy marketed by the
Defendants before inducing Plaintiffs to enter into such scheme, including: 1)
failing to identify the various parties involved in the scheme, 2) failing to reveal
to the Plaintiffs the number of other participants in the scheme, and 3) failing to
reveal the collective number of the strategies and/or transactions that the
Defendants designed, created, engineered, implemented, marketed, promoted
and/or sold, which, in fact, compromised the viability of all of the HOMER
Strategies sold, as the sheer volume of transactions caused a cascading effect
upon the outcome of each individual transaction, invariably causing each one of
them to be deemed potentially illegal and/or abusive;

(47)     Advising Plaintiffs that IRS Notice 2000-44 did not apply to the HOMER
Strategy and/or impact the propriety of the HOMER Strategy;

(48)     Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS
Notice 1999-59;

(49)     Advising Plaintiffs that the HOMER Strategy was valid and proper in spite of IRS
Notice 2000-44 and the ACM Case;

(50)     Failing to disclose existing published authority that purported losses for
transactions such as the HOMER Strategy were improper and not allowable for

72

Federal and/or State income tax purposes;

(51)   Failing to recommend and advise the Plaintiffs to enroll in the Amnesty Program in order to prevent penalties and interest;

(52)   Failing to ensure that the transactions into which Defendants advised each Plaintiff to enter complied with the applicable State and Federal Rules and regulations;

(53)   Failing to comply with their ethical obligations to Plaintiffs;

(54)   Violating their respective professional rules of conduct;

(55)   Providing erroneous tax, legal, investment, and accounting opinions and advice;

(56)   Engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(57)   Advising the Plaintiffs that the step transaction, sham transaction, and economic substance doctrines would not apply to disallow the results of the HOMER Strategy;

(58)   Advising, recommending, instructing, and assisting Plaintiffs in entering into a transaction in which they were advised that the step transaction, sham transaction, and/or economic substance doctrines did not apply to disallow the results of the HOMER Strategy;

(59)   Advising Plaintiffs that each of the various steps of the HOMER Strategy were meaningful and imbued with non-tax considerations;

(60)   Informing the Plaintiffs that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

73

(61)     Informing the Plaintiffs that the Opinion Letters would confirm that the HOMER Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes;

(62)     Advising, recommending, instructing, and assisting Plaintiffs in engaging into a transaction which they were advised had business purpose and economic substance and made investment sense;

(63)     Failing to advise Plaintiffs that the transactions had no business purpose and no economic substance and made no business sense;

(64)     Recommending, instructing, and advising Plaintiffs to enter into the HOMER Contracts as an investment and/or part of a tax strategy;

(65)     Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked economic substance, had no business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines; and

(66)     Failing to advise Plaintiffs of other legitimate tax-savings and investments opportunities available to them.

163.     These Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be false. In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Plaintiffs of the omissions set forth above, was negligent, grossly negligent, and reckless. Accordingly, these Defendants failed to exercise the standard of care

74

required of them as attorneys, accountants, and advisors.

164.   Plaintiffs fully performed their obligations to the Defendants under their contracts and thus did not contribute to the intentional, negligent, grossly negligent, and/or reckless acts in any way.

165.   In reasonable reliance on the Defendants' advice regarding the HOMER Strategy, Plaintiffs paid substantial fees to Defendants for tax, legal, and investment advice, paid additional fees to execute the Strategy, unnecessarily purchased the HOMER Contracts to effectuate the HOMER Strategy, did not enter the Amnesty Program, and filed federal and state tax returns that reflected deductions for losses resulting from the Strategy.

166.   But for the Defendants' failure to meet the applicable standard of care and the intentional and/or negligent misrepresentations and material omissions described above, Plaintiffs would never have hired and paid substantial fees to Defendants for tax and investment advice, paid additional amounts to execute the Strategy, purchased the HOMER Contracts and taken out the HOMER Loans to effectuate the HOMER Strategy, not disclosed the transaction on their federal tax returns as a tax shelter, filed federal and state tax returns that reflected improper deductions for losses resulting from the HOMER Strategy, and not amended those returns.

167.   After    discovering    the    Defendants'    professional    malpractice    and misrepresentations, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

168.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants substantial fees, (2) they unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax

penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

169.     As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

**COUNT VI**
**(BREACH OF CONTRACT/PROFESSIONAL MALPRACTICE)**
**(AGAINST ALL DEFENDANTS EXCEPT THE DEUTSCHE DEFENDANTS AND WHITE & CASE)**

170.     Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-169 as if fully set forth herein.

171.     Plaintiffs entered into oral and written contracts with these Defendants to provide Plaintiffs with professionally competent legal advice, accounting advice and services, tax advice and services, and tax return preparation services.  In connection therewith, these Defendants were required and expected to meet all applicable standards of care, to meet the fiduciary duties of loyalty and honesty, and to comply with all applicable rules of professional conduct.

172.     Plaintiffs fully performed their obligations to these Defendants under these contracts and thus did not contribute to the Defendants' breaches in any way.

173.     These Defendants ignored their obligations and instead provided Plaintiffs with advice, opinions, recommendations, representations and instructions that these Defendants either knew or reasonably should have known to be wrong.  In addition, the rendering of such representations, recommendations, advice, instructions and opinions, as well as the failure to advise Plaintiffs of the omissions set forth above, was negligent, grossly negligent, and reckless.

76

Accordingly, these Defendants failed to exercise the standard of care required of them as professionals and breached their contracts with Plaintiffs.

174.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid Defendants substantial fees, (2) they unnecessarily purchased the HOMER Contracts and took out the Loans to effectuate the HOMER Strategy, (3) they have incurred tax penalties and interest and disallowance of certain deductions, (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, and (5) they have incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

175.    As a proximate cause thereof, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fee and costs.

### COUNT VII
### (DECLARATORY JUDGMENT)
### (AGAINST ALL DEFENDANTS)

176.    Plaintiffs repeat and reallege each and every prior allegation in Paragraphs 1-175 as if fully set forth herein.

177.    The Wilson Plaintiffs were informed that if they elected to not accept the settlement offered by the IRS, then the IRS would disallow the deduction of all losses and out-of-pocket costs and would assess the maximum penalty of 40%. As a result of the extremely harsh result that would occur if these Plaintiffs did not settle with the IRS, the Wilson Plaintiffs reluctantly accepted the IRS' settlement offer and paid the IRS back-taxes, interest, and penalties. The Brody Plaintiffs were able to avoid paying the IRS penalties, and thus settled with the IRS by paying back-taxes and interest.

178. Defendants are legally responsible for: (1) interest and/or penalties assessed by the IRS or state taxing authority, as well as the disallowance of other certain deductions, against Plaintiffs; (2) professional fees and costs incurred by Plaintiffs in connection with the Federal and state investigations and audits and rectifying the situation; (3) significant fees and expenses (including the cost of the HOMER Contracts and the Loan Fees) incurred by Plaintiffs in connection with the HOMER Strategy and on account of the claims asserted herein; and (4) tax savings and investment opportunities lost.

179. Pursuant to Section 2-701 of the Code of Civil Procedure [735 ILCS 2-701], Plaintiffs are entitled to a declaration that Defendants are liable to Plaintiffs for such penalties, interest, loss of certain other deductions, costs, professional fees, expenses and damages. There exists an actual, justiciable controversy between the parties as Defendants have denied such liability.

### COUNT VIII
### (CIVIL CONSPIRACY)
### (AGAINST ALL DEFENDANTS)

180. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1-179 as if fully set forth herein.

181. As described more fully above, the Defendants knowingly acted in concert to market and implement the fraudulent and illegal HOMER Strategy. In doing so, the Defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint, when they in fact lacked those features (which were necessary for a successful tax strategy).

78

182. The Defendants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action (*i.e.*, the Defendants' Arrangement), all for the purposes of obtaining professional fees from consumers, including the Plaintiffs.

183. The acts of the Defendants were contrary to numerous provisions of law, as stated above.

184. There was a meeting of the minds between and among the Defendants, and other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts, proximately caused and continues to cause Plaintiffs' damages as previously set forth herein.

185. As a result of the Defendants' conduct set forth herein, the Plaintiffs have suffered injury to their business and property in that Plaintiffs have paid Defendants more than one million dollars in fees and have incurred actual damages and losses in an amount to be proven at trial; have incurred tax penalties and interest and disallowance of other certain deductions; have incurred and will continue to incur substantial additional fees and costs in hiring new tax and legal advisors to rectify the situation; and have foregone legitimate tax savings and investment opportunities.

186. Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded punitive damages in accordance with the evidence, plus attorneys' fees and costs.

## IX.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A. As to Count I (Violation of the Consumer Fraud and Deceptive Business

79

Practices Act): A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees and costs, rescission of the HOMER Contracts and the Loans and return of all monies paid by them in connection therewith;

B.      As to Count II (Breach of Contract/Breach of the Duty of Good Faith and Fair Dealing): A judgment in favor of Plaintiffs against the Deutsche Defendants jointly and severally, for actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

C.      As to Count III (Breach of Fiduciary Duty): A judgment in favor of the Plaintiffs against each Defendant (except White & Case) jointly and severally, for actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs

D.      As to Count IV (Fraud): A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees and costs, rescission of the HOMER Contracts and the Loans and return of all monies paid by them in connection therewith;

E.      As to Count V (Negligent Misrepresentation):  A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees and costs;

F.      As to Count VI (Breach of Contract/Professional Malpractice): A judgment in favor of the Plaintiffs against each Defendant (except the Deutsche Defendants and White & Case) jointly and severally, actual damages in an amount to be proven at trial in accordance with the evidence, attorneys' fees, consequential damages, incidental damages, interest, and costs;

80

G.     As to Count VII (Declaratory Judgment): A declaration in favor of the Plaintiffs for all relief prayed for herein and that Defendants are liable to Plaintiffs for any and all interest and penalties assessed against them by the IRS and/or State tax authorities resulting from Plaintiffs' participation in the HOMER Strategy, for all professional fees, costs, and expenses incurred by Plaintiffs to engage in the Strategy and to rectify Defendants' wrongdoing, for tax savings and investment opportunities lost as a result of Defendants' conduct, for the disallowance/loss of certain other deductions, and for the cost of the HOMER Contracts purchased and Loans taken out to effectuate the HOMER Strategy, plus punitive damages, attorneys' fees and costs;

H.     As to Count VIII (Civil Conspiracy): A judgment in favor of the Plaintiffs against each Defendant jointly and severally, actual damages in an amount to be proven at trial, plus punitive damages in accordance with the evidence, attorneys' fees, interest, and costs;

I.     Against each Defendant, actual, punitive, and exemplary damages, attorneys' fees, costs, interest, and such other and further relief as the Court may deem just and proper; and

J.     That the Court grant such other, further, and different relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

By:     _____

Robert J. Weber
Law Office of Robert J. Weber
30 N. LaSalle St., Suite 2900
Chicago, IL 60602
(312) 499-4500
Firm I.D. 25892
LOCAL COUNSEL FOR PLAINTIFFS

PLAINTIFFS' ORIGINAL COMPLAINT

81

DEARY MONTGOMERY DEFEO &
CANADA, L.L.P.
DAVID R. DEARY.
W. RALPH CANADA, JR.
STEWART CLANCY
JEVEN R. SLOAN
Chateau Plaza, Suite 1565
2515 McKinney Avenue
Dallas, Texas 75201
(214) 292-2600
(215) 739-3879 (fax)

**LEAD ATTORNEYS FOR PLAINTIFFS**

WHATLEYDRAKE, LLC
JOE R. WHATLEY, JR.
OTHNI LATHRAM
2323 2nd Avenue North
Birmingham, Alabama 35203
(205) 328-9576
(205) 328-9669 (fax)

ATTORNEYS FOR PLAINTIFFS

CORY WATSON CROWDER & DEGARIS
ERNEST CORY
2131 Magnolia Avenue
Birmingham, Alabama 35205
(205) 328-2200
(205) 324-7896 (fax)

ATTORNEYS FOR PLAINTIFFS

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Case No._____

| | |
|---|---|
| DONALD R. WILSON, JR., LAURIE WILSON, DRWJ NO. CLEVELAND TRUST, KENNETH S. BRODY, and KSB HENDERSON TRUST, <br><br> Plaintiffs, <br><br> vs. <br><br> DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC; DAVID PARSE; CRAIG BRUBAKER; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; JOHN OHLE, III; AMERICAN EXPRESS COMPANY; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.; AND ARTHUR ANDERSON, LLP, <br><br> Defendants. | **CONSENT TO DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., DAVID PARSE, AND CRAIG BRUBAKER'S NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT PURSUANT TO 9 U.S.C. § 205** |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:**

American Express Company and American Express Tax and Business Services, Inc. file this consent to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse and Craig Brubaker's Notice of Removal.

1.     The consenting Defendants are AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.

2.     On or about May 9, 2005, a complaint captioned *Donald R. Wilson, Jr., Laurie Wilson, DRWJ No. Cleveland Trust, Kenneth S. Brody, and KSB Henderson Trust. v. Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc., David Parse, Craig Brubaker, Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc., and Arthur Anderson, LLP*, Case No. 2005CH08002, was filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division.     Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker received the complaint on or about May 13, 2005.

3.     AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC. consent to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker's removal of this action to federal court.

2

Respectfully submitted on this 9th day of ~~May,~~ June, 2005.

ANDREWS KURTH LLP

By: _Lynne Whiman_

Lynne Whiman
450 Lexington Avenue
New York, NY 10017
Telephone: 212-850-2814
Fax: 212-850-2929

*Attorneys for American Express Company
and American Express Tax and Business
Services, Inc.*

3

Notice of Filing
Deutsche Bank Ag, Deutsche
Bank Securities INC., David Parse
And Craig Brubaker's Notice of Removal

CASE NO.     05c 3474

FILE DATE:     JUNE 13, 2005

ATTACHMENT #.     1

EXHIBIT     _____

TAB (DESCRIPTION)     _____

●          ●

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DONALD R. WILSON, JR., LAURIE WILSON, DRWJ NO. CLEVELAND TRUST, KENNETH S. BRODY, and KSB HENDERSON TRUST,<br><br>    Plaintiffs,<br><br>vs.<br><br>DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC; DAVID PARSE; CRAIG BRUBAKER; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; JOHN OHLE, III; AMERICAN EXPRESS COMPANY; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.; AND ARTHUR ANDERSON, LLP,<br><br>    Defendants. | ) **CONSENT TO DEUTSCHE BANK AG,**<br>) **DEUTSCHE BANK SECURITIES, INC.,**<br>) **DAVID PARSE, AND CRAIG**<br>) **BRUBAKER'S NOTICE OF REMOVAL**<br>) **OF ACTION TO FEDERAL COURT**<br>) **PURSUANT TO 9 U.S.C. § 205**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Case No.**<br>)<br>)<br>)<br>) **Judge**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:

Banc One Investment Advisors Corporation n/k/a JPMorgan Investment

Advisors, Inc., Bank One Corporation n/k/a JPMorgan Chase & Co., and American

National Bank and Trust Company of Chicago n/k/a JPMorgan Chase Bank, NA, file this

consent to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse and Craig

Brubaker's Notice of Removal.

1. The consenting Defendants are BANC ONE INVESTMENT ADVISORS CORPORATION n/k/a JPMORGAN INVESTMENT ADVISORS, INC., BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO., and AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO n/k/a JPMORGAN CHASE BANK, NA (collectively, the "Bank One Defendants").

2. On or about May 9, 2005, a complaint captioned *Donald R. Wilson, Jr., Laurie Wilson, DRWJ No. Cleveland Trust, Kenneth S. Brody, and KSB Henderson Trust. v. Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc., David Parse, Craig Brubaker, Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc., and Arthur Anderson, LLP*, Case No. 2005CH08002, was filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. The Bank One Defendants understand that Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker received the complaint on or about May 13, 2005.

3. The Bank One Defendants consents to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker's removal of this action to federal court.

Respectfully submitted on this 13th day of June, 2005.

MAYER, BROWN, ROWE & MAW LLP

2

By:_____

Thomas M. Durkin
Daniel G. Hildebrand
J. Gregory Deis
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: 312.706-0600
Fax: 312.701-7711

*Attorneys for the Bank One Defendants*

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DONALD R. WILSON, JR., LAURIE WILSON, DRWJ NO. CLEVELAND TRUST, KENNETH S. BRODY, and KSB HENDERSON TRUST,<br><br>Plaintiffs,<br><br>vs.<br><br>DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC; DAVID PARSE; CRAIG BRUBAKER; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; JOHN OHLE, III; AMERICAN EXPRESS COMPANY; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.; AND ARTHUR ANDERSEN, LLP,<br><br>Defendants. | **CONSENT TO DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., DAVID PARSE, AND CRAIG BRUBAKER'S NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT PURSUANT TO 9 U.S.C. § 205**<br><br><br><br>Case No._____ |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:

Arthur Andersen, LLP files this consent to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse and Craig Brubaker's Notice of Removal.

1.    The consenting Defendant is ARTHUR ANDERSEN, LLP.

2.    On or about May 9, 2005, a complaint captioned *Donald R. Wilson, Jr., Laurie Wilson, DRWJ No. Cleveland Trust, Kenneth S. Brody, and KSB Henderson Trust. v. Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc., David Parse, Craig*

*Brubaker, Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc., and Arthur Andersen, LLP*, Case No. 2005CH08002, was filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker received the complaint on or about May 13, 2005.

3.     Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker are removing the action to the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 9 U.S.C. § 205.

4.     While reserving all rights and defenses, ARTHUR ANDERSEN, LLP agrees with Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker's Notice of Removal and consents to the removal of this action to federal court pursuant to 9 U.S.C. §205.

Respectfully submitted on this __10Th__ day of June, 2005.

SHEFSKY & FROELICH LTD.

By: _Alen A Kennedy_

Brian L. Crowe
John F. Kennedy
Heather A. Jackson
111 E. Wacker Drive, Suite 2700
Chicago, Illinois 60601
Telephone: 312-527-4000
Facsimile: 312-527-5921

*Attorneys for Arthur Andersen, LLP*

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**
Case No._____

| | |
|---|---|
| DONALD R. WILSON, JR., LAURIE WILSON, DRWJ NO. CLEVELAND TRUST, KENNETH S. BRODY, and KSB HENDERSON TRUST,<br><br>Plaintiffs,<br><br>vs.<br><br>DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., D/B/A DEUTSCHE BANK ALEX. BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC; DAVID PARSE; CRAIG BRUBAKER; BANC ONE INVESTMENT ADVISORS CORPORATION; BANK ONE CORPORATION n/k/a JP MORGAN CHASE & CO.; AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO; SCOTT DEICHMANN; JEFFREY CONRAD; WHITE & CASE, LLP; JOHN OHLE, III; AMERICAN EXPRESS COMPANY; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC.; AND ARTHUR ANDERSON, LLP,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CONSENT TO DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., DAVID PARSE, AND CRAIG BRUBAKER'S NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT PURSUANT TO 9 U.S.C. § 205** |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:**

White & Case LLP files this consent to Deutsche Bank AG, Deutsche

Bank Securities Inc., David Parse and Craig Brubaker's Notice of Removal.

1. The consenting Defendant is WHITE & CASE LLP.

2. On or about May 9, 2005, a complaint captioned *Donald R.*

*Wilson, Jr., Laurie Wilson, DRWJ No. Cleveland Trust, Kenneth S. Brody, and KSB*

*Henderson Trust. v. Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a Deutsche*

*Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc., David Parse, Craig Brubaker, Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc., and Arthur Anderson, LLP*, Case No. 2005CH08002, was filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker received the complaint on or about May 13, 2005.

3. WHITE & CASE LLP consents to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker's removal of this action to federal court.

Respectfully submitted on this 10th day of June, 2005.

JENNER & BLOCK LLP

By:

David J. Bradford
David C. Layden
One IBM Plaza
Chicago, IL 60611-7603
Tel (312) 923-2975
Fax (312) 840-7375

*Attorneys for White & Case LLP*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Case No._____

DONALD R. WILSON, JR., LAURIE
WILSON, DRWJ NO. CLEVELAND
TRUST, KENNETH S. BRODY, and KSB
HENDERSON TRUST,

        Plaintiffs,

        vs.

DEUTSCHE BANK AG; DEUTSCHE
BANK SECURITIES, INC., D/B/A
DEUTSCHE BANK ALEX. BROWN, a
DIVISION OF DEUTSCHE BANK
SECURITIES, INC; DAVID PARSE;
CRAIG BRUBAKER; BANC ONE
INVESTMENT ADVISORS
CORPORATION; BANK ONE
CORPORATION n/k/a JP MORGAN
CHASE & CO.; AMERICAN NATIONAL
BANK AND TRUST COMPANY OF
CHICAGO; SCOTT DEICHMANN;
JEFFREY CONRAD; WHITE & CASE,
LLP; JOHN OHLE, III; AMERICAN
EXPRESS COMPANY; AMERICAN
EXPRESS TAX AND BUSINESS
SERVICES, INC.; AND ARTHUR
ANDERSON, LLP,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CONSENT TO DEUTSCHE BANK AG,
DEUTSCHE BANK SECURITIES, INC.,
DAVID PARSE, AND CRAIG
BRUBAKER'S NOTICE OF REMOVAL
OF ACTION TO FEDERAL COURT
PURSUANT TO 9 U.S.C. § 205**

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:**

Scott Deichmann, Jeffrey Conrad and John Ohle, III, file this consent to

Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse and Craig Brubaker's

Notice of Removal.

        1.      The consenting Defendants are SCOTT DEICHMANN, JEFFREY

CONRAD and JOHN OHLE, III.

2. On or about May 9, 2005, a complaint captioned *Donald R. Wilson, Jr., Laurie Wilson, DRWJ No. Cleveland Trust, Kenneth S. Brody, and KSB Henderson Trust, v. Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown, a Division of Deutsche Bank Securities, Inc., David Parse, Craig Brubaker, Banc One Investment Advisors Corporation, Bank One Corporation n/k/a JP Morgan Chase & Co., American National Bank and Trust Company of Chicago, Scott Deichmann, Jeffrey Conrad, White & Case, LLP, John Ohle, III, American Express Company, American Express Tax and Business Services, Inc., and Arthur Anderson, LLP*, Case No. 2005CH08002, was filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker received the complaint on or about May 13, 2005.

3. SCOTT DEICHMANN, JEFFREY CONRAD and JOHN OHLE, III consent to Deutsche Bank AG, Deutsche Bank Securities Inc., David Parse, and Craig Brubaker's removal of this action to federal court.

Respectfully submitted on this ⟋⟋ day of June, 2005.

STETLER & DUFFY, LTD.

By: _____

David J. Stetler
11 S. LaSalle Street, Suite 1200
Chicago, Illinois 60603
Telephone: 312.338.0200
Fax: 312.338.0070

*Attorneys for Scott Deichmann, Jeffrey Conrad, and Jeff Ohle, III*

2

# Exhibit 3

Deutsche Bank 

Deutsche Banc Alex. Brown Inc.

# Account Agreement

KENNETH S. BRODY
Name(s)

Deutsche Banc Alex. Brown Inc.

P.O. Box 515
Baltimore, MD 21203

1444 W. HENDERSON AVENUE
Address

CHICAGO      IL      60657
City      State      Zip Code

222 13475 12
Account Number

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) (defined below) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean this account in the name of the undersigned. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others provided, however, that Deutsche Bank and its subsidiaries and affiliates shall have the rights of set off specifically provided in Paragraph 12. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

**1. Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

**2. Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

**3. Confirmations, Statements and Written Communications**

I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

**4. Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

**5. Cash Accounts**

This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will make full cash payment on or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

**6. Short and Long Orders; Deliveries and Settlements**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you

1



fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

7. **Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

8. **Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

9. **Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

10. **Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

11. **Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you arising under this Account Agreement or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

12. **Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG; you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, may at any time or from time to time at your option and without notice, following the occurrence and during the continuation of a Default or an Event of Default (as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my Account(s); provided, however, that you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation by you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, to me against any Obligation due to you from me against any Obligation due to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, from me, whether or not such Obligation is then due and payable. For the purposes of the setoff described in this paragraph 12, the term "Obligations" shall be limited to such obligations as I may from time to time so identify in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such writing setting forth the term Obligations must be mutually agreed to by me and you.

13. **Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver for or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of preserving the value of collateral, including hedging transactions that may be executed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

14. **Third Party Authorization; No Agency**

If I have authorized any registered investment adviser or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise and (ii) any other instructions concerning My Account(s). I understand that any investment adviser or other third party I authorize to act for me, whether or not referred to me by you, is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such third party, its officers, employees or agents.

15. **Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

16. **Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the

2



survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

### 17. Foreign Securities

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

### 18. Acknowledgment of Possible Conflicts of Interest

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

### 19. No FDIC Insurance, Not Obligations of Any Bank

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

### 20. Arbitration

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Prearbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

### 21. Miscellaneous

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as the security entitlements with respect to any financial assets credited thereto) shall be governed by the laws of the State of New York.

### 22. Paragraph Headings

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

### 23. Please Complete 23a or 23b as applicable.



3



PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I am not familiar with the mechanics and risks of margin, I should not open a margin account or engage in margin transactions.
- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

4

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

Signature _____  Date _11/22/01_

Signature _____  Date _____

Signature _____  Date _____

Paragraph 23 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

# Exhibit 4

Deutsche Banc Alex. Brown Inc.

**Deutsche Bank** ▧

# Account Agreement

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO
Name(s)
C/O WILLIAM RICHARDS, AS TRUSTEE OF THE KSB HENDERSON TRUST

120 SOUTH LASALLE STREET
Address
SUITE IL 1-1245

CHICAGO, ILLINOIS 60603
City                    State              Zip Code

Deutsche Banc Alex. Brown Inc.

P.O. Box 515
Baltimore, MD 21203

222 13995 18
Account Number

---

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

---

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) (defined below)when you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others provided, however, that Deutsche Bank and its subsidiaries and affiliates shall have the rights of set off specifically provided in Paragraph 12. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts**

   This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will make full cash payment on or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

1

CHICAGO 178716v7 -

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG; you, Deutsche Bank AG and all affiliates of Deutsche Bank AG may at any time or from time to time at your option and without notice, following the occurrence and during the continuation of a Default or an Event of Default (as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my Account(s); provided, however, that you, Deutsche Bank AG and all affiliates of Deutsche Bank AG may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation by you, Deutsche Bank AG and all affiliates of Deutsche Bank AG to me against any Obligation due to you, Deutsche Bank AG and all affiliates of Deutsche Bank AG from me against any Obligation due to you, Deutsche Bank AG and all affiliates of Deutsche Bank AG from me, whether or not such Obligation is then due and payable. For the purposes of the setoff described in this paragraph 12, the term "Obligations" shall be limited to such obligations as I may from time to time so identify in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such writing setting forth the term Obligations must be mutually agreed to by me and you.

**13. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of preserving the value of collateral, including hedging transactions that may be executed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**14. Third Party Authorization; No Agency**

If I have authorized any registered investment adviser or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise and (ii) any other instructions concerning My Account(s). I understand that any investment adviser or other third party I authorize to act for me, whether or not referred to me by you, is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such third party, its officers, employees or agents.

**15. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**16. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on our books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**17. Foreign Securities**

2

CHICAGO 178716v7

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

## 18. Acknowledgment of Possible Conflicts of Interest

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups of Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

## 19. No FDIC Insurance, Not Obligations of Any Bank

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

## 20. Arbitration

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Prearbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

## 21. Miscellaneous

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as the security entitlements with respect to any financial assets credited thereto) shall be governed by the laws of the State of New York.

## 22. Paragraph Headings

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

## 23. Trustee Liability

This Agreement is made by the American National Bank and Trust Company of Chicago (the "Trustee") not personally but solely as Trustee under a Trust Agreement creating the KSS HENDERSON TRUST. This Agreement is executed and delivered by the Trustee, not personally but solely as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee; provided, however, that said Trustee hereby personally warrants that it possesses full power and authority to execute and deliver this Agreement. It is expressly understood and agreed that nothing contained in this Agreement shall be construed as creating any liability on said Trustee personally to pay any indebtedness created or secured by this Agreement or any interest that may accrue thereon, or to perform any covenant, express or implied, contained herein, all such personal liability, if any, being expressly waived by all parties hereto and by every person now or hereafter claiming any right or security hereunder. Notwithstanding the above, the Trustee shall be liable for any claims, losses, or liabilities resulting from the Trustee's gross negligence or willful misconduct.

## 24. Please Complete 24a or 24b as applicable.

[illegible redacted/obscured text]

3

Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me, (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien).

BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

American National Bank and Trust Company not personally but solely as Trustee under Trust Agreement of the

_Shirley Henderson Trust_

William E. Richards, First Vice President

444 84 4929

Date: _____

Social Security or Employer ID No.

Signature: _____ Date: _____

Social Security or Employer ID No.

**24b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify, under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable tax treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 24b and to the best of my knowledge and belief it is true, correct and complete.

BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 21.

Signature: _____ Date: _____

Social Security or Employer ID No.

Signature: _____ Date: _____

Social Security or Employer ID No.

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I am not familiar with the mechanics and risks of margin, I should not open a margin account or engage in margin transactions.
- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

4

CHICAGO 178716v7

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

Signature _____   Date _____

Signature _____   Date _____

Signature _____   Date _____

Paragraph 24 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding.  If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

5

# Exhibit 5

Deutsche Banc Alex. Brown Inc.

**Deutsche Bank** 

# Account Agreement

DONALD R. WILSON, JR.
Name(s)

Deutsche Banc Alex. Brown Inc.

P.O. Box 515
Baltimore, MD 21203

2204 NO. CLEVELAND
Address

222-13134  10

CHICAGO     IL     60614     Account Number
City     State     Zip Code

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) (defined below) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean this account in the name of the undersigned. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others provided, however, that Deutsche Bank and its subsidiaries and affiliates shall have the rights of set off specifically provided in Paragraph 12. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan association, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts**

   This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will make full cash payment on or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you

1

fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

**7.  Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8.  Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9.  Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10.  Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11.  Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you arising under this Account Agreement or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12.  Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG; you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, may at any time or from time to time at your option and without notice, following the occurrence and during the continuation of a Default or an Event of Default (as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my Account(s); provided, however, that you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation by you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, to me against any Obligation due to you from my against any Obligation due to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG, from me, whether or not such Obligation is then due and payable. For the purposes of the setoff described in this paragraph 12, the term "Obligations" shall be limited to such obligations as I may from time to time so identify in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such writing setting forth the term Obligations must be mutually agreed to by me and you.

**13.  Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of preserving the value of collateral, including hedging transactions that may be executed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**14.  Third Party Authorization; No Agency**

If I have authorized any registered investment adviser or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise and (ii) any other instructions concerning My Account(s). I understand that any investment adviser or other third party I authorize to act for me, whether or not referred to me by you, is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such third party, its officers, employees or agents.

**15.  Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**16.  Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the

2

survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**17. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**18. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**19. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**20. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Prearbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversy arising out of or relating to any account with you, to the construction, performance or events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

**21. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as the security entitlements with respect to any financial assets credited thereto) shall be governed by the laws of the State of New York.

**22. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**23. Please Complete 23a or 23b as applicable.**

3



**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I am not familiar with the mechanics and risks of margin, I should not open a margin account or engage in margin transactions.
- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

4

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

Signature _____  Date 11/19/01

Signature _____  Date _____

Signature _____  Date _____

Paragraph 23 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

CHICAGO 178720v4 99999-00004

# Exhibit 6

Deutsche Banc Alex. Brown Inc.

Deutsche Bank 

# Account Agreement

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO
Name(s)
C/O WILLIAM RICHARDS, AS TRUSTEE OF THE DRWJ NO. CLEVELAND TRUST

120 SOUTH LASALLE STREET
Address
SUITE IL1-1245

CHICAGO, ILLINOIS 60603
City                        State                   Zip Code

Deutsche Banc Alex. Brown Inc.

P.O. Box 515
Baltimore, MD 21203

222  13997  16

Account Number

---

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

---

In consideration of Deutsche Banc Alex. Brown Inc. (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned (defined below), and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) (defined below)with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to Deutsche Banc Alex. Brown, its subsidiaries, affiliates, officers, directors, agents and employees. Deutsche Banc Alex. Brown is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and its affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others provided, however, that Deutsche Bank and its subsidiaries and affiliates shall have the rights of set off specifically provided in Paragraph 12. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, investment company, investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me. Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger, electronically or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts**

   This paragraph relates to and is effective solely with respect to cash accounts: (i) the undersigned will make full cash payment on or before settlement date for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto on or before settlement date; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s) with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

CHICAGO 175716v7 •

1

**7.** **Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8.** **Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9.** **Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank AG (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10.** **Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11.** **Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness of any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12.** **Setoff**

I agree that the balance of My Account(s) shall be subject to a lien and a security interest in favor of you, Deutsche Bank AG and all affiliates of Deutsche Bank AG and subject to set off against the Obligations (as defined below) to you, Deutsche Bank AG or any affiliates of Deutsche Bank AG; you, Deutsche Bank AG and all affiliates of Deutsche Bank AG may at any time or from time to time at your option and without notice, following the occurrence and during the continuation of a Default or an Event of Default (as such terms are defined in the documents creating the Obligations), appropriate and apply toward the payment of such Obligations that balance of my Account(s); provided, however, that you, Deutsche Bank AG and all affiliates of Deutsche Bank AG may exercise the foregoing right of set off regardless of the existence of a Default or Event of Default with respect to any payment obligation by you, Deutsche Bank AG and all affiliates of Deutsche Bank AG to me against any Obligation due to you, Deutsche Bank AG and all affiliates of Deutsche Bank AG from me against any Obligation due to you, Deutsche Bank AG and all affiliates of Deutsche Bank AG from me, whether or not such Obligation is then due and payable. For the purposes of the setoff described in this paragraph 12, the term "Obligations" shall be limited to such obligations as I may from time to time as identify in writing to you, Deutsche Bank AG and/or any affiliate of Deutsche Bank AG as an "Obligation" for purposes of this paragraph 12; provided, however, that any such writing setting forth the term Obligations must be mutually agreed to by me and you.

**13.** **Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver for or against me or the attachment of levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) which whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Upon a default, I will also bear the cost of preserving the value of collateral, including hedging transactions that may be executed at your discretion. Any sales or purchases hereunder may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**14.** **Third Party Authorization; No Agency**

If I have authorized any registered investment adviser or other third party to give you instructions with respect to My Account(s) with you, you are authorized to accept from such third party, without inquiry or investigation by you, (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise and (ii) any other instructions concerning My Account(s). I understand that any investment adviser or other third party I authorize to act for me, whether or not referred to me by you, is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such third party, its officers, employees or agents.

**15.** **Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such broker-dealer, its officers, employees or agents.

**16.** **Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**17.** **Foreign Securities**

2

CHICAGO 178716v7 ~

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Banc Alex. Brown. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**18. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including, without limitation, fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**19. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Banc Alex. Brown AG states in writing that a particular product is subject to FDIC insurance.

**20. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Prearbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry. I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21203, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

**21. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between you and me concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement and My Account(s) shall be governed by, and construed in accordance with, the laws of the State of New York. Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed to be your jurisdiction and My Account(s) (as well as the security entitlements with respect to any financial assets credited thereto) shall be governed by the laws of the State of New York.

**22. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**23. Trustee Liability**

This Agreement is made by the American National Bank and Trust Company of Chicago (the "Trustee") not personally but solely as Trustee under a Trust Agreement creating the DRWJ NO. CLEVELAND TRUST. This Agreement is executed and delivered by the Trustee, not personally but solely as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee; provided, however, that said Trustee hereby personally warrants that it possesses full power and authority to execute and deliver this Agreement. It is expressly understood and agreed that nothing contained in this Agreement shall be construed as creating any liability on said Trustee personally to pay any indebtedness created or secured by this Agreement or any interest that may accrue thereon, or to perform any covenant, express or implied, contained herein, all such personal liability, if any, being expressly waived by all parties hereto and by every person now or hereafter claiming any right or security hereunder. Notwithstanding the above, the Trustee shall be liable for any claims, losses, or liabilities resulting from the Trustee's gross negligence or willful misconduct.

**24. Please Complete 24a or 24b as applicable.**

████████████████████████████████████████

3

CHICAGO 175716v7 ~

Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me, (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 23.

American National Bank and Trust Company not personally but solely as Trustee under Trust Agreement of the

By _William E. Richards, First Vice President_    DRWJ No. Cleveland Trle    Date

494 90 5426

Signature: ___    Date

Social Security or Employer ID No.: ___

Social Security or Employer ID No.: ___

**24b. Certification — Non-U.S. Resident**

Permanent Residence Address: ___

Type of Beneficial Owner: ___

Country of Incorporation or Organization: ___

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident, (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, (a) a resident of ___ within the meaning of the income tax treaty between the United States and that country, if required (a U.S. Taxpayer Identification Number is included above). I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury I declare that I have examined the information provided for in Paragraph 24b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 23.

Signature: ___    Date

Social Security or Employer ID No.: ___

Signature: ___    Date

Social Security or Employer ID No.: ___

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- If I am not familiar with the mechanics and risks of margin, I should not open a margin account or engage in margin transactions.
- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

4

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 20.

Signature _____     Date _____

Signature _____     Date _____

Signature _____     Date _____

Paragraph 24 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

5

# Exhibit 7

## PROMISSORY NOTE
## OF
## DONALD R. WILSON JR.

US$137,137,500.00                                      Dated as of November 23, 2001

FOR VALUE RECEIVED, DONALD R. WILSON JR. (the "Borrower") promises to pay to the order of Deutsche Bank AG London (the "Bank") at the office of Deutsche Bank AG New York Branch located at 31 West 52nd Street, New York, New York 10019 in lawful money of the United States of America and in immediately available funds the principal amount of One Hundred Thirty-Seven Million One Hundred Thirty-Seven Thousand Five Hundred Dollars and No Cents in United States Dollars (US$137,137,500.00) (the "Loan") on or before November 23, 2002 (the "Maturity Date").

The Borrower also promises to pay interest on the unpaid principal amount of the Loan prior to the Maturity Date at a per annum interest rate equal to 2.05%. Interest shall be payable on the Maturity Date. Any amount of principal, and to the extent permitted by law, interest, and other amounts payable hereunder which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to 2-1/2% per annum above the Base Rate (defined below) in effect from time to time.

The obligations of the Borrower under this Note, including all principal, interest, fees and expenses (individually and collectively, the "Obligations"), are secured by (i) a security interest pursuant to that certain security agreement executed and delivered by the Borrower in favor of the Bank and dated the date hereof (as the same may be amended or modified); (ii) a security interest pursuant to any like security agreement in form and substance satisfactory to the Bank that may be so executed and delivered by the Borrower in favor of the Bank in substitution thereof (an agreement of either type is hereinafter referred to as the "Security Agreement"); (iii) such other collateral that may be pledged by the Borrower from time to time; and (iv) the assets contained in that certain account which is subject to the Securities Account Control Agreement among the Borrower, Deutsche Banc Alex. Brown Inc. (the "Securities Intermediary") and the Bank, executed and delivered the date hereof.

Notwithstanding anything implied or expressed to the contrary contained herein (except for the proviso to this sentence), before proceeding directly against the Borrower personally or resorting to any assets or collateral of the Borrower for payment of the Obligations, except as expressly provided to the contrary pursuant to clauses (i) and (ii) below, the Bank agrees that from the date of the earlier of (1) the Obligations becoming due and payable in full, or (2) the occurrence of an Event of Default under this Note or the Security Agreement, the Bank shall, for a period of not less than sixty (60) days, pursue payment of the Obligations only by either (i) exercising and exhausting available remedies against (a) the collateral described in the Security Agreement, (b) the assets contained in that certain account which is subject to the Securities Account Control Agreement among the Borrower, the Securities Intermediary and the Bank, executed and delivered the date hereof and (c) any substitute or additional collateral expressly securing the Obligations, which substitute or additional collateral was delivered to the Bank on or after the date hereof or (ii) exercising any applicable rights of set-off which may be granted to the Bank from time to time; provided however, and notwithstanding anything implied or expressed to the contrary in this Note, the Bank may proceed directly against the Borrower personally for payment of the Obligations without any prior recourse to the collateral or any prior set-off in the event, and only in the event, of (x) any fraud, material misrepresentation or willful misconduct by the Borrower relating to this Note or any other documents evidencing or securing the indebtedness described in this Note or (y) any collateral securing the obligations evidencing this Note being or becoming unavailable or insufficient to satisfy such obligations due to adverse claims of creditors, real or hypothetical, except in the case of this clause (y) to the extent, if any, that any loss suffered by the Bank is attributable to any action or inaction

by the Bank or the Securities Intermediary that impairs the priority of or invalidates the perfection of the Bank's security interest in such collateral.

1.      **Interest Rates; Interest Periods; Interest Payments.** The following terms used in this promissory note (hereinafter this "Note") have the meanings set forth below:

        (a)  "Base Rate" shall mean a fluctuating interest rate per annum equal to the higher of (i) the rate announced by Deutsche Bank AG New York Branch from time to time as its prime lending rate for unsecured commercial loans within the United States (such rate to change when and as such prime lending rate changes), and (ii) 0.50% in excess of the rate per annum at which Deutsche Bank AG New York Branch as a Branch of a foreign bank, in its sole discretion, can acquire federal funds in the interbank overnight federal funds market including through brokers of recognized standing.

        (b)  "Business Day" shall mean any day excluding Saturday, Sunday and any day on which banking institutions are authorized by law or other governmental actions to close in New York, New York.

        If at any time any interest rate payable hereunder shall exceed the maximum rate of interest permitted by law, the rate of interest payable hereunder shall be deemed to be the maximum rate of interest permitted by applicable law.

        All interest hereunder shall be calculated based on the basis of a 360-day year for the actual number of days elapsed.

2.      **Prepayment; Repayment.**

        (a)  The Borrower shall have the right at any time to prepay all or any portion of the Loan prior to the Maturity Date.  Each prepayment shall be made together with payment of accrued interest on the amount prepaid to and including the date of prepayment.

        (b)  The Borrower shall repay the principal amount of the Loan, to the extent outstanding, on the Maturity Date.

3.      **Payments and Payment Procedures.**

        All payments by the Borrower on account of principal or interest shall be made in lawful money of the United States of America in immediately available funds.  If any payment of principal or interest becomes due on a day on which commercial banks in New York, New York are required or permitted by law to remain closed, such payment may be made on the next succeeding Business Day on which such banks are open, and such extensions shall be included in computing interest in connection with such payment.

4.      **Yield Protection; Indemnity.**

        (a)  If any principal payment hereunder is made for any reason whatsoever on a date other than the Maturity Date, the Borrower shall pay interest accrued and unpaid thereon.  A certificate of the Bank as to the amount required to be paid by the Borrower under this paragraph shall be, except in the case of manifest error or in the absence of good faith, final and conclusive evidence of the amount due to be paid hereunder.

        (b)  In the event that a determination is made by the Bank that the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank with any request or directive

2

regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's capital as a consequence of its obligations to the Borrower or of the Loan to the Borrower evidenced hereby to a level reasonably believed by the Bank to be below that which the Bank could have achieved but for such adoption, change, or compliance, the Borrower promises to pay to the Bank on demand such additional amount or amounts as will compensate the Bank for such reduction, provided that such amount or amounts are then customarily or universally charged by the Bank to all similarly situated borrowers. A certificate of the Bank as to the amount required to be paid by the Borrower under this paragraph shall accompany such demand and shall be, except in the case of manifest error or in the absence of good faith, final and conclusive evidence of the amount due to be paid hereunder. The Bank shall use reasonable efforts to give the Borrower prompt notice of any such adoption, change or compliance, provided that the failure to do so shall not relieve the Borrower of any of its obligations hereunder.

5.     **Representations and Warranties.**  The Borrower hereby represents and warrants to the Bank as follows:

        (a)  The Borrower has all necessary power, authority and legal right to execute and deliver this Note and to perform all of its obligations hereunder.

        (b)  This Note has been duly executed and delivered by the Borrower and constitutes the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

        (c)  The execution and delivery by the Borrower of this Note and the performance by the Borrower of the Borrower's obligations thereunder, will not (x) violate any regulation or provision of law (whether federal, foreign, state or local) affecting the Borrower or any of the Borrower's properties or assets or (y) conflict with or result in a breach of any agreement or instrument to which the Borrower is a party or by which the Borrower's assets may be bound.

        (d)  There are no outstanding judgments or pending actions or proceedings before any court or governmental authority, bureau or agency (whether federal, foreign, state or local) with respect to or threatened against or affecting the Borrower which if adversely determined, could reasonably be expected to have a material adverse effect on the assets, properties, liabilities, financial condition, or prospects of the Borrower.

        (e)  To the best of the Borrower's knowledge, the Borrower is not in default under, or in violation of, any agreement, instrument, law, regulation, ordinance, resolution, decree, order or judgment to which the Borrower is a party or by which any of the Borrower is bound, or to which any of the Borrower's properties or assets is subject except where such violation or default could not reasonably be expected to have a material adverse effect on the financial condition, properties, assets, liabilities or prospects of the Borrower.

        (f)  All financial information heretofore furnished to the Bank by the Borrower or by the Borrower's accountants, attorneys or financial advisors on the Borrower's behalf is true, correct and complete and presents fairly the financial condition of the Borrower as of the dates thereof and for the periods covered therein, including known contingent liabilities of every kind.

        (g)  The proceeds of the Loan are to be used by the Borrower solely for the purpose of purchasing options from the Bank (individually and collectively, the "Options").

        (h)  No part of the proceeds of the Loan will be used directly or indirectly for the purpose of purchasing or carrying any margin stock as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements ("Regulation U"). Neither the making of the Loan nor

3

the use of proceeds thereof will violate or be inconsistent with Regulation U. If requested by the Bank, the Borrower will complete and sign Part I of a copy of Federal Reserve Form U-1 referred to in Regulation U and deliver such copy to the Bank.

6.      **Affirmative Covenants.** The Borrower will, unless the Bank shall otherwise consent in writing:

(a) deliver to the Bank upon its request, copies of his financial statements certified by the Borrower to be true and correct in all material respects as of the end of such calendar year;

(b) deliver to the Bank notice of any material adverse change in the financial condition, properties, assets, liabilities, business, or prospects of the Borrower together with a certificate of the Borrower containing a reasonably detailed explanation of the nature of such change within five (5) days after the Borrower becomes aware of such change;

(c) deliver to the Bank notice of any Event of Default or Default (as used herein, the term "Default" means any default hereunder that, with the passage or time or the giving of notice, or both, would constitute an Event of Default) accompanied by a statement explaining the reason for such Default or Event of Default and the Borrower's proposed course of action for dealing with such Default or Event of Default within five (5) days after the Borrower becomes aware of such Default or Event of Default;

(d) maintain adequate insurance upon all of the Borrower's properties and maintain the Borrower's properties and assets in good repair and order;

(e) duly pay and discharge all taxes or other claims which might become a lien upon any of the Borrower's property except to the extent that such items are being in good faith appropriately contested; and

(f) at the written request of the Bank, pay all withholding, stamp or issuance taxes, if any, payable by reason of the execution, delivery or issuance of this Note under any applicable ordinance or statute now existing or hereafter enacted, and the Borrower will at all times indemnify and hold harmless the Bank against any liability in respect thereof.

7.      **Negative Covenants.** Except with the consent in writing of the Bank, the Borrower will not:

(a) either (i) transfer, sell, alienate, assign or (ii) create, assume or permit to exist, any mortgage, pledge, lien or encumbrance of or upon, or security interest in (collectively, a "Lien"), on any of the Options without the prior written consent of the Bank; and

(b) sell, assign, transfer, lease or otherwise dispose of all or any substantial part of the Borrower's assets, including without limitation the Options, for less than the fair market value of the assets so sold or otherwise disposed of.

8.      **Events of Default.** The occurrence of any of the following events shall constitute an event of default (each, an "Event of Default"):

(a) failure by the Borrower to make any payment of principal, or within one (1) day after the date when due, interest or any other amount in respect of any of the Obligations; or

(b) any representation or warranty made by the Borrower to the Bank herein or in connection with the making of the loan evidenced hereby or any certificate, statement or report made in compliance with this Note, shall have been incorrect or omits any material fact; or

(c) a failure by the Borrower to observe any of the agreements of the Borrower contained in clause (b) or (c) of Paragraph 6 or Paragraph 7 of this Note; or

4

(d) failure by the Borrower to perform any other term, condition or covenant hereunder; or

(e) the Borrower shall fail to pay any principal of or premium or interest with respect to any debt in an amount exceeding U.S.$500,000 (or its equivalent in any other currency) (but excluding debt evidenced by this Note) of the Borrower when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such debt; or any such debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such debt shall be required to be made, in each case prior to the stated maturity thereof; or

(f) the Borrower or any endorser or guarantor hereof shall make an assignment for the benefit of creditors, generally admit in writing their inability to pay their debts when due, file a petition in bankruptcy, be adjudicated insolvent or bankrupt, petition or apply to any tribunal for the appointment of a receiver or any trustee for them or a substantial part of their assets, or shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar law or statute of any jurisdiction, whether now or hereafter in effect, or if there shall have been filed any such petition or application, or any such proceeding shall have been commenced against the Borrower; or the Borrower or any endorser or guarantor hereof by any act or omission shall indicate their consent to, approval of, or acquiescence in, any such petition, application or proceeding or the appointment of a receiver of or any trustee for them or all or any substantial part of any of their properties, or shall suffer any such receivership or trusteeship; or

(g) any judgment shall have been issued against the Borrower or any attachment, levy or execution shall have been made against any of the Borrower's properties for any aggregate amount in excess of U.S.$500,000 (or its equivalent in any other currency); or

(h) the Security Agreement shall have been terminated, or shall cease to be in full force and effect, or shall cease to give the Bank the rights, powers, and privileges purported to be created thereby, or the Borrower shall have failed to perform as described therein or shall have contested the validity of such Security Agreement or disputed its obligations thereunder; or

(i) the occurrence of any default under any of the security documents, to which the Borrower is a party, securing repayment of the indebtedness evidenced by this Note.

9.    Remedies.

(a) In the event of the occurrence of any Event of Default, the Bank may, but shall not be required to declare the principal of and any accrued interest in respect hereof and all Obligations hereunder to be due and payable whereupon the same shall become immediately due and payable without presentment, demand, protest or other notice of any kind (all of which are hereby waived by the Borrower); provided that upon the occurrence of any Event of Default described in subparagraph (f) of paragraph 8, such Obligations shall become immediately due and payable without presentment, demand, protest or notice of any kind.

(b) The Borrower hereby waives presentment, demand for payment, protest, notice of protest, notice of dishonor and any or all other notices or demands in connection with the delivery, acceptance, performance, default or enforcement hereof.

5

10.    **Miscellaneous.**

(a)  All agreements, representations and warranties made herein shall survive the delivery of this Note. The Borrower hereby waives any and all rights which the Borrower may have to setoff and any counterclaim of any nature or description in any litigation in any court with respect to, in connection with, or arising out of, this Note or any instrument or document delivered pursuant hereto or with respect to the validity, protection, interpretation, collection or enforcement hereof.

(b)  The Borrower shall pay the Bank's reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred in the preservation of the Bank's rights under or enforcement of this Note. The Borrower agrees to pay, indemnify and hold the Bank harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever relating to or arising from the making of the Loan hereunder or the transactions contemplated hereby other than those arising as a result of the gross negligence or willful misconduct of the Bank.

(c)  No modification or waiver of, or with respect to, any provision of this Note or consent to any departure by the Borrower from any of the terms or conditions thereof shall in any event be effective unless it shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall, of itself, entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(d)  Each and every right granted to the Bank hereunder or under any other instrument or document delivered hereunder or in connection herewith, or allowed to the Bank at law or in equity, shall be cumulative and not exclusive of any other, and may be exercised from time to time and as often as may be deemed desirable by the Bank. No failure on the part of the Bank or the holder of this Note to exercise, and no delay in exercising, any right shall operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or future exercise thereof or the exercise of any other right.

(e)  The provisions of this Note are severable, and if any clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision hereof in any jurisdiction.

(f)  All notices, requests and other communications pursuant to this Note shall be in writing, either by letter that is delivered by hand, including by overnight courier, or that is sent by certified mail, return receipt requested or telefaxed, addressed as follows: (i) if to the Borrower, to the address set forth on the signature page below, (fax number 312-542-1002); and (ii) if to the Bank:

Deutsche Bank AG London
c/o Deutsche Bank AG New York Branch
31 West 52nd Street
New York, New York  10019
Attention:  Foreign Exchange Derivatives
Tel: 212.469.4033
Facsimile: 212.469.4466

with a copy to
Deutsche Bank AG New York Branch
Legal Division
31 West 52nd Street

6

New York, New York 10019
Attention: Alex T. Alexander, Esq.
            Michelle Cenis, Esq.
            Legal Division
Tel: 212.469.7102
Facsimile: 212.469.2929

Any notice, request or communication hereunder shall be deemed to have been given five days after being deposited in the mail, postage prepaid, when delivered in the case of delivery by an overnight courier, or in the case of fax notice, when delivery to the fax number is confirmed by the sender's fax machine, addressed as aforesaid. Any party may change the person or address to which the notices are to be given hereunder, but any such notice shall be effective only when actually received by the party to whom it is addressed.

(g) The Borrower hereby irrevocably submits to the nonexclusive jurisdiction of any New York State or United States Federal Court sitting in New York City over any action or proceeding arising out of or relating to this Note and irrevocably agrees that all claims in respect of such action or proceeding in any New York State or Federal court sitting in New York City may be heard and determined in such Court. The Borrower hereby irrevocably waives, to the fullest extent possible, the defense of an inconvenient forum to the maintenance of such action or proceeding in any New York State or Federal court sitting in New York City. The Borrower hereby irrevocably appoints Mark Abramowitz, of Jenkens & Gilchrist Parker Chapin LLP, (the "Process Agent"), with an office on the date hereof at The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, as his agent to receive on his behalf, and that of his property, service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York State or Federal Court. Such service may be made by mailing or delivering a copy thereof to the Borrower in care of the Process Agent at its address above, and the Borrower hereby irrevocably authorizes and directs the Process Agent to accept such service. The parties agree that nothing in this paragraph shall affect their right to serve legal process in any other manner permitted by law or affect their right to bring any action or proceeding against the other party or their property in the courts of other jurisdictions. The Borrower agrees that a final judgment in any action or proceeding under this paragraph shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(h) The captions in this Note are for convenience of reference only and shall not define or limit the provisions hereof.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

EACH OF THE BORROWER AND THE BANK HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT OR ANY MATTER ARISING HEREUNDER OR THEREUNDER.

[Signature Page to Follow]

7

IN WITNESS WHEREOF, this Note has been executed as of the date first above written.

_____
*Signature of Borrower*

*Address of Borrower:*
    2204 N. Cleveland
    Chicago, Illinois 60614

Witness: _____
    *Signature*

    John Beary
    Name:

8

# Exhibit 8

## PROMISSORY NOTE
## OF
## KENNETH S. BRODY

US$45,712,500.00                                    Dated as of November 23, 2001

FOR VALUE RECEIVED, KENNETH S. BRODY (the "Borrower") promises to pay to the order of Deutsche Bank AG London (the "Bank") at the office of Deutsche Bank AG New York Branch located at 31 West 52nd Street, New York, New York 10019 in lawful money of the United States of America and in immediately available funds the principal amount of Forty-Five Million Seven Hundred Twelve Thousand Five Hundred Dollars and No Cents in United States Dollars (US$45,712,500.00) (the "Loan") on or before November 23, 2002 (the "Maturity Date").

The Borrower also promises to pay interest on the unpaid principal amount of the Loan prior to the Maturity Date at a per annum interest rate equal to 2.05%. Interest shall be payable on the Maturity Date. Any amount of principal, and to the extent permitted by law, interest, and other amounts payable hereunder which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall bear interest, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to 2-1/2% per annum above the Base Rate (defined below) in effect from time to time.

The obligations of the Borrower under this Note, including all principal, interest, fees and expenses (individually and collectively, the "Obligations"), are secured by (i) a security interest pursuant to that certain security agreement executed and delivered by the Borrower in favor of the Bank and dated the date hereof (as the same may be amended or modified); (ii) a security interest pursuant to any like security agreement in form and substance satisfactory to the Bank that may be so executed and delivered by the Borrower in favor of the Bank in substitution thereof (an agreement of either type is hereinafter referred to as the "Security Agreement"); (iii) such other collateral that may be pledged by the Borrower from time to time; and (iv) the assets contained in that certain account which is subject to the Securities Account Control Agreement among the Borrower, Deutsche Banc Alex. Brown Inc. (the "Securities Intermediary") and the Bank, executed and delivered the date hereof.

Notwithstanding anything implied or expressed to the contrary contained herein (except for the proviso to this sentence), before proceeding directly against the Borrower personally or resorting to any assets or collateral of the Borrower for payment of the Obligations, except as expressly provided to the contrary pursuant to clauses (i) and (ii) below, the Bank agrees that from the date of the earlier of (1) the Obligations becoming due and payable in full, or (2) the occurrence of an Event of Default under this Note or the Security Agreement, the Bank shall, for a period of not less than sixty (60) days, pursue payment of the Obligations only by either (i) exercising and exhausting available remedies against (a) the collateral described in the Security Agreement, (b) the assets contained in that certain account which is subject to the Securities Account Control Agreement among the Borrower, the Securities Intermediary and the Bank, executed and delivered the date hereof and (c) any substitute or additional collateral expressly securing the Obligations, which substitute or additional collateral was delivered to the Bank on or after the date hereof or (ii) exercising any applicable rights of set-off which may be granted to the Bank from time to time; provided however, and notwithstanding anything implied or expressed to the contrary in this Note, the Bank may proceed directly against the Borrower personally for payment of the Obligations without any prior recourse to the collateral or any prior set-off in the event, and only in the event, of (x) any fraud, material misrepresentation or willful misconduct by the Borrower relating to this Note or any other documents evidencing or securing the indebtedness described in this Note or (y) any collateral securing the obligations evidencing this Note being or becoming unavailable or insufficient to satisfy such obligations due to adverse claims of creditors, real or hypothetical, except in the case of this clause (y) to the extent, if any, that any loss suffered by the Bank is attributable to any action or inaction

by the Bank or the Securities Intermediary that impairs the priority of or invalidates the perfection of the Bank's security interest in such collateral.

1. **Interest Rates; Interest Periods; Interest Payments.** The following terms used in this promissory note (hereinafter this "Note") have the meanings set forth below:

(a) "Base Rate" shall mean a fluctuating interest rate per annum equal to the higher of (i) the rate announced by Deutsche Bank AG New York Branch from time to time as its prime lending rate for unsecured commercial loans within the United States (such rate to change when and as such prime lending rate changes), and (ii) 0.50% in excess of the rate per annum at which Deutsche Bank AG New York Branch as a Branch of a foreign bank, in its sole discretion, can acquire federal funds in the interbank overnight federal funds market including through brokers of recognized standing.

(b) "Business Day" shall mean any day excluding Saturday, Sunday and any day on which banking institutions are authorized by law or other governmental actions to close in New York, New York.

If at any time any interest rate payable hereunder shall exceed the maximum rate of interest permitted by law, the rate of interest payable hereunder shall be deemed to be the maximum rate of interest permitted by applicable law.

All interest hereunder shall be calculated based on the basis of a 360-day year for the actual number of days elapsed.

2. **Prepayment; Repayment.**

(a) The Borrower shall have the right at any time to prepay all or any portion of the Loan prior to the Maturity Date. Each prepayment shall be made together with payment of accrued interest on the amount prepaid to and including the date of prepayment.

(b) The Borrower shall repay the principal amount of the Loan, to the extent outstanding, on the Maturity Date.

3. **Payments and Payment Procedures.**

All payments by the Borrower on account of principal or interest shall be made in lawful money of the United States of America in immediately available funds. If any payment of principal or interest becomes due on a day on which commercial banks in New York, New York are required or permitted by law to remain closed, such payment may be made on the next succeeding Business Day on which such banks are open, and such extensions shall be included in computing interest in connection with such payment.

4. **Yield Protection; Indemnity.**

(a) If any principal payment hereunder is made for any reason whatsoever on a date other than the Maturity Date, the Borrower shall pay interest accrued and unpaid thereon. A certificate of the Bank as to the amount required to be paid by the Borrower under this paragraph shall be, except in the case of manifest error or in the absence of good faith, final and conclusive evidence of the amount due to be paid hereunder.

(b) In the event that a determination is made by the Bank that the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank with any request or directive

2

regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's capital as a consequence of its obligations to the Borrower or of the Loan to the Borrower evidenced hereby to a level reasonably believed by the Bank to be below that which the Bank could have achieved but for such adoption, change, or compliance, the Borrower promises to pay to the Bank on demand such additional amount or amounts as will compensate the Bank for such reduction, provided that such amount or amounts are then customarily or universally charged by the Bank to all similarly situated borrowers. A certificate of the Bank as to the amount required to be paid by the Borrower under this paragraph shall accompany such demand and shall be, except in the case of manifest error or in the absence of good faith, final and conclusive evidence of the amount due to be paid hereunder. The Bank shall use reasonable efforts to give the Borrower prompt notice of any such adoption, change or compliance, provided that the failure to do so shall not relieve the Borrower of any of its obligations hereunder.

5.    **Representations and Warranties.**  The Borrower hereby represents and warrants to the Bank as follows:

(a)   The Borrower has all necessary power, authority and legal right to execute and deliver this Note and to perform all of its obligations hereunder.

(b)   This Note has been duly executed and delivered by the Borrower and constitutes the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(c)   The execution and delivery by the Borrower of this Note and the performance by the Borrower of the Borrower's obligations thereunder, will not (x) violate any regulation or provision of law (whether federal, foreign, state or local) affecting the Borrower or any of the Borrower's properties or assets or (y) conflict with or result in a breach of any agreement or instrument to which the Borrower is a party or by which the Borrower's assets may be bound.

(d)   There are no outstanding judgments or pending actions or proceedings before any court or governmental authority, bureau or agency (whether federal, foreign, state or local) with respect to or threatened against or affecting the Borrower which if adversely determined, could reasonably be expected to have a material adverse effect on the assets, properties, liabilities, financial condition, or prospects of the Borrower.

(e)   To the best of the Borrower's knowledge, the Borrower is not in default under, or in violation of, any agreement, instrument, law, regulation, ordinance, resolution, decree, order or judgment to which the Borrower is a party or by which the Borrower is bound, or to which any of the Borrower's properties or assets is subject except where such violation or default could not reasonably be expected to have a material adverse effect on the financial condition, properties, assets, liabilities or prospects of the Borrower.

(f)   All financial information heretofore furnished to the Bank by the Borrower or by the Borrower's accountants, attorneys or financial advisors on the Borrower's behalf is true, correct and complete and presents fairly the financial condition of the Borrower as of the dates thereof and for the periods covered therein, including known contingent liabilities of every kind.

(g)   The proceeds of the Loan are to be used by the Borrower solely for the purpose of purchasing options from the Bank (individually and collectively, the "Options").

(h)   No part of the proceeds of the Loan will be used directly or indirectly for the purpose of purchasing or carrying any margin stock as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements ("Regulation U"). Neither the making of the Loan nor

3

the use of proceeds thereof will violate or be inconsistent with Regulation U. If requested by the Bank, the Borrower will complete and sign Part I of a copy of Federal Reserve Form U-1 referred to in Regulation U and deliver such copy to the Bank.

6.      **Affirmative Covenants.** The Borrower will, unless the Bank shall otherwise consent in writing:

(a) deliver to the Bank upon its request, copies of his financial statements certified by the Borrower to be true and correct in all material respects as of the end of such calendar year;

(b) deliver to the Bank notice of any material adverse change in the financial condition, properties, assets, liabilities, business, or prospects of the Borrower together with a certificate of the Borrower containing a reasonably detailed explanation of the nature of such change within five (5) days after the Borrower becomes aware of such change;

(c) deliver to the Bank notice of any Event of Default or Default (as used herein, the term "Default" means any default hereunder that, with the passage or time or the giving of notice, or both, would constitute an Event of Default) accompanied by a statement explaining the reason for such Default or Event of Default and the Borrower's proposed course of action for dealing with such Default or Event of Default within five (5) days after the Borrower becomes aware of such Default or Event of Default;

(d) maintain adequate insurance upon all of the Borrower's properties and maintain the Borrower's properties and assets in good repair and order;

(e) duly pay and discharge all taxes or other claims which might become a lien upon any of the Borrower's property except to the extent that such items are being in good faith appropriately contested; and

(f) at the written request of the Bank, pay all withholding, stamp or issuance taxes, if any, payable by reason of the execution, delivery or issuance of this Note under any applicable ordinance or statute now existing or hereafter enacted, and the Borrower will at all times indemnify and hold harmless the Bank against any liability in respect thereof.

7.      **Negative Covenants.** Except with the consent in writing of the Bank, the Borrower will not:

(a) either (i) transfer, sell, alienate, assign or (ii) create, assume or permit to exist, any mortgage, pledge, lien or encumbrance of or upon, or security interest in (collectively, a "Lien"), on any of the Options without the prior written consent of the Bank; and

(b) sell, assign, transfer, lease or otherwise dispose of all or any substantial part of the Borrower's assets, including without limitation the Options, for less than the fair market value of the assets so sold or otherwise disposed of.

8.      **Events of Default.** The occurrence of any of the following events shall constitute an event of default (each, an "Event of Default"):

(a) failure by the Borrower to make any payment of principal, or within one (1) day after the date when due, interest or any other amount in respect of any of the Obligations; or

(b) any representation or warranty made by the Borrower to the Bank herein or in connection with the making of the loan evidenced hereby or any certificate, statement or report made in compliance with this Note, shall have been incorrect or omits any material fact; or

(c) a failure by the Borrower to observe any of the agreements of the Borrower contained in clause (b) or (c) of Paragraph 6 or Paragraph 7 of this Note; or

4

(d)  failure by the Borrower to perform any other term, condition or covenant hereunder; or

(e)  the Borrower shall fail to pay any principal of or premium or interest with respect to any debt in an amount exceeding U.S.$500,000 (or its equivalent in any other currency) (but excluding debt evidenced by this Note) of the Borrower when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such debt; or any such debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such debt shall be required to be made, in each case prior to the stated maturity thereof; or

(f)  the Borrower or any endorser or guarantor hereof shall make an assignment for the benefit of creditors, generally admit in writing their inability to pay their debts when due, file a petition in bankruptcy, be adjudicated insolvent or bankrupt, petition or apply to any tribunal for the appointment of a receiver or any trustee for them or a substantial part of their assets, or shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar law or statute of any jurisdiction, whether now or hereafter in effect, or if there shall have been filed any such petition or application, or any such proceeding shall have been commenced against the Borrower; or the Borrower or any endorser or guarantor hereof by any act or omission shall indicate their consent to, approval of, or acquiescence in, any such petition, application or proceeding or the appointment of a receiver of or any trustee for them or all or any substantial part of any of their properties, or shall suffer any such receivership or trusteeship; or

(g)  any judgment shall have been issued against the Borrower or any attachment, levy or execution shall have been made against any of the Borrower's properties for any aggregate amount in excess of U.S.$500,000 (or its equivalent in any other currency); or

(h)  the Security Agreement shall have been terminated, or shall cease to be in full force and effect, or shall cease to give the Bank the rights, powers, and privileges purported to be created thereby, or the Borrower shall have failed to perform as described therein or shall have contested the validity of such Security Agreement or disputed its obligations thereunder; or

(i)  the occurrence of any default under any of the security documents, to which the Borrower is a party, securing repayment of the indebtedness evidenced by this Note.

9.  Remedies.

(a)  In the event of the occurrence of any Event of Default, the Bank may, but shall not be required to declare the principal of and any accrued interest in respect hereof and all Obligations hereunder to be due and payable whereupon the same shall become immediately due and payable without presentment, demand, protest or other notice of any kind (all of which are hereby waived by the Borrower); provided that upon the occurrence of any Event of Default described in subparagraph (f) of paragraph 8, such Obligations shall become immediately due and payable without presentment, demand, protest or notice of any kind.

(b)  The Borrower hereby waives presentment, demand for payment, protest, notice of protest, notice of dishonor and any or all other notices or demands in connection with the delivery, acceptance, performance, default or enforcement hereof.

5

10. **Miscellaneous.**

(a) All agreements, representations and warranties made herein shall survive the delivery of this Note. The Borrower hereby waives any and all rights which the Borrower may have to setoff and any counterclaim of any nature or description in any litigation in any court with respect to, in connection with, or arising out of, this Note or any instrument or document delivered pursuant hereto or with respect to the validity, protection, interpretation, collection or enforcement hereof.

(b) The Borrower shall pay the Bank's reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred in the preservation of the Bank's rights under or enforcement of this Note. The Borrower agrees to pay, indemnify and hold the Bank harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever relating to or arising from the making of the Loan hereunder or the transactions contemplated hereby other than those arising as a result of the gross negligence or willful misconduct of the Bank.

(c) No modification or waiver of, or with respect to, any provision of this Note or consent to any departure by the Borrower from any of the terms or conditions thereof shall in any event be effective unless it shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall, of itself, entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(d) Each and every right granted to the Bank hereunder or under any other instrument or document delivered hereunder or in connection herewith, or allowed to the Bank at law or in equity, shall be cumulative and not exclusive of any other, and may be exercised from time to time and as often as may be deemed desirable by the Bank. No failure on the part of the Bank or the holder of this Note to exercise, and no delay in exercising, any right shall operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or future exercise thereof or the exercise of any other right.

(e) The provisions of this Note are severable, and if any clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision hereof in any jurisdiction.

(f) All notices, requests and other communications pursuant to this Note shall be in writing, either by letter that is delivered by hand, including by overnight courier, or that is sent by certified mail, return receipt requested or telefaxed, addressed as follows: (i) if to the Borrower, to the address set forth on the signature page below, (fax number 312-542-1021); and (ii) if to the Bank:

Deutsche Bank AG London
c/o Deutsche Bank AG New York Branch
31 West 52nd Street
New York, New York 10019
Attention: Foreign Exchange Derivatives
Tel: 212.469.4033
Facsimile: 212.469.4466

with a copy to
Deutsche Bank AG New York Branch
Legal Division
31 West 52nd Street

New York, New York 10019
Attention: Alex T. Alexander, Esq.
  Michelle Cenis, Esq.
  Legal Division
Tel: 212.469.7102
Facsimile: 212.469.2929

  Any notice, request or communication hereunder shall be deemed to have been given five days after
being deposited in the mail, postage prepaid, when delivered in the case of delivery by an overnight
courier, or in the case of fax notice, when delivery to the fax number is confirmed by the sender's fax
machine, addressed as aforesaid. Any party may change the person or address to which the notices are to
be given hereunder, but any such notice shall be effective only when actually received by the party to
whom it is addressed.

  (g) The Borrower hereby irrevocably submits to the nonexclusive jurisdiction of any New York .
State or United States Federal Court sitting in New York City over any action or proceeding arising out of
or relating to this Note and irrevocably agrees that all claims in respect of such action or proceeding in
any New York State or Federal court sitting in New York City may be heard and determined in such
Court. The Borrower hereby irrevocably waives, to the fullest extent possible, the defense of an
inconvenient forum to the maintenance of such action or proceeding in any New York State or Federal
court sitting in New York City. The Borrower hereby irrevocably appoints Mark Abramowitz, of Jenkens
& Gilchrist Parker Chapin LLP, (the "Process Agent"), with an office on the date hereof at The Chrysler
Building, 405 Lexington Avenue, New York, NY 10174, as his agent to receive on his behalf, and that of
his property, service of copies of the summons and complaint and any other process which may be served
in any such action or proceeding in any such New York State or Federal Court. Such service may be
made by mailing or delivering a copy thereof to the Borrower in care of the Process Agent at its address
above, and the Borrower hereby irrevocably authorizes and directs the Process Agent to accept such
service. The parties agree that nothing in this paragraph shall affect their right to serve legal process in
any other manner permitted by law or affect their right to bring any action or proceeding against the other
party or their property in the courts of other jurisdictions. The Borrower agrees that a final judgment in
any action or proceeding under this paragraph shall be conclusive and may be enforced in other
jurisdictions by suit on the judgment or in any other manner provided by law.

  (h) The captions in this Note are for convenience of reference only and shall not define or limit
the provisions hereof.

  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH
THE LAWS OF THE STATE OF NEW YORK.

  EACH OF THE BORROWER AND THE BANK HEREBY IRREVOCABLY WAIVES ALL
RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING
OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT OR ANY
MATTER ARISING HEREUNDER OR THEREUNDER.

[Signature Page to Follow]

7

IN WITNESS WHEREOF, this Note has been executed as of the date first above written.

_____
*Signature of Borrower*

*Address of Borrower:*
    1444 W. Henderson Avenue
    Chicago, Illinois 60657

Witness:   Connie CK Choe
       *Signature*

      CONNIE CK CHOE
      **Name:**

"OFFICIAL SEAL"
CONNIE CK CHOE
Notary Public, State of Illinois
My Commission Expires May 9, 2004

8

# Exhibit 9

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Kenneth S. Brody
222 West Adams, Suite 1900
Chicago,Il 60606

**Government Bond Option Transaction -- Our Transaction No. [ 118242a ]**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Kenneth S. Brody ("Party B"; "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1. **General Terms:**

| | |
|---|---|
| Trade Date: | 20 November 2001 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |

| | |
|---|---|
| Buyer: | Party B |
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 11,824,738.00 of nominal amount of the Bonds per Option. |
| Strike Price (K): | 102.85 |
| Knock-out Barrier | |
| (KNO$_{barrier}$): | 100.72 |
| Cap: | 98.45 |
| Reset Strike Price (R$_{strike}$): | 100.77 |
| Reset Factor (R$_{factor}$): | -0.00817400 |
| FX Factor : | .8800 |
| BX$_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{barrier}$: | Means the 15:30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{bonus}$: | Means the 15:30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| Premium: | 11,373,615.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2. **Procedure for Exercise:**

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| Written Confirmation of Exercise: | Inapplicable |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |
| Seller Contact Details for | Deutsche Bank AG, London |

Purpose of Giving Notice:

3.  **Settlement Terms:**

| | |
|---|---|
| Settlement: | Cash |
| Settlement Date: | The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date. |
| Business Day Convention for Settlement Date: | Modified Following |
| Split Ticket Delivery: | Inapplicable |
| Clearance System: | Inapplicable |
| Valuation Time: | Inapplicable |
| Cash Settlement Amount: | For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following: |

(a) Cash Settlement Amount. "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of K and the Cap shall be as follows:

$$K = K - R_{factor} \times Max \, (0, BX_{reset} - R_{strike})$$

$$Cap = Cap + R_{factor} \times Max \, (0, BX_{reset} - R_{strike})$$

1. If $BX_{barrier}$ is below the $KNO_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2. If $BX_{barrier}$ is at or above the $KNO_{barrier}$ and $BX_{bonus}$ is at or above the $KNO_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:
Notional x $FX_{factor}$ x max (0, K -- max ($BX_{bonus}$, Cap )) x 100.05%

3. If $BX_{barrier}$ is at or above the $KNO_{barrier}$ and $BX_{bonus}$ is below the $KNO_{barrier}$, then the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:
Notional x $FX_{factor}$ x max (0, K -- max ($BX_{bonus}$, Cap )) x 100.00%.

4.  **Account Details:**

| | |
|---|---|
| Account(s) for payments and/or deliveries to Seller: | To be advised |
| Account(s) for payments and/or deliveries to Buyer: | To be advised |

5.  **Offices:**

(a)   The Office of Party A for the Government Bond Option is London.

(b) .   The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

6. **Broker/Arranger:Inapplicable**

7. **Other Terms:**
1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

**8. Representations:**
Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK A.G. LONDON

By:
Name:
Title:

By:
Name:
Title:

Confirmed as of the date first above written:
Kenneth S. Brody

By:
Name:
Title:

# Exhibit 10

KNOCK-IN PUT OPTION

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Kenneth S. Brody
222 West Adams, Suite 1900
Chicago,Il 60606

*Acct # : 222 13975 12*

*ADP # 8159410*

*TRAILER : See DB Confirm 118242*

Government Bond Option Transaction -- Our Transaction No. [ 118242b]

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Kenneth S. Brody ("Party B", "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1.   **General Terms:**

Trade Date:                20 November 2001
Option Style:              European

KNOCK-IN PUT OPTION

| | |
|---|---|
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 11,824,738.00 of nominal amount of the Bonds per Option |
| Strike Price (K): | 102.85 |
| Knock-in Barrier ($KNI_{barrier}$): | 100.72 |
| Cap: | 98.45 |
| Reset Strike Price ($R_{strike}$): | 100.77 |
| Reset Factor ($R_{factor}$): | -0.00817400 |
| FX Factor : | .8800 |
| $BX_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{barrier}$: | Means the 15.30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{bonus}$: | Means the 15.30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| Premium: | 11,396,385.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2.    **Procedure for Exercise:**

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| Written Confirmation of Exercise: | Inapplicable |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |

**KNOCK-IN PUT OPTION**

| | |
|---|---|
| Seller Contact Details for Purpose of Giving Notice: | Deutsche Bank AG, London |

**3.  Settlement Terms:**

| | |
|---|---|
| Settlement: | Cash |
| Settlement Date: | The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date. |
| Business Day Convention for Settlement Date: | Modified Following |
| Split Ticket Delivery: | Inapplicable |
| Clearance System: | Inapplicable |
| Valuation Time: | Inapplicable |
| Cash Settlement Amount: | For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following: |

a) Cash Settlement Amount. "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of K and the **Cap** shall be as follows:

$$K = K - R_{factor} \times Max\,(0, BX_{reset} - R_{strike}\,)$$

$$Cap = Cap + R_{factor} \times Max\,(0, BX_{reset} - R_{strike}\,)$$

1.  If $BX_{barrier}$ is at or above the $KNI_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2.  If $BX_{barrier}$ is below the $KNI_{barrier}$ and $BX_{bonus}$ is below the $KNI_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:
    Notional x $FX_{factor}$ x max (0, K – max ($BX_{bonus}$, Cap )) x 100.05%

3.  If $BX_{barrier}$ is below the $KNI_{barrier}$ and $BX_{bonus}$ is at or above the $KNI_{barrier}$, then the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:
    Notional x $FX_{factor}$ x max (0, K – max ($BX_{bonus}$, Cap )) x 100.00%.

**4.  Account Details:**

| | |
|---|---|
| Account(s) for payments and/or deliveries to Seller: | To be advised |
| Account(s) for payments and/or deliveries to Buyer: | To be advised |

**5.  Offices:**

(a)  The Office of Party A for the Government Bond Option is London

KNOCK-IN PUT OPTION

(b)     The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

6.      **Broker/Arranger:** Inapplicable

7.      **Other Terms:**

1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

8. **Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK AG, LONDON

By:
Name:
Title:

By: _____
        Name:
        Title:

Confirmed as of the date first above written:
Kenneth S. Brody

By:
Name:
Title:

# Exhibit 11

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Kenneth S. Brody
222 West Adams, Suite 1900
Chicago,Il 60606

**Government Bond Option Transaction – Our Transaction No. | 118242c ]**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch (**"Party A"**, **"we"**, **"us"**, **"our"**) and Kenneth S. Brody (**"Party B"**, **"you"**, **"your"**) on the Trade Date specified below (the "Transaction")

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of, an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1. **General Terms:**

| | |
|---|---|
| Trade Date: | 20 November 2001 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |

| | |
|---|---|
| Buyer: | Party B |
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 11,824,738.00 of nominal amount of the Bonds per Option. |
| Strike Price (K): | 98.45 |

| | |
|---|---|
| Knock-out Barrier (KNO$_{barrier}$): | 100.72 |
| Cap: | 102.85 |
| Reset Strike Price (R$_{strike}$): | 100.77 |
| Reset Factor (R$_{factor}$): | 0.00817400 |
| FX Factor : | .8800 |
| BX$_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{barrier}$: | Means the 15:30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{bonus}$: | Means the 15:30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |

| | |
|---|---|
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |

| | |
|---|---|
| Premium: | 11,626,615.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2.    Procedure for Exercise:

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |

| | |
|---|---|
| Written Confirmation of Exercise: | Inapplicable |

| | |
|---|---|
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |
| Seller Contact Details for | Deutsche Bank AG, London |

Purpose of Giving Notice:

3.  Settlement Terms:

Settlement:                          Cash

Settlement Date:                     The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date.

Business Day Convention for          Modified Following
Settlement Date:

Split Ticket Delivery:               Inapplicable

Clearance System:                    Inapplicable

Valuation Time:                      Inapplicable

Cash Settlement Amount:              For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following:

(a) Cash Settlement Amount. "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of K and the Cap shall be as follows:

$K = K - R_{factor} \times Max\ (0, BX_{reset} - R_{strike})$

$Cap = Cap + R_{factor} \times Max\ (0, BX_{reset} - R_{strike})$

1. If $BX_{barrier}$ is at or above the $KNO_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2. If $BX_{barrier}$ is below $KNO_{barrier}$ and $BX_{bonus}$ is below $KNO_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

Notional x $FX_{factor}$ x max $(0, min\ (BX_{bonus}, Cap) - K)$ x 100.05%

3. If $BX_{barrier}$ is below $KNO_{barrier}$ and $BX_{bonus}$ is at or above $KNO_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

Notional x $FX_{factor}$ x max $(0, min\ (BX_{bonus}, Cap) - K)$ x 100.00%.

4.  Account Details:

Account(s) for payments              To be advised
and/or deliveries to Seller:

Account(s) for payments              To be advised
and/or deliveries to Buyer:

5.  Offices:

(a)    The Office of Party A for the Government Bond Option is London

(b)     The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

6.     Broker/Arranger: Inapplicable

7.     Other Terms:

1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

8. Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)     **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)     **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK AG, LONDON

By:                                         By: _____
Name:                                          Name:
Title:                                          Title:

Confirmed as of the date first above written:
Kenneth S. Brody

By: _____
Name:
Title:

# Exhibit 12

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Kenneth S. Brody
222 West Adams, Suite 1900
Chicago, Il 60606

**Government Bond Option Transaction -- Our Transaction No. [118242d  ]**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Kenneth S. Brody("Party B", "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of, to an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1.   **General Terms:**

| | |
|---|---|
| Trade Date: | 20 November 2001 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |
| Buyer: | Party B |

| | |
|---|---|
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 11,824,738.00 of nominal amount of the Bonds per Option. |
| Strike Price (K): | 98.45 |
| Knock-in Barrier (KNI$_{barrier}$): | 100.72 |
| Cap: | 102.85 |
| Reset Strike Price (R$_{strike}$): | 100.77 |
| Reset Factor (R$_{factor}$): | 0.00817400 |
| FX Factor : | .8800 |
| BX$_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{barrier}$: | Means the 15:30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{bonus}$: | Means the 15:30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| Premium: | 11,603,385.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2. **Procedure for Exercise:**

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| Written Confirmation of Exercise: | Inapplicable |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |
| Seller Contact Details for Purpose of Giving Notice: | Deutsche Bank AG, London |

3.  **Settlement Terms:**

| | |
|---|---|
| Settlement: | Cash |
| Settlement Date: | The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date. |
| Business Day Convention for Settlement Date: | Modified Following |
| Split Ticket Delivery: | Inapplicable |
| Clearance System: | Inapplicable |
| Valuation Time: | Inapplicable |
| Cash Settlement Amount: | For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following: |

(a) **Cash Settlement Amount.** "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of K and the Cap shall be as follows:

$$K = K - R_{factor} \times Max (0, BX_{reset} - R_{strike})$$

$$Cap = Cap + R_{factor} \times Max (0, BX_{reset} - R_{strike})$$

1.  If $BX_{barrier}$ is below the $KNI_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2.  If $BX_{barrier}$ is at or above $KNI_{barrier}$ and $BX_{bonus}$ is at or above $KNI_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

$$Notional \times FX_{factor} \times max (0, min (BX_{bonus}, Cap) - K) \times 100.05\%$$

3.  If $BX_{barrier}$ is at or above $KNI_{barrier}$ and $BX_{bonus}$ is below $KNI_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

$$Notional \times FX_{factor} \times max (0, min (BX_{bonus}, Cap) - K) \times 100.00\%.$$

4.  **Account Details:**

| | |
|---|---|
| Account(s) for payments and/or deliveries to Seller: | To be advised |
| Account(s) for payments and/or deliveries to Buyer: | To be advised |

5.  **Offices:**

(a)  The Office of Party A for the Government Bond Option is London.

(b)  The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

6. **Broker/Arranger:** Inapplicable

7. **Other Terms:**

1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

8. **Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**DEUTSCHE BANK AG, LONDON**

By: _____          By: _____
Name:                                        Name:
Title:                                       Title:


Confirmed as of the date first above written:
Robert J. Platt

By: _____
Name:
Title:

# Exhibit 13

KNOCK-OUT PUT OPTION

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Donald R. Wilson Jr.
222 West Adams, Suite 1900
Chicago,Il 60606

*Acct # 222 13134 10*

*AOP #: 8159410*

*TRAILER: See DB Confirm 118254*

Government Bond Option Transaction -- Our Transaction No. [ J18254a ]

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Donald R. Wilson Jr. ("Party B"; "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1.    **General Terms:**

| | |
|---|---|
| Trade Date: | 20 November 2001 |
| Option Style: | European |
| Option Type: | Put |
| Seller: | Party A |

KNOCK-OUT PUT OPTION

| | |
|---|---|
| Buyer: | Party B |
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 35,474,214.00 of nominal amount of the Bonds per Option. |
| Strike Price (K): | 102.85 |
| Knock-out Barrier (KNO$_{barrier}$): | 100.72 |
| Cap: | 98.45 |
| Reset Strike Price (R$_{strike}$): | 100.77 |
| Reset Factor (R$_{factor}$): | -0.00817400 |
| FX Factor : | .8800 |
| BX$_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{barrier}$: | Means the 15:30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| BX$_{bonus}$: | Means the 15:30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| Premium: | 34,120,845.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2.    Procedure for Exercise:

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| Written Confirmation of Exercise: | Inapplicable |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |
| Seller Contact Details for | Deutsche Bank AG. London |

KNOCK-OUT PUT OPTION

Purpose of Giving Notice:

3. **Settlement Terms:**

| | |
|---|---|
| Settlement: | Cash |
| Settlement Date: | The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date. |
| Business Day Convention for Settlement Date: | Modified Following |
| Split Ticket Delivery: | Inapplicable |
| Clearance System: | Inapplicable |
| Valuation Time: | Inapplicable |
| Cash Settlement Amount: | For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following: |

(a) Cash Settlement Amount. "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of K and the Cap shall be as follows:

$K = K - R_{factor} \times Max\ (0,\ BX_{reset} - R_{strike}\ )$

$Cap = Cap + R_{factor} \times Max\ (0,\ BX_{reset} - R_{strike}\ )$

1. If $BX_{barrier}$ is below the $KNO_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2. If $BX_{barrier}$ is at or above the $KNO_{barrier}$ and $BX_{bonus}$ is at or above the $KNO_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:
   Notional x $FX_{factor}$ x max (0, K – max ($BX_{bonus}$, Cap )) x 100.05%

3. If $BX_{barrier}$ is at or above the $KNO_{barrier}$ and $BX_{bonus}$ is below the $KNO_{barrier}$, then the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:
   Notional x $FX_{factor}$, x max (0, K – max ($BX_{bonus}$, Cap )) x 100.00%.

4. **Account Details:**

| | |
|---|---|
| Account(s) for payments and/or deliveries to Seller: | To be advised |
| Account(s) for payments and/or deliveries to Buyer: | To be advised |

5. **Offices:**

   (a)   The Office of Party A for the Government Bond Option is London.

   (b)   The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

**KNOCK-OUT PUT OPTION**

6.    **Broker/Arranger:Inapplicable**

7.    **Other Terms:**

1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

8. **Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**DEUTSCHE BANK AG, LONDON**

By:                                                    By: _____
Name:                                                       Name:
Title:                                                       Title:

Confirmed as of the date first above written:
Donald R. Wilson Jr.

By: _____
Name:
Title:

# Exhibit 14

KNOCK-IN PUT OPTION

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Donald R. Wilson Jr.
222 West Adams, Suite 1900
Chicago,Il 60606

**Government Bond Option Transaction – Our Transaction No. [ 118254b]**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Donald R. Wilson Jr. ("Party B", "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form) with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1.  **General Terms:**

    Trade Date:                20 November 2001
    Option Style:              European

## KNOCK-IN PUT OPTION

| | |
|---|---|
| Option Type: | Put |
| Seller: | Party A |
| Buyer: | Party B |
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 35,474,214.00 of nominal amount of the Bonds per Option |
| Strike Price (K): | 102.85 |
| Knock-in Barrier ($KNI_{barrier}$): | 100.72 |
| Cap: | 98.45 |
| Reset Strike Price ($R_{strike}$): | 100.77 |
| Reset Factor ($R_{factor}$): | -0.00817400 |
| FX Factor : | .8800 |
| $BX_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{barrier}$: | Means the 15.30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{bonus}$: | Means the 15.30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| Premium: | 34,189,155.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

## 2. Procedure for Exercise:

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| Written Confirmation of Exercise: | Inapplicable |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |

KNOCK-IN PUT OPTION

Seller Contact Details for
Purpose of Giving Notice:                    Deutsche Bank AG, London

3.   **Settlement Terms:**

Settlement:                                  Cash

Settlement Date:                             The second Business Day in Frankfurt and New York after the relevant Exercise
                                             Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's
                                             period within which to remedy an Event of Default of Party B shall extend no
                                             later than 9:00 a.m. (Frankfurt time) on the settlement date.

Business Day Convention for                  Modified Following
Settlement Date:

Split Ticket Delivery:                       Inapplicable

Clearance System:                            Inapplicable

Valuation Time:                              Inapplicable

Cash Settlement Amount:                      For the purposes of this Government Bond Option Transaction only, Section
                                             7.2(a) of the Definitions shall be deemed to be deleted and replaced by the
                                             following:

                                             a) **Cash Settlement Amount.** "Cash Settlement Amount" means an amount in
                                             USD equal to the following Settlement Formula calculated by the Calculation
                                             Agent and determined as set out in paragraphs 1 to 3 below, provided that if
                                             $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event")
                                             the definitions of **K** and the **Cap** shall be as follows:

                                             $K = K - R_{factor} \times Max\ (0, BX_{reset} - R_{strike}\ )$

                                             $Cap = Cap + R_{factor} \times Max\ (0, BX_{reset} - R_{strike}\ )$

                                             1.  If $BX_{barrier}$ is at or above the $KNI_{barrier}$, the Expiration Date shall be the
                                                 Barrier Observation Date and the Settlement Formula shall be zero.

                                             2.  If $BX_{barrier}$ is below the $KNI_{barrier}$ and $BX_{bonus}$ is below the $KNI_{barrier}$, the
                                                 Expiration Date shall be the Bonus Observation Date and the Settlement
                                                 Formula shall be:
                                                 Notional x $FX_{factor}$ x max (0, K – max ($BX_{bonus}$, Cap )) x 100.05%

                                             3.  If $BX_{barrier}$ is below the $KNI_{barrier}$ and $BX_{bonus}$ is at or above the $KNI_{barrier}$,
                                                 then the Expiration Date shall be the Bonus Observation Date and the
                                                 Settlement Formula shall be:
                                                 Notional x $FX_{factor}$ x máx (0, K – max ($BX_{bonus}$, Cap )) x 100.00%.

4.   **Account Details:**

Account(s) for payments                      To be advised
and/or deliveries to Seller:

Account(s) for payments                      To be advised
and/or deliveries to Buyer:

5.   **Offices:**

     (a)     The Office of Party A for the Government Bond Option is London

**KNOCK-IN PUT OPTION**

    (b)     The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

6.    **Broker/Arranger:Inapplicable**

7.    **Other Terms:**
1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

8. **Representations:**
Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK AG, LONDON

By: _____
Name:
Title:

By: _____
    Name:
    Title:

Confirmed as of the date first above written:
Donald R. Wilson Jr.

By: _____
Name:
Title:

# Exhibit 15

KNOCK-OUT CALL OPTION

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Donald R. Wilson Jr.
222 West Adams, Suite 1900
Chicago,Il 60606

**Government Bond Option Transaction -- Our Transaction No. | 118254c |**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Donald R. Wilson Jr. ("Party B", "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of, an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1. **General Terms:**

| | |
|---|---|
| Trade Date: | 20 November 2001 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |

KNOCK-OUT CALL OPTION

| | |
|---|---|
| Buyer: | Party B |
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 35,474,214.00 of nominal amount of the Bonds per Option. |
| Strike Price (K): | 98.45 |
| | |
| Knock-out Barrier | |
| $(KNO_{barrier})$: | 100.72 |
| Cap: | 102.85 |
| Reset Strike Price $(R_{strike})$: | 100.77 |
| Reset Factor $(R_{factor})$: | 0.00817400 |
| FX Factor : | .8800 |
| $BX_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{barrier}$: | Means the 15:30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{bonus}$: | Means the 15:30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| | |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| | |
| Premium: | 34,879,845.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2.    Procedure for Exercise:

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| | |
| Written Confirmation of Exercise: | Inapplicable |
| | |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |
| Seller Contact Details for | Deutsche Bank AG, London |

KNOCK-OUT CALL OPTION

Purpose of Giving Notice:

3. **Settlement Terms:**

| | |
|---|---|
| Settlement: | Cash |
| Settlement Date: | The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date. |
| Business Day Convention for Settlement Date: | Modified Following |
| Split Ticket Delivery: | Inapplicable |
| Clearance System: | Inapplicable |
| Valuation Time: | Inapplicable |
| Cash Settlement Amount: | For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following: |

(a) Cash Settlement Amount. "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of $K$ and the **Cap** shall be as follows:

$$K = K - R_{factor} \times Max\ (0, BX_{reset} - R_{strike})$$

$$Cap = Cap + R_{factor} \times Max\ (0, BX_{reset} - R_{strike})$$

1. If $BX_{barrier}$ is at or above the $KNO_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2. If $BX_{barrier}$ is below $KNO_{barrier}$ and $BX_{bonus}$ is below $KNO_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

Notional x $FX_{factor}$ x max $(0, min\ (BX_{bonus}, Cap) - K)$ x 100.05%

3. If $BX_{barrier}$ is below $KNO_{barrier}$ and $BX_{bonus}$ is at or above $KNO_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

Notional x $FX_{factor}$ x max $(0, min\ (BX_{bonus}, Cap) - K)$ x 100.00%.

4. **Account Details:**

| | |
|---|---|
| Account(s) for payments and/or deliveries to Seller: | To be advised |
| Account(s) for payments and/or deliveries to Buyer: | To be advised |

5. **Offices:**

(a)  The Office of Party A for the Government Bond Option is London

KNOCK-OUT CALL OPTION

    (b)    The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

**6.    Broker/Arranger:** Inapplicable

**7.    Other Terms:**
1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

**8. Representations:**
Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK AG, LONDON

By:

Name:

Title:

By: _____

    Name:

    Title:

Confirmed as of the date first above written:
Donald R. Wilson Jr.

By: _____

Name:

Title:

# Exhibit 16

KNOCK-IN CALL OPTION

# Deutsche Bank AG London



Deutsche Bank Alex Brown as Nominee for
Donald R. Wilson Jr.
222 West Adams, Suite 1900
Chicago,Il 60606

**Government Bond Option Transaction -- Our Transaction No. |]18254d  ]**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between Deutsche Bank AG acting through its London Branch ("Party A", "we", "us", "our") and Donald R. Wilson Jr.("Party B", "you", "your") on the Trade Date specified below (the "Transaction").

The definitions and provisions contained in the 1997 ISDA Government Bond Option Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

This Confirmation evidences a complete and binding agreement between you and us as to the terms of the transaction to which this Confirmation relates. In addition you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by you and us of such an agreement this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation except as expressly modified below. Until you and we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") and confirming transactions (each a "Transaction") entered into between you and us (notwithstanding anything to the contrary in a Confirmation) shall supplement and form part of, to an agreement in the form of the ISDA Form as if you and we had executed an agreement on the Trade Date of the first such transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, and (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements". In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purposes of this Transaction.

The terms of the Option Transaction to which this Confirmation relates are as follows:

1.　　**General Terms:**

| | |
|---|---|
| Trade Date: | 20 November 2001 |
| Option Style: | European |
| Option Type: | Call |
| Seller: | Party A |
| Buyer: | Party B |

KNOCK-IN CALL OPTION

| | |
|---|---|
| Bonds: | 2 year German Government Bond – BKO 3.75% 12 Sept 03 |
| Number of Options: | One |
| Option Entitlement: | 35,474,214.00 of nominal amount of the Bonds per Option. |
| Strike Price (K): | 98.45 |
| Knock-in Barrier $(KNI_{barrier})$: | 100.72 |
| Cap: | 102.85 |
| Reset Strike Price $(R_{strike})$: | 100.77 |
| Reset Factor $(R_{factor})$: | 0.00817400 |
| FX Factor : | .8800 |
| $BX_{reset}$: | Means the 15.30 Frankfurt Market Fixing on the Reset Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{barrier}$: | Means the 15:30 Frankfurt Market Fixing on the Barrier Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| $BX_{bonus}$: | Means the 15:30 Frankfurt Market Fixing on the Bonus Observation Date that the Calculation Agent, acting in good faith, deems to be acceptable. |
| Reset Observation Date: | 4 December 2001 |
| Barrier Observation Date: | 13 December 2001 |
| Bonus Observation Date: | 19 December 2001 |
| Premium: | 34,810,155.00 |
| Premium Payment Date: | 23 November 2001 |
| Business Day Convention for Premium Payment Date: | Modified Following |
| Business Days: | Frankfurt and New York |
| Seller Business Day: | Frankfurt and New York |
| Exchange: | The Stock Exchange where the Bond is traded. |
| Calculation Agent: | Party A |

2.  **Procedure for Exercise:**

| | |
|---|---|
| Expiration Date: | As per settlement terms |
| Expiration Time: | 15:30 Frankfurt Time |
| Partial Exercise: | Inapplicable |
| Multiple Exercise: | Inapplicable |
| Written Confirmation of Exercise: | Inapplicable |
| Limited Right to Confirm Exercise: | Inapplicable |
| Automatic Exercise: | Applicable |
| Buyer Contact Details for Purpose of Giving Notice: | To be advised |
| Seller Contact Details for Purpose of Giving Notice: | Deutsche Bank AG, London |

KNOCK-IN CALL OPTION

3. **Settlement Terms:**

| | |
|---|---|
| Settlement: | Cash |
| Settlement Date: | The second Business Day in Frankfurt and New York after the relevant Exercise Date; provided that, for purposes of Section 5(a) of the ISDA Form, Party B's period within which to remedy an Event of Default of Party B shall extend no later than 9:00 a.m. (Frankfurt time) on the settlement date. |
| Business Day Convention for Settlement Date: | Modified Following |
| Split Ticket Delivery: | Inapplicable |
| Clearance System: | Inapplicable |
| Valuation Time: | Inapplicable |
| Cash Settlement Amount: | For the purposes of this Government Bond Option Transaction only, Section 7.2(a) of the Definitions shall be deemed to be deleted and replaced by the following: |

(a) **Cash Settlement Amount.** "Cash Settlement Amount" means an amount in USD equal to the following Settlement Formula calculated by the Calculation Agent and determined as set out in paragraphs 1 to 3 below, provided that if $BX_{reset}$ is higher than the $R_{strike}$ on the Reset Observation Date (a "Reset Event") the definitions of **K** and the **Cap** shall be as follows:

$$K = K - R_{factor} \times Max\ (0,\ BX_{reset} - R_{strike}\ )$$

$$Cap = Cap + R_{factor} \times Max\ (0,\ BX_{reset} - R_{strike}\ )$$

1. If $BX_{barrier}$ is below the $KNI_{barrier}$, the Expiration Date shall be the Barrier Observation Date and the Settlement Formula shall be zero.

2. If $BX_{barrier}$ is at or above $KNI_{barrier}$ and $BX_{bonus}$ is at or above $KNI_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

$$Notional \times FX_{factor} \times max\ (0,\ min\ (BX_{bonus},\ Cap\ ) - K\ ) \times 100.05\%$$

3. If $BX_{barrier}$ is at or above $KNI_{barrier}$ and $BX_{bonus}$ is below $KNI_{barrier}$, the Expiration Date shall be the Bonus Observation Date and the Settlement Formula shall be:

$$Notional \times FX_{factor} \times max\ (0,\ min\ (BX_{bonus},\ Cap\ ) - K\ ) \times 100.00\%.$$

4. **Account Details:**

| | |
|---|---|
| Account(s) for payments and/or deliveries to Seller: | To be advised |
| Account(s) for payments and/or deliveries to Buyer: | To be advised |

5. **Offices:**

(a) The Office of Party A for the Government Bond Option is London.

(b) The Office of Party B for this Transaction is as noted on the Deutsche Banc Alex Brown New Account Form for Party B.

KNOCK-IN CALL OPTION

6.  Broker/Arranger:Inapplicable

7.  Other Terms:
1. Upon the occurrence of a Reset Event, the Calculation Agent shall notify Party B orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of a Reset Event and provide details of the occurrence of such Reset Event. A failure to give such notice shall not however prejudice the occurrence of a Reset Event. In determining whether a Reset Event has occurred, a particular Spot Price shall be disregarded if the Calculation Agent, acting in good faith, considers that it would not be commercially reasonable to take account of it.

8. Representations:
Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)   Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)  Assessment and Understanding. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) Status of Parties. The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of your and our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
DEUTSCHE BANK AG/ LONDON

By:
Name:
Title:

By:
Name:
Title:

Confirmed as of the date first above written:
Donald K. Wilson Jr.

By:
Name:
Title:

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAREN M. KEETER, et al.,

                         Plaintiffs,

      v.                                 1:04-cv-3759-WSD

KPMG LLP, et al.,

                         Defendants.

## ORDER

This matter is before the Court on Plaintiffs' Motion to Remand [34].

**I.    BACKGROUND**

On October 11, 2004, Plaintiffs[1] filed their Complaint in the Superior Court of Fulton County, Georgia. Plaintiffs allege Defendants fraudulently counseled Plaintiffs to implement an investment strategy known as "Bond Linked Issue Premium Structure" ("BLIPS"). Plaintiffs claim they were told BLIPS would yield a reasonable profit and otherwise minimize Plaintiffs' tax liability. Plaintiffs further allege that BLIPS, in reality, was unlawful, alleging further that it involved abusive tax shelters. Plaintiffs' Complaint asserts nine claims against Defendants: (1) civil

---

[1] Plaintiffs comprise three groups: (1) five limited-liability companies; (2) five members of the Keeter family who are the sole members of the five limited-liability companies; and (3) four related members of the Keeter family.

conspiracy and facilitation of fraud; (2) fraud; (3) breach of fiduciary duty; (4)
negligent misrepresentation; (5) negligence and gross negligence against various
Defendants; (6) negligence and gross negligence against other Defendants; (7)
unfair and deceptive practices; (8) punitive damages; and (9) expenses of litigation
and attorney's fees. (See Compl., attached as Ex. A to Notice of Removal [1].)

On December 23, 2004, Defendants removed this action to this Court,
pursuant to 9 U.S.C. § 205 and 28 U.S.C. § 1441. (See Notice of Removal [1].)
On February 14, 2005, Plaintiffs moved to remand this case to the Superior Court
of Fulton County, Georgia, principally on the grounds the removal was not
authorized by 9 U.S.C. § 205.

On May 4, 2005, the Court conducted a hearing (the "Hearing") on various
motions pending before the Court, including Plaintiffs' motion to remand. Having
considered the parties' pleadings, and the evidence and argument presented by
counsel at the Hearing, the Court finds that Defendants' removal to this Court was
proper.

## II.   DISCUSSION

The Convention on the Recognition and Enforcement of Foreign Arbitral

Awards (the "Convention") provides:

> Where the subject matter of an action or proceeding
> pending in a State court relates to an arbitration agreement
> or award falling under the Convention, the defendant or
> the defendants may, at any time before the trial thereof,
> remove such action or proceeding to the district court of
> the United States for the district and division embracing
> the place where the action or proceeding is pending.

9 U.S.C. § 205.  Plaintiffs concede (for the purposes of remand) their claims

"relate to" an arbitration agreement between Plaintiffs and Deutsche Bank

Securities, Inc. ("DBSI").  (See Pls.' Reply Br. in Supp. of Mot. to Remand [70] at

2.)  The issue before the Court on Plaintiffs' Motion to Remand is whether the

parties' arbitration agreement "fall[s] under the Convention."

An arbitration agreement arising out of a legal relationship between two

citizens of the United States does not fall under the Convention unless the

relationship (1) involves property located abroad; (2) envisions performance or

enforcement abroad; or (3) has some other reasonable relation with one or more

foreign states.  9 U.S.C. § 202; see also Freudensprung v. Offshore Technical

Servs., Inc., 379 F.3d 327, 340 (5th Cir. 2004); Hansen v. KPMG, LLP, No. 04-

-3-

10525, slip op. at 4 (C.D. Cal. March 29, 2005); <u>Reddam v. KPMG, LLP</u>, No. 04-1227, slip op. at 4 (C.D. Cal. Dec. 14, 2004).

Here, the evidence indicates the relationship between the parties both envisioned performance abroad and involved property located abroad. For example, the Credit Agreement between the parties demonstrates Deutsche Bank AG, Cayman Islands Branch, a foreign bank, made $501,300,000.00 available to Plaintiffs to fund the BLIPS strategy. (<u>See</u> Oct. 12, 1999 Credit Agreement ("Credit Agreement"), attached as Ex. A to Deutsche Bank's Opp'n to Pls.' Mot. to Remand [50].)[2] Plaintiffs also allege the BLIPS strategy involved Plaintiffs' purchase of large amounts of foreign currency (Euros). (<u>See</u> Am. Compl. ¶¶ 55, 132.) Finally, Plaintiff Daren M. Keeter signed and notarized a letter, stating: "The Borrower (Plaintiff) intends (i) to borrow funds from Deutsche Bank AG, Cayman Islands Branch and (ii) to execute transactions with or through [the Cayman

---

[2] The Credit Agreement itself was between Plaintiffs and Deutsche Bank AG, Cayman Islands Branch. (<u>See</u> Credit Agreement at cover sheet and 1.) Section 2.01(b) prescribed the letter to be used by Plaintiffs to request the Cayman Islands Branch to make available the amount that was the subject to the Credit Agreement. That letter, set out in Exhibit B to the Credit Agreement, required Plaintiffs James P. Keeter, Bradley A. Keeter, Daren M. Keeter and Steven J. Keeter, individually and in their representative capacities, to request the Cayman Islands Branch of Deutsche Bank to make the funds available.

Branch] involving the Growth Strategies (all of the foregoing, the "Transactions")."

(See Sept. 23, 1999 Letter, attached as Ex. B to Notice of Removal.) This

evidence, along with other evidence presented in the parties' pleadings and at the

Hearing, demonstrates the relationship between the parties envisioned performance

abroad and involved property located abroad. Accordingly, the arbitration

agreement falls under the Convention and Defendants properly removed the case to

this Court pursuant to 9 U.S.C. § 205. See Hansen, No. 04-10525, slip op. at 4

(denying motion to remand because the arbitration agreement fell under the

Convention; "the commercial relationship envisioned performance abroad: the

implementation of a transaction involving millions of dollars in loans from a foreign

bank."); Reddam, No. 04-1227, slip op. at 4 (same).

## III.  CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Remand [34] is

**DENIED**.

**SO ORDERED**, this 16th day of May, 2005.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

-6-

## C. Melissa Ewing

| | |
|---|---|
| **From:** | ganddb_efile_notice@gand.uscourts.gov |
| **Sent:** | Tuesday, May 17, 2005 8:40 AM |
| **To:** | ganddb_efile_nef@gand.uscourts.gov |
| **Subject:** | Activity in Case 1:04-cv-03759-WSD Keeter et al v. KPMG, LLC et al "Order on Motion to Remand to State Court" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Northern District of Georgia

Notice of Electronic Filing

The following transaction was received from jdb entered on 5/17/2005 at 8:39 AM EDT and filed on 5/16/2005

**Case Name:**      Keeter et al v. KPMG, LLC et al
**Case Number:**      1:04-cv-3759
**Filer:**
**Document Number:** 97

**Docket Text:**
ORDER denying [34] Motion to Remand to State Court . Signed by Judge William S. Duffey Jr. on 5/16/05. (jdb)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060868753 [Date=5/17/2005] [FileNumber=693414-0]
[3a6adf8ff8790fc1b27d5ce4823780c2ea80911aa979c1cbc6752568e77d572a9534
9c5ae314509838170647bd178c69da1656be4854c2d01746ff6bf5b61bf5]]

**1:04-cv-3759 Notice will be electronically mailed to:**

Jonathan Altman      jonathan.altman@mto.com,

Steven M. Bauer      Steven.bauer@lw.com,

Karen Barris Bragman      karen.bragman@agg.com

Ellen K. Brown      ellen.brown@lw.com,

John D. Dalbey      jdd@cclblaw.com

5/17/2005

Everette L. Doffermyre , Jr    edoffermyre@dsckd.com, swindish@dsckd.com

Henry D. Fellows , Jr    hfellows@fjl-law.com, tfacini@fjl-law.com;mcrawford@fjl-law.com

Daniel Patrick Griffin    dgriffin@millermartin.com

Allen William Groves    ! agroves@seyfarth.com

David Scott Hagy    dhagy@dsckd.com

Lawrence M. Hill    lhill@dbllp.com,

Jeffrey D. Horst    Horst@krevolinhorst.com, debbie@krevolinhorst.com

Ryan Altgeld Kurtz    rkurtz@millermartin.com, pcraig@millermartin.com

Kelly Librera    klibrera@dbllp.com,

Gary V. Mauney    garymauney@lewis-roberts.com,

Aaron M. May    aaron.may@mto.com,

Darius C. Ogloza    darius.ogloza@lw.com,

J. Marbury Rainer    &nbl sp mrainer@phrd.com

James A. Roberts , III    jimroberts@lewis-roberts.com,

Robert Leonard Rothman    robert.rothman@agg.com

David Anthony Sirna    sirna@krevolinhorst.com

**1:04-cv-3759 Notice will be delivered by other means to:**

Stuart E. Abrams
Frankel & Abrams
230 Park Avenue
New York, NY 10169

Christine Chi
Dewey Ballantine
1301 Avenue of the Americas
New York, NY 10019-6092

Seth C. Farber
Dewey Ballantine
1301 Avenue of the Americas
New York, NY 10019-6092

5/17/2005

# Exhibit 18

rightfax         3/29/2005 10:45    PAGE 002/010     Fax Server

ORIGINAL         *SEND*

FILED

MAR 29 2005

CLERK, U S DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| STEPHEN L. HANSEN, | ) | Case No. SA CV 04-10525-GLT (MANx) |
|      Plaintiff, | ) | ORDER ON PLAINTIFF'S MOTION TO |
| | ) | REMAND AND DEFENDANTS' MOTIONS TO |
| vs. | ) | COMPEL ARBITRATION OR STAY |
| | ) | PROCEEDINGS |
| KPMG, LLP et al., | ) | |
| | ) | |
|      Defendants. | ) | |

DOCKETED ON CM

MAR 29 2005

BY _____ 024

Remand is DENIED and the action is STAYED.

I.    BACKGROUND

Plaintiff alleges Defendants conspired and fraudulently induced him
to participate in an investment transaction known as "BLIPS." Now,
Plaintiff moves to remand, and Defendants move to compel arbitration or
stay proceedings.[1/]

---

[1/] The Court takes judicial notice of its December 14, 2004
Order in Reddam v. KPMG, LLP, SA CV 04-1227 GLT (MANx). The
parties dispute whether the Reddam Order is applicable here.
Defendants contend it is applicable because the arbitration
clause in Reddam is identical to the arbitration clause here, and
the issues the Court analyzed in its Reddam Order are almost

39



1                          II.   DISCUSSION

2        A.   Motion to Remand

3        This action was removed under 9 U.S.C. § 205, allowing removal to

4   federal court where an action in state court "relates to" an

5   arbitration agreement under the Convention.

6        Plaintiff argues (1) this action does not relate to the

7   arbitration agreement and (2) the agreement does not fall under the

8   Convention.[2]

9             1.   Whether This Action Relates to the Arbitration Agreement

10       In Beiser v. Weyler,[3] the Fifth Circuit elaborated on § 205's

11  "relates to" requirement:

12  ───────────────

13  identical to the issues presented here.  But Plaintiff argues the
    Reddam Order is not applicable because, in part, Deutsche Bank
14  Securities Inc. (the signatory to the arbitration agreement) and
    Deutsche Bank (a related entity) have been dismissed with
15  prejudice.  The Court considers the Reddam Order for whatever
    applicability it has.
16

17       [2] Plaintiff also argues remand is proper because he will
    not be bound by the arbitration agreement; that is, the non-
18  signatory Defendants cannot compel arbitration under the theory
    of contractual right or the theory of equitable estoppel.  The
19  Court does not address this argument in the context of
    Plaintiff's motion to remand because the jurisdiction question
20  under § 205 is distinct from whether Defendants can compel
    arbitration on the merits.  See Beiser v. Weyler, 284 F.3d 665,
21  670-72 (5th Cir. 2002).

22       [3] Plaintiff argues Beiser is not controlling.  According to
    Plaintiff, Beiser adopted a "low bar" for jurisdiction under §
23  205 "because of the risk of jeopardizing the treaty obligations
24  of the United States." (Pl.'s Reply at 4.)  This concern,
    Plaintiff contends, is not implicated here.
25       In arriving at its conclusion, however, the Fifth Circuit
26  did not rely on Plaintiff's concern.  On the page Plaintiff
    cites, (Pl.'s Reply at 4 n.2), the Fifth Circuit based its
27  holding on congressional intent and federalism concerns, not on
    the risk of jeopardizing treaty obligations.  Beiser is on point
28  and persuasive.

1       [W]henever an arbitration agreement falling under the Convention
2       could conceivably affect the outcome of the plaintiff's case,
3       the agreement "relates to" the plaintiff's suit. . . . [T]he
4       district court will have jurisdiction under § 205 over just
5       about any suit in which a defendant contends . . . an
6       arbitration clause falling under the Convention provides a
7       defense.

8  284 F.3d 665, 669 (5th Cir. 2002).

9       The Fifth Circuit set a "low bar" for jurisdiction under § 205:
10  "In allowing removal whenever the arbitration clause could conceivably
11  impact the disposition of the case, we make it easy, not hard, for
12  defendants to remove. . . . [E]asy removal is exactly what Congress
13  intended in § 205."[4/]  Id.

14      In light of this "easy" standard, the Court finds the arbitration
15  agreement Plaintiff entered into with Deutsche Bank Securities Inc.
16  relates to Plaintiff's claims against Defendants. Here, the arbitration
17  agreement enabled Plaintiff to implement the BLIPS transaction. (See,
18  e.g., Compl. ¶¶ 15, 17, 113 (alleging the tax loss generated by BLIPS
19  depended on the structure of a loan provided by Deutsche Bank, and the
20  loan was "necessary" to the fraudulent scheme).) Given this enablement,
21  the arbitration agreement will conceivably impact the disposition of

22

23      [4/] Relying on Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th
24  Cir. 1992), Boggs v. Lewis, 863 F.2d 662, 663 (9th Cir. 1988),
    and Takeda v. Northwestern National Life Insurance Co., 765 F.2d
25  815, 818 (9th Cir. 1985), Plaintiff argues § 205 should be
    strictly construed against removal.
26      Plaintiff's argument is not well taken. Gaus, Boggs, and
    Takeda did not address § 205; instead, they addressed removal
27  based either on diversity or § 1441. They are inapplicable
    because Congress intended to make removal easier under § 205.
28  Beiser, 284 F.3d at 674.

S:\GLT\LC1\Civil\2004\04-10525.Order.Remand-Arb1.wpd      3



1  this case.

2        This action relates to the arbitration agreement.

3        2.   Whether the Arbitration Agreement Falls Under the

4             Convention

5        For the Convention to apply, the commercial relationship out of

6  which the agreement arises need only involve property located abroad,

7  envision performance abroad, or otherwise relate to a foreign state.  9

8  U.S.C. § 202 (1999); Freudensprung v. Offshore Technical Servs., Inc.,

9  379 F.3d 327, 340 (5th Cir. 2004) (declaring the Convention applies to

10  an arbitration agreement, even between two U.S. citizens, "provided

11  there is a 'reasonable relation' between the parties' commercial

12  relationship and some 'important foreign element'").

13        Plaintiff, however, appears to argue the question is whether the

14  arbitration agreement itself envisions performance abroad.  The Court

15  cannot adopt this view.  Under § 202, the question is whether the

16  commercial relationship envisions performance abroad -- that is, whether

17  the commercial relationship involves a "reasonable relation" with a

18  foreign element.

19        Here, Plaintiff borrowed millions of dollars from Deutsche Bank --

20  a foreign bank -- in connection with the BLIPS transaction, (Compl. ¶

21  15).  This demonstrates the commercial relationship envisioned

22  performance abroad: the implementation of a transaction involving

23  millions of dollars in loans from a foreign bank.

24        The arbitration agreement falls under the Convention.  Plaintiff's

25  motion to remand is DENIED.[5/]

26  ─────────────────────

27      [5/] Plaintiff's other arguments do not change this result.
    Relying on Brockman v. Merabank, 40 F.3d 1013, 1016 (9th Cir.

28  1994), and Sabater v. Lead Industries Ass'n, No. 00 Civ. 8026,
    2001 U.S. Dist. LEXIS 14758, at *17-18 (S.D.N.Y. Sept. 21, 2001),

Rightfax          3/3  2005 10:45    PAGE 006/010       Server

B.   Motions to Compel Arbitration or Stay Proceedings

1.   Arbitration

At the March 14, 2004 hearing, Plaintiff requested that, before any stay was ordered, the Court first rule whether Defendant non-signatories could compel arbitration.  Defendants did not object to such a ruling.  Therefore, the Court will rule on this issue.

Plaintiff and Deutsche Bank Securities, Inc. entered into an arbitration agreement, which applies to "all controversies which may arise between us concerning any transaction . . . performance or breach of this or any other agreement between us."  (Def. KPMG's Mot. Compel Arbitration at 3.)  Defendants, non-signatories to the agreement, seek to compel arbitration under this agreement.  The question is presented whether a non-signatory to an arbitration agreement can compel arbitration.

While the Ninth Circuit has apparently not yet ruled on the

Plaintiff argues the Court no longer has jurisdiction over this action because Deutsche Bank Securities Inc. and Deutsche Bank have been dismissed with prejudice.
    Here, the Court has original jurisdiction over this action because it relates to an arbitration agreement under § 205. Neither Brockman nor Sabater addresses the effect of dismissal under § 205.
    Plaintiff also asserts the arbitration provision is limited to "controversies which may arise between us concerning any transaction of construction, performance or breach of this or any agreement between us." (Pl.'s Mot. Remand at 9.)  According to Plaintiff, this "narrow" arbitration clause does not extend to the tort claims at issue here.  See Tracer Research Corp. v. Nat'l Envtl. Servs. Co., 42 F.3d 1292, 1295-96 (9th Cir. 1994).
    The Court addressed this argument in its Reddam Order. There, the Court did not accept this argument because (1) the general rule is to construe arbitration clauses broadly, (2) any doubts are to be resolved in favor of arbitration, and (3) the Court found Tracer Research Corp. to be inapplicable.  The Court reaches the same conclusion here.

1   subject, other circuits have held a non-signatory may compel arbitration
2   under an equitable estoppel theory. See, e.g., Choctaw Generation Ltd.
3   P'ship v. Am. Home Assurance Co., 271 F.3d 403, 407 (2d Cir. 2001);
4   Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524, 528 (5th Cir.
5   2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753,
6   757 (11th Cir. 1993); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile,
7   S.A., 863 F.2d 315, 320-21 (4th Cir. 1988); Hughes Masonry Co. v.
8   Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 841 n.9 (7th Cir.
9   1981). See also Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d
10  11, 18-19 (1st Cir. 2002) (noting the availability of equitable
11  estoppel to compel arbitration). This principle was recently adopted by
12  at least one California state court. Metalclad Corp. v. Ventana Envtl.
13  Org. P'ship, 109 Cal. App. 4th 1705, 1717 (2003).

14      Several Ninth Circuit district courts have recognized and applied
15  the equitable estoppel theory. For example, Estate of Garcia v.
16  Stonechange, Ltd., No. C-97-4368, 1998 WL118177, at *5 (N.D. Cal. Mar.
17  2, 1998), recognized equitable estoppel standing, and cited with
18  approval Eleventh Circuit equitable estoppel cases, applicable when
19  "obligations and duties are 'intimately founded in and intertwined with
20  the underlying contract obligations.'" In a significant recent case,
21  Boston Telecommunications Group, Inc. v. Deliotte Touche Tohmatsu, 278
22  F. Supp. 2d 1041, 1048 (N.D. Cal. 2003), held a non-signatory may compel
23  arbitration "'when the signatory to the contract containing an
24  arbitration clause raises allegations of substantially interdependent
25  and concerted misconduct by both the nonsignatory and one or more of the
26  signatories to the contract.'"

27      The reasoning from the other circuits and district courts from
28  this Circuit is persuasive. There is no good reason to believe the

S:\GLT\LC1\Civil\2004\04-10525.Order.Remand-Arb1.wpd      6

1  Ninth Circuit would not recognize equitable estoppel as a theory for a
2  non-signatory to compel arbitration in an appropriate case.

3       Here, the Court holds the conduct alleged by Plaintiff is
4  sufficient under the equitable estoppel theory to permit the non-
5  signatory Defendants to compel arbitration.  Plaintiff alleges Deutsche
6  Bank Securities, Inc. (a signatory) and the non-signatory Defendants
7  "entered into an agreement and conspiracy between themselves to
8  fraudulently induce Plaintiff to invest in BLIPS."  (Compl. ¶ 112.)
9  Plaintiff describes the non-signatory Defendants as one team involved in
10 a single course of misconduct, (Compl. ¶¶ 19, 31, 112), and seeks to
11 hold them jointly liable for each other's conduct.  (Compl. ¶¶ 112-14).
12 Plaintiff's allegations plead interdependent and concerted misconduct.
13 See, e.g., Roberson v. The Money Tree, 954 F. Supp. 1519, 1529 n.11
14 (M.D. Ala. 1997) ("A civil conspiracy is a kind of partnership, in which
15 each member becomes the agent of the other."); Rutledge v. Elec. Hose &
16 Rubber Co., 327 F. Supp. 1267, 1274 (C.D. Cal. 1971) ("[A] conspiracy
17 creates an agency relationship . . . ."), aff'd, 511 F.2d 668 (9th Cir.
18 1975).

19      The Court holds that, under the present pleadings, the non-
20 signatory defendants may compel arbitration.[6]

21           2.   Stay

22      A provision in the arbitration agreement limits the ability to
23 compel arbitration against a party whose claims are encompassed by a

24

25  ───────────────

26      [6]At the March 14, 2005 hearing Plaintiff offered to amend
    the complaint to take out the conspiracy-related facts.
27  Plaintiff may make a future motion to amend if he wishes, but it
    is doubtful an amendment would change the outcome: Plaintiff's
28  underlying theory is an inter-related, cooperative course of
    misconduct.

S:\GL\TLC1\Civil\2004\04-10525.Order.Remand-Arb1.wpd     7



1  class action.  Specifically, the provision reads:

2      No person shall . . . seek to enforce any pre-dispute

3      arbitration agreement against any person . . . who is a member

4      of a putative class who has not opted out of the class with

5      respect to any claims encompassed by the putative class action

6      until; (x) the class certification is denied; (y) the class is

7      decertified; or (z) the customer is excluded from the class[.]

8  (Def. KPMG's Reply at 12.)

9      Here, the Becnel putative class action is pending in Arkansas and

10 it appears to encompass Plaintiff's claims.

11     This action will be STAYED.[7]

12                    III.  DISPOSITION

13     Plaintiff's motion to remand is DENIED.  The Court STAYS this

14 action for 180 days in light of Becnel.  Any party may advise the Court

15 _____

16     [7] Neither Plaintiff nor Defendants appear to dispute the
   propriety of a stay pending resolution in Becnel.  Plaintiff
17 asserts "it is clear . . . the Court cannot order arbitration
   until either (1) Becnel is not certified as a class or (2)
18 [Plaintiff] elects to opt out of Becnel."  (Pl.'s Reply at 12.)
   Defendant KPMG requests the stay in its reply in support of its
19 motion to compel arbitration or stay proceedings and in its
   opposition to Plaintiff's motion to remand.  All Defendants
20 joined in Defendant KPMG's opposition.  (See Def. Carl D.
   Hasting's Notice of Joinder; Defs. Presidio Growth & Presidio
21 Advisory Services' Joinder; Def. Sidley Austin's Opp'n at 3 n.2.)
22     Defendants Presidio Growth and Presidio Advisory Services
   separately request a stay as to all parties if the Court grants
23 Defendants' motions to compel arbitration.
24     In Reddam, the Court addressed this issue under almost
   identical circumstances.  In its Reddam Order, the Court granted
25 a stay because plaintiffs' claims centered on their allegation of
   a joint conspiracy to defraud, and, given this commonality,
26 allowing two proceedings to run concurrently would be inefficient
   and risk duplicative findings and inconsistent rulings.  (See
27 Reddam Order at 13-14 (relying on Johnston v. Deutsche Bank (Civ.
28 No. 03-5240) and Whipple v. Deutsche Bank (Civ. No. 03-5240)).)
   This reasoning is applicable here.
   S:\GLT\LC1\Civil\2004\04-10525.Order.Remand-Arb1.wpd    8

1 | if, as a result of action in the _Becnel_ case, it is appropriate to

2 | continue or lift this stay.  If, at the end of 180 days, the Court has

3 | not heard from either party that it is appropriate to continue the stay,

4 | the Court will assume the matter has been otherwise resolved, and will

5 | dismiss his case without prejudice.

6 |

7 | DATED: March 28 , 2005

8 |

9 |                                      GARY L. TAYLOR
                                       UNITED STATES DISTRICT JUDGE

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JOHN S. CHEW, JR.; THE JOHN S.
CHEW, JR. REVOCABLE TRUST;
KAREN TRUMPORE F/K/A KAREN
ROBINSON, INDIVIDUALLY AND AS THE PARENT
AND LEGAL GUARDIAN OF THREE MINOR CHILDREN
CLAIRE E. ROBINSON, KELLY P.
ROBINSON , AND OLIVIA A ROBINSON;
THE CLAIRE E. ROBINSON
SUBCHAPTER S TRUST; THE KELLY P.
ROBINSON SUBCHAPTER S TRUST;
THE OLIVIA A. ROBINSON
SUBCHAPTER S TRUST; AND NORTH
HAMPTON INVESTMENTS, LLC                              **PLAINTIFFS**

VS.                                       **CIVIL ACTION NO. 3:04CV748BN**

KPMG, LLP, PEDER JOHNSON, TRACIE
HENDERSON, DONNA BRUCE, SIDNEY
AUSTIN BROWN & WOOD LLP, R.J.
RUBLE, DEUTSCHE BANK AG,
DEUTSCHE BANK SECURITIES, INC.
D/B/A DEUTSCHE BANK ALEX BROWN,
PRESIDIO ADVISORS LLC, JOHN M.
LARSON, FUNSTON STREET LLC,
FUNSTON STREET, LTD., VALLEJO
STREET LLC, VALLEJO STREET, LTD.,
AND ATHABASCA, L.P.                                  **DEFENDANTS**

## OPINION AND ORDER

This casue is before the Court on Plaintiffs' Motion to Remand.
Having considered the Motion, the Response and the Rebuttal, as well
as supporting and opposing authority, the Court finds that the
Motion is not well taken and that it should be denied.

## I.  FACTS

This cause of action arises out of Defendants' promotion and sale of a tax shelter to Plaintiffs.  The tax shelter is known as the Offshore Portfolio Investment Strategy, or OPIS.[1]  The facts of this case are complex.  However, for purposes of this Opinion and Order the relevant facts are summarized in this and the following section of the Opinion.

Defendant KPMG, LLP (hereinafter "KPMG") is a large accounting firm.[2]  Defendant Presidio Advisory Services, LLC (hereinafter "Presidio") is an investment advisory firm.[3]  KPMG and Presidio allegedly recruited the Deutsche Defendants[4] and the Brown & Wood

_____

[1]The substance of the OPIS strategy is set forth paragraph 55 (pages 23 – 25) of the Complaint.  In brief summary, the strategy involves a series of _foreign_ investments and re-investments (investments and re-investments in securities of entities _outside of the United States_) in an attempt, through use of Internal Revenue Code provisions, to inflate the cost basis of the client's investment.  When the investment is subsequently sold, the client realizes a capital loss for income tax purposes, based on the inflated cost basis.

[2]Defendants Peter Johnson, Donna Bruce and Tracie Henderson are alleged agents of KPMG.

[3]Defendant John M. Larson is an alleged agent of Presidio.

[4]The Deutsche Defendants include Deutsche Bank AG (hereinafter "Deutsche Bank") and Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown (hereinafter "DB Alex Brown").  Deutsche Bank is a German corporation.  It is "a joint stock company principally dedicated to financing foreign trade." Complaint, p. 10, ¶ 23.  DB Alex Brown is a Delaware Corporation, with its principle place of business in New York.  It is a firm which deals in the purchase and sale of securities.  DB Alex Brown is a member of the New York Stock Exchange.  The brokerage contract between Plaintiff John S. Chew, Jr. Revocable Trust and DB Alex Brown contains an arbitration

2

Defendants[5] to put the OPIS strategy into action. Complaint, p. 13, ¶ 30. The remaining Defendants are Funston Street LLC, Funston Street, Ltd., Vallejo Street LLC, Vallejo Street, Ltd., and Athabasca, L.P. The primary role of these Defendants was the purchase and/or sale of call options and/or put options within the OPIS strategy.

Regarding the OPIS strategy, the Complaint states that:

KPMG would market the transaction to long-term wealthy clients of itself and the other participants. Presidio, as the investment advisor, provided the design and rhetoric to recast the tax strategies as investment strategies. The Deutsche Defendants would provide financing and nominal investment transactions that provided the investment "cover" to disguise the tax driven motives. Brown & Wood would provide the purportedly "independent" opinion letters blessing the strategy and supposedly insulating the clients from Internal Revenue Service ("IRS") penalties in the event of an audit.

Id.

Beginning in 1998, Plaintiffs began engaging in the OPIS strategy. "The KPMG Defendants, along with the Brown & Wood Defendants, advised the Plaintiffs that, as a result of [their investments in the OPIS strategy], it was proper to utilize the losses generated by the OPIS transaction on Plaintiffs' tax returns [for 1998 and 1999]." Complaint, p. 35, ¶ 80. "These Defendants

---

clause. The remand issue addressed herewith hinges upon the jurisdictional effect of that arbitration clause.

[5]The Brown & Wood Defendants are Sidney Austin Brown & Wood, L.L.P. (hereinafter "Brown & Wood") and R. J. Ruble. Brown & Wood is a law firm, and Ruble is alleged to be an agent of Brown & Wood.

repeatedly reiterated to Plaintiffs that the OPIS transaction was a legal tax shelter." Id. at p. 36, ¶ 80. However, beginning in year 1999 and evolving through 2002, the IRS took the position that losses based on investment strategies such as OPIS were invalid for tax purposes. Nevertheless, Defendants allegedly continued to advise Plaintiffs that the OPIS tax strategy continued to be valid. Id. at p. 38, ¶ 87.

In late 2001, the IRS offered a "disclosure initiative" which allowed participants in OPIS and similar investment strategies the opportunity to disclose information regarding their transactions. In return, the IRS would forego assessing penalties based on the transactions. In April 2002, Plaintiffs enrolled in the disclosure initiative program. In October 2002, the IRS initiated another plan under which it offered to finally settle the dispute by allowing OPIS participants to avoid penalties and to recognize approximately twenty percent of claimed capital losses relating to their OPIS transactions. Plaintiffs accepted this offer and, as a result of the ensuing IRS audit, Plaintiffs allegedly paid over sixteen million dollars in back-taxes and interest. Complaint, p. 39, ¶ 93. Plaintiffs also allege that they will owe additional back-taxes, penalties and interest to the Mississippi State Tax Commission. Id. at p. 40, ¶ 95. Plaintiffs finally contend that they expended eight million dollars in fees paid to Defendants for executing the OPIS transactions. Id. at p. 44, ¶ 106.

4

Based on these facts, Plaintiffs filed suit against Defendants in the Circuit Court of the First Judicial District of Hinds County, Mississippi, on January 28, 2004. The claims asserted in the Complaint are:

COUNT ONE: Breach of contract and the breach of the duty of good faith and fair dealing; asserted against the Deutsche Defendants, the Presidio Defendants, Funston Street LLC and Vallejo Street LLC.

COUNT TWO: Breach of fiduciary duty; asserted against all Defendants.

COUNT THREE: Fraud; asserted against all Defendants.

COUNT FOUR: Negligent misrepresentation and professional malpractice; asserted against the Brown & Wood Defendants, the KPMG Defendants and the Presidio Defendants.

COUNT FIVE: Breach of contract / unjust enrichment; asserted against the Brown & Wood Defendants, the KPMG Defendants and the Presidio Defendants.

COUNT SIX: Declaratory judgment; asserted against all Defendants.

COUNT SEVEN: Unethical, excessive and illegal fees; asserted against the KPMG Defendants and the Brown & Wood Defendants.

COUNT EIGHT: Civil conspiracy; asserted against all Defendants.

5

Plaintiffs seek an unspecified amount of both compensatory and punitive damages, as well as declaratory relief.

Defendants removed the case to this Court on September 10, 2004. Defendants contend that this Curt has subject matter jurisdiction over the case pursuant to 9 U.S.C. § 205, which sets forth provisions for removing a case to federal court based on Chapter 2 of the Federal Arbitration Act (hereinafter "FAA"). The arbitration agreement which forms the basis of Defendants' removal argument is part of a brokerage contract titled "Customer's Agreement" between Plaintiff John S. Chew, Jr. Revocable Trust (hereinafter "Chew") and Defendant DB Alex Brown.[6] Both of these parties are citizens of the United States in the context of the FAA. The significance of this fact becomes apparent below.

Plaintiffs filed the subject Motion to Remand on September 29, 2004. The Motion to Remand is now ripe for consideration.

## II. ANALYSIS

Based solely on the arbitration agreement between Chew and DB Alex Brown, Defendants contend that "[t]his Court has jurisdiction over this lawsuit under 9 U.S.C. § 203, because '[a]n action or proceeding falling under the [Convention on the Recognition and Enforcement of Foreign Arbitral Awards ('Convention')] shall be deemed to arise under the laws and treaties of the United States.'"

---

[6]The Customer's Agreement is attached as Exhibit "A" to Defendants' Notice of Removal.

6

Notice of Removal. p. 4, ¶ 4. The "Convention" referenced by Defendants is the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Convention is described by the United States Court of Appeals for the Fifth Circuit in Beiser v. Weyler, 284 F.3d 665, 666 n.2 (5th Cir. 2002), as follows:

> Congress ratified the Convention in 1970 to provide United States citizens predictable enforcement of arbitral contracts in foreign courts. Signatories to the Convention agree that they will enforce written agreements to submit disputes to arbitration. Signatories also agree that they will enforce the judgments of arbitrators.
>
> Congress implemented the Convention at 9 U.S.C. §§ 201-208.[7] Section 202 defines which arbitration agreements "fall under the Convention." In order for an agreement to fall under the Convention, it must arise out of a commercial relationship. At least one of the parties to the agreement must not be a U.S. citizen, or, if the agreement is entirely between U.S. citizens, it must have some "reasonable relation" with a foreign state. 9 U.S.C. § 202.
>
> 9 U.S.C. § 208 provides that the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16,[8] applies to arbitration agreements under the Convention to the extent that the FAA does not conflict with either the Convention or its implementing legislation.

(Internal citations to case law omitted).

---

[7] 9 U.S.C. §§ 201-208 comprise Chapter 2 of the FAA, which is titled "Convention on the Recognition and Enforcement of Foreign Arbitral Awards." Chapter 2 of the FAA is referred to above and below as the "Convention." This Chapter, of course, pertains to the jurisdictional and enforcement aspects of an arbitration agreement which contains a "foreign" component, as defined by the FAA.

[8] 9 U.S.C. §§ 1-16 comprise Chapter 1 of the FAA. This Chapter is titled "General Provisions." As indicated by its title, Chapter 1 contains generally applicable provisions of the FAA.

7

To summarize, Defendants contend that because the arbitration agreement between Chew and DB Alex Brown falls under the purview of the Convention, this Court has subject matter jurisdiction over the entire cause, including the claims asserted by non-signatories to the Customer's Agreement, pursuant to the provisions of Chapter 2 of the FAA.[9] Plaintiff's, of course, argue a contrary position.

To establish a foundation for this analysis the Court must set forth applicable statutory law, all of which is contained in Title 9 of the United States Code. First, § 203 grants federal courts jurisdiction over cases involving arbitration agreements which fall under the Convention. Section 203 states in relevant part that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States...shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."

---

[9] The arbitration clause in question is contained in paragraph 14 of the Customer's Agreement. In part, the arbitration clause states:

> THE UNDERSIGNED [DB Alex Brown] AGREES, and by carrying an Account of the Undersigned you [Chew] agree, that except as inconsistent with the foregoing, all controversies which may arise between us concerning any transaction of construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.

Id. at ¶ 14(v).

Next, § 202 sets forth the standards which the Court must apply in determining whether an arbitration agreement falls under the Convention. Section 202 states:

An arbitration agreement...arising out of a legal relationship...which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. _An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship [1] involves property located abroad, [2] envisages performance or enforcement abroad, or [3] has some other reasonable relation with one or more foreign states._ For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

(Emphasis added).

Finally, § 205 allows for removal of a state court case to federal court when the claims in the state court proceeding "relate to" an arbitration agreement "falling under the Convention." In relevant part, § 205 states "[w]here the _subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention,_ the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to" federal court. (Emphasis added).

The Court begins by analyzing § 202 to determine whether the subject arbitration agreement falls under the Convention. In this case, it is undisputed that the only arbitration agreement in issue is included as part of the Customer's Agreement between Plaintiff

9

Chew and Defendant DB Alex Brown, and that both of these parties are citizens of the United States for purposes of the FAA. Therefore, unless the Customer's Agreement *either* (1) involves property located abroad, *or* (2) envisages performance or enforcement abroad, *or* (3) has some other reasonable relation with one or more foreign states, the arbitration agreement does not fall under the Convention and Plaintiffs' Motion to Remand must be granted. Conversely, if *any one* of these three tests is met then the arbitration agreement falls under the Convention and the Motion to Remand must be denied.

The first of the three § 202 tests is clearly met; that is, the Customer's Agreement containing the arbitration clause involves property located abroad. The reasoning of the Court on this issue is best summarized by an excerpt from the Memorandum of the Deutsche Bank Defendants' Opposition to Plaintiffs' Motion to Remand.

> As alleged in the Complaint, "[t]he first phase [of the OPIS transaction] is a direct investment in the stock of Deutsche Bank [AG]." Complt. ¶ 55(a). Deutsche Bank AG is a foreign corporation with its principal place of business in Frankfurt, Germany. Complt. ¶ 11. Furthermore, "[t]he second phase is an indirect investment through an *offshore* trading entity" - also in Deutsche Bank AG common stock. *Id.* ¶ 55(b)(emphasis added). Accordingly, the investment property used in the OPIS transaction was located abroad and, for this reason alone, the arbitration agreement falls under the Convention.

*Id.* at pp. 6-7. Adopting this argument, the Court finds that the subject arbitration agreement involves property located abroad and

that it falls under the Convention. Next considered is whether removal was proper under § 205.

Removal of this case was proper under § 205 so long as the subject claims "relate to" an arbitration agreement "falling under the Convention." As the Court found above, the subject arbitration agreement falls under the Convention. Therefore, the only issue to be resolved in determining whether removal was proper is whether Plaintiffs' claims "relate to" the subject arbitration agreement.

In _Beiser_, the Fifth Circuit provides a detailed analysis of the meaning of "relates to" in the context of § 205. "[T]he phrase 'relates to' sweeps broadly...." _Beiser_, 284 F.3d at 669 (citation omitted). The phrase "generally conveys a sense of breadth." _Id._ (citation omitted). _Beiser_ goes on to hold that

> whenever an arbitration agreement falling under the Convention could _conceivably_ affect the outcome of the plaintiff's case, the agreement "relates to" the plaintiff's suit. Thus, the district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense. As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case. That is all that is required to meet the low bar of "relates to."

_Id._ (emphasis in original).

Without the need for a detailed analysis, this Court finds that under the _Beiser_ court's broad interpretation of the phrase "relates to" in the § 205 context, the claims asserted in this suit certainly

11

relate to the subject arbitration agreement. Accordingly, the Court finds that removal of this case was proper.

Next considered is whether the case should be severed and remanded in part to state court. Arguing in the alternative that severance and partial remand is proper in this case, Plaintiffs point to the fact that the only arbitration agreement in issue in this case is between Plaintiff Chew and Defendant DB Alex Brown. It is undisputed that no other parties in this case signed the Customer's Agreement which contains that arbitration clause. Accordingly, Plaintiffs seek severance and remand to state court of all claims other than those asserted by Chew against DB Alex Brown.

Plaintiff's argument is based on the provisions of 28 U.S.C. § 1441(c), which states:

> Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

At this phase of the litigation, the Court opts to refrain from exercising its discretion regarding the severance and partial remand of this case. However, as further developed below in the "Conclusion" section of this Opinion, the Court will later revisit the issue as the case unfolds.

### III. CONCLUSION

12

For the reasons set forth above, Plaintiffs' Motion to Remand must be denied. Two other pending Motions pertaining to the Motion to Remand are: (1) the Deutsche Defendants' Motion for an Extension of Time in Which to Serve Response to Plaintiffs' Motion to Remand (docket entry no. 30); and (2) the Motion of KPMG for Extension of Time in Which to Serve Response to Plaintiffs' Motion to Remand (docket entry no. 54). The Responses referenced in these two Motion were submitted without objection, and the Court considered those Responses in the above analysis. Therefore, both of these Motions should be denied as moot.

The Court notes that the holdings contained herein do _not_ relate to whether the arbitration agreement in question is enforceable as to one, all or any combination of the Plaintiffs by one, all or any combination of the Defendants. For purposes of determining jurisdiction under the Convention, the question of whether the arbitration agreement is actually enforceable must not be considered. Beiser, 284 F.3d at 671 (holding that "the jurisdictional and merits issues are separate."). The Court must therefore rule on whether the arbitration agreement is enforceable and/or the extent to which it is enforceable at a later phase of this proceeding.

13

As multiple parties have filed Motions to Compel Arbitration, the arbitration issue will soon be ripe for consideration.[10] Plaintiffs are directed to file Responses to the outstanding Motions stated in footnote 10 of this Order on or before **Monday, January 31, 2005**. Defendant are directed to Reply to Plaintiffs' Responses in accordance with the Local Rules of this Court. In the Responses and Replies, the parties are directed to address the issue of whether this case should be remanded in total or in part if: (1) none or less than all of the Plaintiffs are ordered to arbitrate their claims; or (2) none or less than all of the claims themselves are subject to binding arbitration.

Based on the holdings herein:

IT IS THEREFORE ORDERED that Plaintiffs' Motion to Remand [18-1] is hereby denied.

IT IS FURTHER ORDERED that the Deutsche Defendants' Motion for an Extension of Time in Which to Serve Response to Plaintiffs' Motion to Remand [30-1] is hereby denied as moot.

---

[10]Through an Order rendered by Magistrate Judge Alfred G. Nicols on September 29, 2004, all aspects of this case were stayed with the exception of the remand issue. Based on the stay, Plaintiffs have not responded to the following pending Motions: (1) Deutsche Bank Defendants' Motion to Dismiss the Action and Compel Arbitration (docket entry no. 7); (2) Motion to Dismiss of Defendants Presidio Advisory Services, LLC and John M. Larson (docket entry no. 10); (3) KPMG's Motion to Compel Arbitration and Stay Proceedings (docket entry no. 12); and (4) Defendant Sidney Austin Brown & Wood LLP's Motion to Compel Arbitration (docket entry no. 13).

IT IS FURTHER ORDERED that the Motion of KPMG for Extension of Time in Which to Serve Response to Plaintiffs' Motion to Remand [54-1] is hereby denied as moot.

IT IS FURTHER ORDERED that Plaintiffs must file Responses to the following Motions on or before **Monday, January 31, 2005:** (1) Deutsche Bank Defendants' Motion to Dismiss the Action and Compel Arbitration (docket entry no. 7); (2) Motion to Dismiss of Defendants Presidio Advisory Services, LLC and John M. Larson (docket entry no. 10); (3) KPMG's Motion to Compel Arbitration and Stay Proceedings (docket entry no. 12); and (4) Defendant Sidney Austin Brown & Wood LLP's Motion to Compel Arbitration (docket entry no. 13). Defendant must Reply to Plaintiffs' Responses in accordance with the Local Rules of this Court. In the Responses and Replies, the parties are ordered to address the issue of whether this case should be remanded in total or in part if: (1) none or less than all of the Plaintiffs are ordered to arbitrate their claims; or (2) none or less than all of the claims themselves are subject to binding arbitration.

SO ORDERED this the 6th day of January, 2005.

s/ William H. Barbour, Jr.
UNITED STATES DISTRICT JUDGE

tct

15

# Exhibit 20



ENTERED  DEC 15 2004  CLERK, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA SANTA ANA OFFICE  BY ___ DEPUTY

Priority ✗ Send ✗ Clsd Enter ✗ JS-5/JS-6 ✗ JS-2/JS-3

FILED  DEC 14 2004  CLERK, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA SOUTHERN DIVISION AT SANTA ANA  BY ___ DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d).

Docketed ✗ Copies / NTC Sent ✗ JS-5 / JS-6 ✗ JS-2 / JS-3 ___ CLSD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

J. PAUL REDDAM et al.,

    Plaintiffs,

vs.

KPMG LLP et al.,

    Defendants.

Case No. SA CV 04-1227-GLT (MANx)

ORDER ON PLAINTIFFS' MOTION TO REMAND AND DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR STAY PROCEEDINGS

Among other things, the Court holds that, under appropriate circumstances, a non-signatory to an arbitration agreement may compel arbitration under the theory of contractual right or the theory of equitable estoppel.

## I.  BACKGROUND

Seeking to sell his corporation while minimizing his tax liability, Plaintiff consulted Defendants, which developed and implemented three tax strategies known as the Offshore Portfolio Investment Strategy ("OPIS"), the Bond Linked Issue Premium Structure ("BLIPS"), and Presidio/Greenvest 2001. Defendants' strategies allegedly resulted in huge tax liabilities, compelling Plaintiffs to

*(40)*

1 sue.  In the Complaint, Plaintiffs allege professional negligence, legal
2 malpractice, breach of fiduciary duty, fraud, negligent
3 misrepresentation, joint venture liability, and violation of California
4 Business and Professions Code section 17200.

5       Here, Plaintiffs bring a motion to remand, and Defendants bring
6 motions to compel arbitration or stay proceedings.

7                              II.   DISCUSSION

8       A.   Remand

9       Plaintiffs assert the sole basis for federal jurisdiction is 9
10 U.S.C. §§ 201-208, which allows for removal to federal court "[w]here
11 the subject matter of an action or proceeding pending in a State court
12 relates to an arbitration agreement or award falling under the
13 Convention." 9 U.S.C. § 205 (1999) (emphasis added).  Plaintiffs argue
14 their claims against Defendant Deutsche Bank A.G. do not "relate to an
15 arbitration agreement"; therefore, there is no basis for federal
16 jurisdiction and remand is proper.

17      The central issue is whether this action "relates to" the
18 arbitration clause.  Plaintiffs deny any relation, arguing they have an
19 arbitration agreement with only Deutsche Bank Securities, Inc. because
20 their agreement is expressly limited to "controversies which may arise
21 between us concerning any transaction of construction, performance or
22 breach of this or any agreement between us . . . ."  (Burgunder Decl.
23 Ex. 1 (emphases added).)

24      The standard for what satisfies the "relates to" requirement,
25 however, is broad.  In Beiser v. Weyler, the Fifth Circuit stated:
26          whenever an arbitration agreement falling under the Convention
27          could conceivably affect the outcome of the plaintiff's case,
28          the agreement "relates to" the plaintiff's suit.  Thus, the

S:\GLT\LC1\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd2

 1       district court will have jurisdiction under § 205 over just
 2       about any suit in which a defendant contends [] an arbitration
 3       clause falling under the Convention provides a defense.
 4  284 F.3d 665, 666, 669 (5th Cir. 2002). The Fifth Circuit
 5  continued: "In allowing removal whenever the arbitration clause
 6  could conceivably impact the disposition of the case, we make it
 7  easy, not hard, for defendants to remove. . . . [E]asy removal is
 8  exactly what Congress intended in § 205." Id. at 674.

 9       In light of this "easy" standard, this Court holds the arbitration
10  agreement Plaintiffs entered into with Deutsche Bank Securities, Inc.
11  "relates to" Plaintiffs' claims against Defendant Deutsche Bank A.G.
12  For example, the arbitration agreement (or Customer's Agreement) enabled
13  Plaintiffs to implement a number of transactions relevant to this
14  action.  (Compl. ¶ 35 ("To effectuate the OPIS tax strategy [in this
15  action] . . . Reddam Trust opened an account with Deutsche Bank in late
16  May 1999 . . . ."); Reddam Decl. Ex. B (listing the "account opening
17  forms," or Customer's Agreement, as a "Condition Precedent").)

18       In short, where, as here, the Customer's Agreement enabled
19  Plaintiffs to implement the relevant transactions in this action, it is
20  at minimum "conceivable" that the arbitration clause will affect the
21  outcome of this action.

22       Alternatively, Plaintiffs contend § 205 -- Defendants' sole basis
23  for federal jurisdiction -- applies only if the agreement is itself an
24  international agreement; here, Plaintiffs argue the agreement is purely
25  domestic.  Consequently, Plaintiffs conclude § 205 does not apply and
26  there is no basis for federal jurisdiction.

27       Plaintiffs are mistaken.  An "international arbitration agreement"
28  per se is not necessary; rather, for the Convention and § 205 to apply,

1  the commercial relationship out of which the agreement arises need only
2  involve property located abroad, envision performance abroad, or
3  otherwise relate to a foreign state.  9 U.S.C. § 202; e.g.,
4  Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 340 (5th
5  Cir. 2004).

6      Here, the facts indicate the agreement involved property located
7  abroad.  For example, Plaintiffs allege the "OPIS strategy involved an
8  investment by the KPMG client in a foreign bank's stock [and] the
9  purchase of call options on the same foreign bank's stock."  Plaintiffs
10 continue: an "off-shore limited partnership was set up to engage in
11 highly leveraged purchases of stock in the same foreign bank, using
12 proceeds of a loan transaction with that bank."  (E.g., Compl. ¶¶ 19-20
13 (emphases added).)

14     Plaintiffs also envisioned performance abroad, as demonstrated by
15 Plaintiffs' plan to borrow $83.3 million principal and $50 million
16 premium in a loan from Deutsche Bank A.G. -- a foreign bank -- to fund
17 the BLIPS tax strategy.  (Compl. ¶ 45.)  Given the "easy" removal
18 standard articulated by Beiser, the Court holds the Convention and § 205
19 apply.[1/]

20     Next, Plaintiffs contend that, even if the Court has jurisdiction
21 over Defendant Deutsche Bank A.G., the claims against the other
22 Defendants should be remanded.  This contention is not well-taken.

23

24 [1/] Plaintiffs also argue Defendant Deutsche Bank A.G. agreed
   to resolve disputes related to its financing activities in court.
25 Upon reviewing the agreements Plaintiffs cite, the Court does not
   agree.  Absent "clear and unequivocal" language, courts do not
26 interpret forum selection clauses to waive removal rights under
   the Convention.  McDermott Int'l, Inc. v. Lloyds Underwriters of
27 London, 944 F.2d 1199, 1209-13 (5th Cir. 1991).  Here, the
   language in the submission-to-jurisdiction clause does not
28 address arbitration directly, or waive the right.
   S:\GLT\LCI\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd   4

1   Because the Court has original jurisdiction over the claims against
2   Defendant Deutsche Bank A.G., the Court also has original jurisdiction
3   over the claims against all other Defendants.  The Ninth Circuit has
4   held that, where a federal statute provides for original jurisdiction
5   over "an action or proceeding," the grant of original jurisdiction
6   applies to the entire suit, not just certain claims or parties.
7   Brockman v. Merabank, 40 F.3d 1013, 1015-17 (9th Cir. 1994); California
8   v. Keating, 986 F.2d 346, 348 (9th Cir. 1993) ("The words 'action, suit,
9   or proceeding' are not limited to specific claims, but are synonymous
10  with the term 'case' in the constitutional sense . . . [the] terms
11  'action' and 'case' refer to the same thing, i.e., the entirety of a
12  civil proceeding . . . .") (internal citation omitted).

13      Here, the jurisdictional statute provides, "An action or
14  proceeding falling under the Convention shall be deemed to arise under
15  the laws and treaties of the United States.  The district courts of the
16  United States . . . shall have original jurisdiction over such an action
17  or proceeding . . . ."  9 U.S.C. § 203 (emphases added).  Consequently,
18  because the claims against Defendant Deutsche Bank A.G. "relate to" an
19  arbitration agreement subject to the Convention, the Court also has
20  original jurisdiction over the entire "action or proceeding" under §
21  205, including claims against the other Defendants.

22      In reply, Plaintiffs argue Brockman is inapplicable, as the
23  statute in Brockman specifically "vest[ed] the district court with
24  original jurisdiction over every claim in an action where the RTC is a
25  party."  40 F.3d at 1015.  Plaintiffs' argument is not convincing.
26  Plaintiffs' quote is a summary of the Third and Eighth Circuits'
27  conclusion as to the effect of the jurisdictional statute in Brockman;
28  the statute, by its terms, did not provide original jurisdiction over

S:\GLT\LC1\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd    5

nignurAA          1x  6/2004 2:53    PAGE 007/015   ax Server

1   every claim.

2      In short, the Court retains jurisdiction over the claims against

3   the other Defendants.  Plaintiffs' motion to remand is denied.

4      B.   <u>Arbitration</u>

5      The Federal Arbitration Act ("FAA") strongly favors arbitration.

6   <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1131 (9th

7   Cir. 2000).  A court compels arbitration if the claim at issue is

8   within the scope of a valid, enforceable agreement to arbitrate.  9

9   U.S.C. §§ 3, 4.  On a motion to compel arbitration, courts resolve any

10   doubts in favor of arbitration.  <u>Moses H. Cone Mem'l Hosp. v. Mercury</u>

11   <u>Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983).  If a court finds a party's

12   claims are subject to arbitration, then the court may stay the action

13   pending arbitration.  9 U.S.C. § 3.

14        1.   <u>Olson Lemons PC</u>

15      Defendant Olson Lemons PC's motion to compel arbitration is based

16   on different grounds from Defendants Deutsche Bank A.G.'s, Sidley Austin

17   Brown & Wood's, and KPMG's motions.  Its motion centers on whether an

18   arbitration agreement exists between it and Plaintiffs.

19      Defendant sent Plaintiffs an opinion letter on the tax

20   consequences of investments Plaintiffs desired to make.  Defendant

21   asserts the letter conditioned its use on Plaintiffs' agreement to

22   arbitrate disputes pursuant to the FAA.  Defendant argues that, even

23   though Plaintiffs did not sign the letter, its requirement to arbitrate

24   is enforceable, <u>Nghiem v. NEC Elec. Inc.</u>, 25 F.3d 1437, 1438-39 (9th

25   Cir. 1994), because Plaintiffs relied on it and reliance manifests

26   acceptance of the contract's terms, including the arbitration clause.

27      Plaintiffs contend they received and acted on Defendant's advice

28   almost one year before receiving the written opinion letter and

1   "unilateral arbitration provision," which was "never discussed with or

2   agreed to by Mr. Reddam." (Pls.' Opp'n at 2; Reddam Decl. ¶ 6.)

3   Plaintiffs argue they never agreed to the arbitration clause.

4      Under these facts, the parties agree the existence of an agreement

5   to arbitrate is based on state law contract principles governing the

6   formation of a contract.  Cheng-Canindin v. Renaissance Hotel Assocs.,

7   50 Cal. App. 4th 676, 683 (Ct. App. 1996).

8      Applying state law contract principles, the Court concludes

9   Defendant's AAA arbitration clause is not enforceable because agreement

10   to arbitrate cannot be inferred from the conduct of the parties.  Here,

11   the only mention of arbitration was about a year after Defendant's

12   advice was given, relied upon, and acted on.  When the arbitration

13   clause was sent to Plaintiffs, they had already received, relied on, and

14   paid for Defendant's services.  As Defendant states, "It was too late

15   for Mr. Reddam to reject the opinion letter . . . ." (Pls.' Opp'n at

16   5.)[2]

17      Defendant Olson Lemons PC's motion to compel arbitration is

18   denied.[3] Under the Court's ruling on Defendant Presidio's motion to

19   stay, infra, this action is stayed as to Defendant Olson Lemons PC as

20

21      [2] Defendant, however, contends Nghiem holds "an unsigned
writing is a sufficient basis to support the contractual
22   arbitration obligation between the parties."  Defendant is
incorrect.  While a signed writing is unnecessary, an unsigned
23   writing, standing alone, is insufficient.  Nghiem, 25 F.3d at
1439-40 (finding an unsigned writing yet proceeding to analyze
24   plaintiff's conduct to determine whether he impliedly assented to
arbitrate, thereby indicating an unsigned writing, by itself, is
25   not enough).
26

27      [3] Olson Lemons does not make a non-signatory's motion to
28   compel arbitration under the Deutsche Bank Securities, Inc.,
arbitration agreement, as other defendants do.

1  well.

2      2.    **Defendants Deutsche Bank A.G., Sidley Austin Brown & Wood,**
3            **and KPMG: Arbitration Compelled by Non-signatory**

4      Plaintiffs and Deutsche Bank Securities, Inc. (not named as a
5  defendant) entered into an arbitration agreement, which applies to "all
6  controversies which may arise between us concerning any transaction . .
7  . performance, or breach of this or any other agreement between us."
8  (Burgunder Decl. Ex. 1.) Non-signatory Defendants Deutsche Bank A.G.,
9  Sidley Austin Brown & Wood, and KPMG (non-signatories) seek arbitration
10 under this agreement.

11     The Court holds that, if appropriate circumstances exist,
12 arbitration may be compelled by a non-signatory to the arbitration
13 agreement under either the theory of contractual right or the equitable
14 estoppel theory.

15            a.    **The contractual right theory**

16     While signatories to a contract containing an arbitration
17 provision are generally the only ones bound by it, the Ninth Circuit
18 Court of Appeals has recognized instances where a non-signatory may
19 compel arbitration.

20     In 1993 the Court summarized Ninth Circuit rulings in Britton v.
21 Co-op Banking Group, 4 F.3d 742 (9th Cir. 1993). The Court noted the
22 Circuit has declined to adopt the judicial estoppel theory. Observing
23 that the right to compel arbitration stems from a contractual right, the
24 Court noted Ninth Circuit precedent holds "an entity that is neither a
25 party to nor agent for nor beneficiary of the contract lacks standing to
26 compel arbitration." Id. at 744. Applying this contractual right
27 limitation, the Court observed non-signatory arbitration enforcement
28 might be available to a third-party beneficiary, a successor in



1  interest, or a class of agents intended to benefit from the arbitration

2  clause.  Id. at 745-48.

3      In the decade since Britton, several district courts in the Ninth

4  Circuit have applied the contractual right theory of non-signatory

5  enforcement.  Newport Petroleum, Inc., v. Tug Justine Foss, 1997

6  WL876955 (W.D. Wash. 1997), relied on the rule that a successor in

7  interest can enforce an arbitration clause in a contract signed by its

8  predecessor.  Citing the Britton case, Creative Telecommunications,

9  Inc., v. Breeden, 120 F.Supp. 2d 1225, 1240 (D. Hawaii, 1999) held

10  "federal courts have consistently afforded agents, employees, and

11  representatives the benefit of arbitration agreements entered into by

12  their principals to the extent that the alleged misconduct relates to

13  their behavior as officers or directors or in their capacities as agents

14  of the corporation."[4/]

15      The Court holds the conduct alleged by Plaintiff is sufficient

16  under the contractual right theory to permit the non-signatories to

17  compel arbitration in this case.  Plaintiff alleges the non-defendant

18  Deutsche Bank Securities, Inc., a signatory, and the non-signatory

19  Defendants were agents of each other, and engaged in substantially

20  interdependent and concerted misconduct.  Deutsche Bank A.G. and

21  Deutsche Bank Securities, Inc. are treated as a single entity, and

22  referred to simply as "Deutsche Bank.  Defendants are alleged to have

23  formed a "de facto joint venture," and to have conspired together to

24  devise and promote the transactions.  All defendants are alleged to be

25

26      [4/]Other district court cases applying the Britton rules have
   dealt with a signatory seeking to enforce an arbitration clause
27  against a non-signatory.  Comer v. Micor, Inc., 278 F. Supp. 2d
   1030 (N.D. Cal. 2003); Ahtna Government Services Corp. v. 52
28  Rausch, LLC, 2003 WL 403359 (N.D. Cal. 2003).

1  jointly and severally liable.  Under the facts Plaintiff has alleged,

2  the non-signatories may invoke the arbitration requirement.

3              b.   The equitable estoppel theory

4       Even if the non-signatories did not qualify under Britton's

5  contractual right theory, they qualify under the equitable estoppel

6  theory.

7       Although the Ninth Circuit Court of Appeals has apparently not yet

8  ruled on the subject, other circuits that have ruled on the point have

9  held that, under appropriate facts, a non-signatory may compel

10  arbitration under an equitable estoppel theory.  See, e.g., Choctaw

11  Generation Ltd. Partnership v. American Home Assur. Co., 271 F.3d 403,

12  407 (2nd Cir. 2001); Grigson v. Creative Artists Agency L.L.C., 210 F.3d

13  524, 528 (5th Cir. 2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers,

14  Inc., 10 F.3d 753, 757 (11th Cir. 1993); J.J. Ryan & Sons, Inc. v.

15  Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988);

16  Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp., 659

17  F.2d 836, 841 n. 9 (7th Cir. 1981); see also Medical Air Technology

18  Corp. v. Marwan Inv., Inc., 303 F.3d 11, 18-19 (1st  Cir. 2002) (noting

19  the availability of equitable estoppel to compel arbitration).  This

20  principle was recently adopted by at least one California state court.

21  See, e.g., Metalclad Corp. v. Ventana Envtl. Org. P'ship, 109

22  Cal.App.4th 1705, 1717 (2003).  Equitable estoppel has been held

23  appropriate where: (1) the complaint raises allegations of substantially

24  interdependent and concerted misconduct by both a signatory and one or

25  more non-signatories; and (2) this misconduct is founded in and

26  intertwined with the underlying contractual obligations.  MS Dealer Serv.

27  Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999).

28       "The circuits have been willing to estop a signatory from avoiding

1   arbitration with a nonsignatory when the issues the nonsignatory is

2   seeking to resolve in arbitration are intertwined with the agreement

3   that the estopped party has signed." Choctaw, supra, 271 F.3d at 406.

4   If the non-signatories were not allowed to compel arbitration in these

5   instances, "the arbitration proceedings between the two signatories

6   would be rendered meaningless and the federal policy in favor of

7   arbitration effectively thwarted." MS Dealer Serv. Corp. at id.

8   (internal quotation marks omitted).

9        Several Ninth Circuit district courts have recognized and applied

10  the equitable estoppel theory.  Estate of Garcia v. Stonechange, Ltd.,

11  1998 WL118177 (N.D. Cal. 1998) recognized equitable estoppel standing,

12  and cited with approval Eleventh Circuit equitable estoppel cases,

13  applicable when "obligations and duties are 'intimately founded in and

14  intertwined with the underlying contract obligations.'"  In a

15  significant recent case citing the Fifth Circuit, Boston

16  Telecommunications Group, Inc., v. Deliotte Touche Tohmatsu, 278 F. Supp

17  2d 1041, 1048 (N.D. Cal. 2003) held a non-signatory may compel

18  arbitration "'when the signatory to the contract containing an

19  arbitration clause raises allegations of substantially interdependent

20  and concerted misconduct by both the nonsignatory and one or more of the

21  signatories to the contract.'"[5]

22       The reasoning from the other circuits and district courts from

23  this circuit is persuasive.  There is no good reason to believe the

24

25  ─────────────

26  [5]/Other Ninth Circuit district court cases have recognized
    the equitable estoppel theory, but held it did not apply under

27  the facts of that particular case.  Ahtna Government Services
    Corp. v. 52 Rausch, LLC, 2003 WL 403359 (N.D. Cal. 2003); Pacific

28  Builders, Inc. v. Mitsui Trust & Banking Co., 57 F. Supp 2d 1018
    (D. Hawaii, 1999).

S:\GLT\LC1\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd   11



1 | Ninth Circuit Court of Appeals would not recognize equitable estoppel as
2 | a theory for a non-signatory to compel arbitration in an appropriate
3 | case.

4 |     The Court holds that, under appropriate circumstances, a non-
5 | signatory to an arbitration agreement may compel arbitration under the
6 | theory of equitable estoppel. Under the allegations in this case, as
7 | stated above, the conditions for equitable estoppel are present. The
8 | non-signatory defendants may compel arbitration.

9 |        2. <u>Whether the Agreement Covers the Dispute</u>

10 |     Plaintiffs contend the agreement with Deutsche Bank Securities,
11 | Inc. does not cover the allegations in the Complaint. Plaintiffs argue
12 | the arbitration clause is narrow: textually, it is not only limited to
13 | controversies "between us concerning any transactions . . . or breach of
14 | the agreement or any other agreement between us," (Burgunder Decl. Ex.
15 | 1), but the language covers only contract interpretation and performance
16 | claims, and cannot be construed to cover the tort claims at issue here.

17 |     Arbitration clauses in general, as well as clauses containing the
18 | phrase "relating to," are usually construed broadly; but arbitration
19 | clauses containing the phrases "arising from" or "arising out of" are
20 | usually construed narrowly. <u>Tracer Research Corp. v. Nat'l Envtl.</u>
21 | <u>Servs. Co.</u>, 42 F.3d 1292, 1294-95 (9th Cir. 1994).

22 |     Here, the arbitration agreement states, "all controversies which
23 | may arise between us <u>concerning any transaction</u> . . . or breach of this
24 | or any other agreement between us . . . shall be determined by
25 | arbitration." (Burgunder Decl. Ex. 1 (emphasis added).) Plaintiffs
26 | appear to contend the "concerning any transaction" phrase is narrow
27 | because it specifies the types of disputes covered by the agreement.
28 | According to Plaintiffs, if the "arising from" language in <u>Tracer</u>

1  Research Corp. was narrow -- all disputes "arising from" the agreement -
2  - then the "concerning" language here -- only specific types of
3  disputes -- must also be narrow.

4        The Court disagrees.  The general rule is to construe
5  arbitration clauses expansively.  Moses H. Cone Mem'l Hosp., 460 U.S. at
6  24-25.  In Tracer Research Corp., the Ninth Circuit held the phrases
7  "arising from" or "arising out of" would trigger a narrow construction.
8  Here, the agreement does not contain those phrases; therefore, the
9  general rule applies, as does the Supreme Court's instruction to resolve
10  any doubts in favor of arbitration.  Id.

11        In sum, Defendants Deutsche Bank A.G.'s, Sidley Austin Brown &
12  Wood's, and KPMG's motions to compel arbitration are granted.[4]

13        C.   Stay

14        A party to a suit in federal court may seek a stay of the action
15  pending arbitration of the issues in the litigation.  Wagner v. Stratton
16  Oakmont, Inc., 83 F.3d 1046, 1048 (9th Cir. 1996).

17        Defendant Presidio asks the Court to stay this action pending the
18  resolution of the arbitration.  Defendant argues Plaintiffs' claims
19  center on their allegation of a joint conspiracy to defraud.  Given this
20  commonality, Defendant contends allowing two proceedings to run
21  concurrently would be inefficient and risk duplicative findings and
22  inconsistent rulings.  See, e.g., United States ex rel. Newton v.
23  Neumann Carribean Int'l, Ltd., 750 F.2d 1422, 1427 (9th Cir. 1985)
24  (noting the importance of "economy and efficiency" in determining the

25

26        [4] Defendant KPMG also argues the non-signatory Plaintiff
27  (i.e., Zed Corporation) should be compelled to arbitrate.
   Plaintiffs do not appear to contest this argument.  Having
28  considered the merits of the argument, the Court grants Defendant
   KPMG's motion on this point.
   S:\GLT\LC1\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd   13

1  propriety of a stay).

2      Here, <u>Johnston v. Deutsche Bank</u> (Civ. No. 03-5240) and <u>Whipple v.</u>

3  <u>Deutsche Bank</u> (Civ. No. 03-5240) are on point and persuasive. In

4  <u>Johnston</u> and <u>Whipple</u> -- two related cases involving claims against

5  Deutsche Bank, Sidley Austin Brown & Wood, KPMG, and Presidio arising

6  from plaintiff's participation in an investment strategy similar to the

7  investment in this case -- the United States District Court for the

8  Western District of Arkansas granted Deutsche Bank's motion to stay

9  after finding the case against Presidio would involve "common questions

10 of fact . . . within the scope of the arbitration agreement."

11 (Presidio's Mot. at 4.) Like <u>Johnston</u> and <u>Whipple</u>, where plaintiff's

12 conspiracy and aiding-and-abetting claims implicated common questions of

13 fact, here Plaintiffs allege "joint venture liability" and "aiding and

14 abetting breach of fiduciary duty." These allegations rebut Plaintiffs'

15 assertion that no common questions apply to Defendant.

16     Defendant Presidio's motion to stay is granted.

17                    III.    DISPOSITION

18     Plaintiffs' motion to remand is DENIED. Defendants Deutsche Bank

19 A.G.'s, Sidley Austin Brown & Wood's, and KPMG's motions to compel

20 arbitration are GRANTED, and this action is STAYED pending completion of

21 the arbitration. Defendant Olson Lemons PC's motion to compel

22 arbitration is DENIED. Defendant Presidio's motion to stay is

23 GRANTED.[7]

24 DATED: December 14, 2004

25

26                              GARY L. TAYLOR
                                UNITED STATES DISTRICT JUDGE
27

28     [7] Defendant Presidio's agreed motion for extension of time
   to respond to the Complaint is granted as well.
   S:\GLT\LCI\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd  14

# Exhibit 21

(Slip Opinion)  OCTOBER TERM, 2004  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GRABLE & SONS METAL PRODUCTS, INC. v. DARUE ENGINEERING & MANUFACTURING

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 04–603.  Argued April 18, 2005—Decided June 13, 2005

The Internal Revenue Service seized real property owned by petitioner (hereinafter Grable) to satisfy a federal tax delinquency, and gave Grable notice by certified mail before selling the property to respondent (hereinafter Darue). Grable subsequently brought a quiet title action in state court, claiming that Darue's title was invalid because 26 U. S. C. §6335 required the IRS to give Grable notice of the sale by personal service, not certified mail. Darue removed the case to Federal District Court as presenting a federal question because the title claim depended on an interpretation of federal tax law. The District Court declined to remand the case, finding that it posed a significant federal-law question, and it granted Darue summary judgment on the merits. The Sixth Circuit affirmed, and this Court granted certiorari on the jurisdictional question.

*Held:* The national interest in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal-question jurisdiction over the disputed issue on removal. Pp. 3–11.

(a) Darue was entitled to remove the quiet title action if Grable could have brought it in federal court originally, as a civil action "arising under the . . . laws . . . of the United States," 28 U. S. C. §1331. Federal-question jurisdiction is usually invoked by plaintiffs pleading a cause of action created by federal law, but this Court has also long recognized that such jurisdiction will lie over some state-law claims that implicate significant federal issues, see, *e.g., Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180. Such federal jurisdiction demands not only a contested federal issue, but a substantial one. And the jurisdiction must be consistent with congressional judgment about the sound division of labor between state and federal courts

Syllabus

governing §1331's application. These considerations have kept the
Court from adopting a single test for jurisdiction over federal issues
embedded in state-law claims between nondiverse parties. Instead,
the question is whether the state-law claim necessarily stated a fed-
eral issue, actually disputed and substantial, which a federal forum
may entertain without disturbing a congressionally approved balance
of federal and state judicial responsibilities. Pp. 3–6.

(b) This case warrants federal jurisdiction. Grable premised its su-
perior title claim on the IRS's failure to give adequate notice, as de-
fined by federal law. Whether Grable received notice is an essential
element of its quiet title claim, and the federal statute's meaning is
actually disputed. The meaning of a federal tax provision is an im-
portant federal-law issue that belongs in federal court. The Govern-
ment has a strong interest in promptly collecting delinquent taxes,
and the IRS's ability to satisfy its claims from delinquents' property
requires clear terms of notice to assure buyers like Darue that the
IRS has good title. Finally, because it will be the rare state title case
that raises a federal-law issue, federal jurisdiction to resolve genuine
disagreement over federal tax title provisions will portend only a mi-
croscopic effect on the federal-state division of labor. This conclusion
puts the Court in venerable company, quiet title actions having been
the subject of some of the earliest exercises of federal-question juris-
diction over state-law claims. E.g., Hopkins v. Walker, 244 U. S. 486,
490–491. Pp. 6–7.

(c) Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U. S. 804, is
not to the contrary. There, in finding federal jurisdiction unavailable
for a state tort claim resting in part on an allegation that the defen-
dant drug company had violated a federal branding law, the Court
noted that Congress had not provided a private federal cause of ac-
tion for such violations. Merrell Dow cannot be read to make a fed-
eral cause of action a necessary condition for federal-question juris-
diction. It disclaimed the adoption of any bright-line rule and
expressly approved the exercise of jurisdiction in Smith, where there
was no federal cause of action. Accordingly, Merrell Dow should be
read in its entirety as treating the absence of such cause as evidence
relevant to, but not dispositive of, the "sensitive judgments about
congressional intent," required by §1331. Id., at 810. In Merrell
Dow, the principal significance of this absence was its bearing on the
consequences to the federal system. If the federal labeling standard
without a cause of action could get a state claim into federal court, so
could any other federal standards without causes of action. And that
would mean an enormous number of cases. A comparable analysis
yields a different jurisdictional conclusion here, because state quiet
title actions rarely involve contested federal-law issues. Pp. 7–11.

Cite as: 545 U. S. \_\_\_\_ (2005)  3

Syllabus

377 F. 3d 592, affirmed.

SOUTER, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion.

Cite as: 545 U. S. _____ (2005)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–603

## GRABLE & SONS METAL PRODUCTS, INC., PETITIONER *v.* DARUE ENGINEERING & MANUFACTURING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2005]

JUSTICE SOUTER delivered the opinion of the Court.

The question is whether want of a federal cause of action to try claims of title to land obtained at a federal tax sale precludes removal to federal court of a state action with non-diverse parties raising a disputed issue of federal title law. We answer no, and hold that the national interest in providing a federal forum for federal tax litigation is sufficiently substantial to support the exercise of federal question jurisdiction over the disputed issue on removal, which would not distort any division of labor between the state and federal courts, provided or assumed by Congress.

I

In 1994, the Internal Revenue Service seized Michigan real property belonging to petitioner Grable & Sons Metal Products, Inc., to satisfy Grable's federal tax delinquency. Title 26 U. S. C. §6335 required the IRS to give notice of the seizure, and there is no dispute that Grable received actual notice by certified mail before the IRS sold the property to respondent Darue Engineering & Manufactur-

ing. Although Grable also received notice of the sale itself,
it did not exercise its statutory right to redeem the prop-
erty within 180 days of the sale, §6337(b)(1), and after
that period had passed, the Government gave Darue a
quitclaim deed. §6339.

Five years later, Grable brought a quiet title action in
state court, claiming that Darue's record title was invalid
because the IRS had failed to notify Grable of its seizure of
the property in the exact manner required by §6335(a),
which provides that written notice must be "given by the
Secretary to the owner of the property [or] left at his usual
place of abode or business." Grable said that the statute
required personal service, not service by certified mail.

Darue removed the case to Federal District Court as
presenting a federal question, because the claim of title
depended on the interpretation of the notice statute in the
federal tax law. The District Court declined to remand the
case at Grable's behest after finding that the "claim does
pose a significant question of federal law," Tr. 17 (Apr. 2,
2001), and ruling that Grable's lack of a federal right of
action to enforce its claim against Darue did not bar the
exercise of federal jurisdiction. On the merits, the court
granted summary judgment to Darue, holding that al-
though §6335 by its terms required personal service,
substantial compliance with the statute was enough. 207
F. Supp. 2d 694 (WD Mich. 2002).

The Court of Appeals for the Sixth Circuit affirmed. 377
F. 3d 592 (2004). On the jurisdictional question, the panel
thought it sufficed that the title claim raised an issue of
federal law that had to be resolved, and implicated a
substantial federal interest (in construing federal tax law).
The court went on to affirm the District Court's judgment
on the merits. We granted certiorari on the jurisdictional
question alone,[1] 543 U. S. ___ (2005) to resolve a split

_____

[1] Accordingly, we have no occasion to pass upon the proper interpre-

Opinion of the Court

within the Courts of Appeals on whether *Merrell Dow
Pharmaceuticals Inc.* v. *Thompson,* 478 U. S. 804 (1986),
always requires a federal cause of action as a condition for
exercising federal-question jurisdiction.[2] We now affirm.

II

Darue was entitled to remove the quiet title action if
Grable could have brought it in federal district court
originally, 28 U. S. C. §1441(a), as a civil action "arising
under the Constitution, laws, or treaties of the United
States," §1331. This provision for federal-question juris-
diction is invoked by and large by plaintiffs pleading a
cause of action created by federal law (*e.g.,* claims under
42 U. S. C. §1983). There is, however, another longstand-
ing, if less frequently encountered, variety of federal "aris-
ing under" jurisdiction, this Court having recognized for
nearly 100 years that in certain cases federal question
jurisdiction will lie over state-law claims that implicate
significant federal issues. *E.g., Hopkins* v. *Walker,* 244
U. S. 486, 490–491 (1917). The doctrine captures the com-
monsense notion that a federal court ought to be able to
hear claims recognized under state law that nonetheless
turn on substantial questions of federal law, and thus
justify resort to the experience, solicitude, and hope of
uniformity that a federal forum offers on federal issues,
see ALI, Study of the Division of Jurisdiction Between
State and Federal Courts 164–166 (1968).

The classic example is *Smith* v. *Kansas City Title &
Trust Co.,* 255 U. S. 180 (1921), a suit by a shareholder
claiming that the defendant corporation could not lawfully

---

tation of the federal tax provision at issue here.

[2] Compare *Seinfeld* v. *Austen,* 39 F. 3d 761, 764 (CA7 1994) (finding
that federal-question jurisdiction over a state-law claim requires a
parallel federal private right of action), with *Ormet Corp.* v. *Ohio Power
Co.,* 98 F. 3d 799, 806 (CA4 1996) (finding that a federal private action
is not required).

buy certain bonds of the National Government because
their issuance was unconstitutional. Although Missouri
law provided the cause of action, the Court recognized
federal-question jurisdiction because the principal issue in
the case was the federal constitutionality of the bond
issue. *Smith* thus held, in a somewhat generous state-
ment of the scope of the doctrine, that a state-law claim
could give rise to federal-question jurisdiction so long as it
"appears from the [complaint] that the right to relief
depends upon the construction or application of [federal
law]." *Id.*, at 199.

The *Smith* statement has been subject to some trimming
to fit earlier and later cases recognizing the vitality of the
basic doctrine, but shying away from the expansive view
that mere need to apply federal law in a state-law claim
will suffice to open the "arising under" door. As early as
1912, this Court had confined federal-question jurisdiction
over state-law claims to those that "really and substan-
tially involv[e] a dispute or controversy respecting the
validity, construction or effect of [federal] law." *Shulthis*
v. *McDougal*, 225 U. S. 561, 569 (1912). This limitation
was the ancestor of Justice Cardozo's later explanation
that a request to exercise federal-question jurisdiction
over a state action calls for a "common-sense accommoda-
tion of judgment to [the] kaleidoscopic situations" that
present a federal issue, in "a selective process which picks
the substantial causes out of the web and lays the other
ones aside." *Gully* v. *First Nat. Bank in Meridian*, 299
U. S. 109, 117–118 (1936). It has in fact become a con-
stant refrain in such cases that federal jurisdiction de-
mands not only a contested federal issue, but a substantial
one, indicating a serious federal interest in claiming the
advantages thought to be inherent in a federal forum.
*E.g.*, *Chicago* v. *International College of Surgeons*, 522
U. S. 156, 164 (1997); *Merrell Dow, supra*, at 814, and
n. 12; *Franchise Tax Bd. of Cal.* v. *Construction Laborers*

*Vacation Trust for Southern Cal.*, 463 U. S. 1, 28 (1983).

But even when the state action discloses a contested and substantial federal question, the exercise of federal jurisdiction is subject to a possible veto. For the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of §1331. Thus, *Franchise Tax Bd.* explained that the appropriateness of a federal forum to hear an embedded issue could be evaluated only after considering the "welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system." *Id.,* at 8. Because arising-under jurisdiction to hear a state-law claim always raises the possibility of upsetting the state-federal line drawn (or at least assumed) by Congress, the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction. See also *Merrell Dow, supra,* at 810.

These considerations have kept us from stating a "single, precise, all-embracing" test for jurisdiction over federal issues embedded in state-law claims between non-diverse parties. *Christianson* v. *Colt Industries Operating Corp.,* 486 U. S. 800, 821 (1988) (STEVENS, J., concurring). We have not kept them out simply because they appeared in state raiment, as Justice Holmes would have done, see *Smith, supra,* at 214 (dissenting opinion), but neither have we treated "federal issue" as a password opening federal courts to any state action embracing a point of federal law. Instead, the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.

6    GRABLE & SONS METAL PRODUCTS, INC. *v.* DARUE
ENGINEERING & MFG.
Opinion of the Court

### III
### A

This case warrants federal jurisdiction. Grable's state complaint must specify "the facts establishing the superiority of [its] claim," Mich. Ct. Rule 3.411(B)(2)(c) (West 2005), and Grable has premised its superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law. Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case. The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court. The Government has a strong interest in the "prompt and certain collection of delinquent taxes," *United States* v. *Rodgers,* 461 U. S. 677, 709 (1983), and the ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice to allow buyers like Darue to satisfy themselves that the Service has touched the bases necessary for good title. The Government thus has a direct interest in the availability of a federal forum to vindicate its own administrative action, and buyers (as well as tax delinquents) may find it valuable to come before judges used to federal tax matters. Finally, because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor. See n. 3, *infra.*

This conclusion puts us in venerable company, quiet title actions having been the subject of some of the earliest exercises of federal-question jurisdiction over state-law claims. In *Hopkins,* 244 U. S., 490–491, the question was federal jurisdiction over a quiet title action based on the plaintiffs' allegation that federal mining law gave them

Opinion of the Court

the superior claim. Just as in this case, "the facts showing
the plaintiffs' title and the existence and invalidity of the
instrument or record sought to be eliminated as a cloud
upon the title are essential parts of the plaintiffs' cause of
action."[3] *Id.,* at 490. As in this case again, "it is plain that
a controversy respecting the construction and effect of the
[federal] laws is involved and is sufficiently real and sub-
stantial." *Id.,* at 489. This Court therefore upheld federal
jurisdiction in *Hopkins,* as well as in the similar quiet title
matters of *Northern Pacific R. Co.* v. *Soderberg,* 188 U. S.
526, 528 (1903), and *Wilson Cypress Co.* v. *Del Pozo y
Marcos,* 236 U. S. 635, 643–644 (1915). Consistent with
those cases, the recognition of federal jurisdiction is in
order here.

### B

*Merrell Dow Pharmaceuticals Inc.* v. *Thompson,* 478
U. S. 804 (1986), on which Grable rests its position, is not
to the contrary. *Merrell Dow* considered a state tort claim
resting in part on the allegation that the defendant drug
company had violated a federal misbranding prohibition,
and was thus presumptively negligent under Ohio law.
*Id.,* at 806. The Court assumed that federal law would
have to be applied to resolve the claim, but after closely

---

[3] The quiet title cases also show the limiting effect of the requirement
that the federal issue in a state-law claim must actually be in dispute
to justify federal-question jurisdiction. In *Shulthis* v. *McDougal,* 225
U. S. 561 (1912), this Court found that there was no federal question
jurisdiction to hear a plaintiff's quiet title claim in part because the
federal statutes on which title depended were not subject to "any contro-
versy respecting their validity, construction, or effect." *Id.,* at 570. As the
Court put it, the requirement of an actual dispute about federal law was
"especially" important in "suit[s] involving rights to land acquired under a
law of the United States," because otherwise "every suit to establish title
to land in the central and western states would so arise [under federal
law], as all titles in those States are traceable back to those laws." *Id.,* at
569–570.

examining the strength of the federal interest at stake and
the implications of opening the federal forum, held federal
jurisdiction unavailable.     Congress had not provided a
private federal cause of action for violation of the federal
branding requirement, and the Court found "it would . . .
flout, or at least undermine, congressional intent to con-
clude that federal courts might nevertheless exercise
federal-question jurisdiction and provide remedies for
violations of that federal statute solely because the viola-
tion . . . is said to be a . . . 'proximate cause' under state
law." *Id.*, at 812.

Because federal law provides for no quiet title action
that could be brought against Darue,[4] Grable argues that
there can be no federal jurisdiction here, stressing some
broad language in *Merrell Dow* (including the passage just
quoted) that on its face supports Grable's position, see
Note, Mr. *Smith* Goes to Federal Court: Federal Question
Jurisdiction over State Law Claims Post-*Merrell Dow*, 115
Harv. L. Rev. 2272, 2280–2282 (2002) (discussing split in
Circuit Courts over private right of action requirement
after *Merrell Dow*).     But an opinion is to be read as a
whole, and *Merrell Dow* cannot be read whole as overturn-
ing decades of precedent, as it would have done by effec-
tively adopting the Holmes dissent in *Smith*, see *supra*, at
5, and converting a federal cause of action from a suffi-
cient condition for federal-question jurisdiction[5] into a
necessary one.

In the first place, *Merrell Dow* disclaimed the adoption
of any bright-line rule, as when the Court reiterated that

---

[4] Federal law does provide a quiet title cause of action against the
Federal Government.   28 U. S. C. §2410.   That right of action is not
relevant here, however, because the federal government no longer has
any interest in the property, having transferred its interest to Darue
through the quitclaim deed.

[5] For an extremely rare exception to the sufficiency of a federal right
of action, see *Shoshone Mining Co.* v. *Rutter*, 177 U. S. 505, 507 (1900).

Opinion of the Court

"in exploring the outer reaches of §1331, determinations
about federal jurisdiction require sensitive judgments
about congressional intent, judicial power, and the federal
system." 478 U. S., at 810. The opinion included a
lengthy footnote explaining that questions of jurisdiction
over state-law claims require "careful judgments," *id.,* at
814, about the "nature of the federal interest at stake," *id.,*
at 814, n. 12 (emphasis deleted). And as a final indication
that it did not mean to make a federal right of action
mandatory, it expressly approved the exercise of jurisdic-
tion sustained in *Smith,* despite the want of any federal
cause of action available to *Smith*'s shareholder plaintiff.
478 U. S., at 814, n. 12. *Merrell Dow* then, did not toss
out, but specifically retained the contextual enquiry that
had been *Smith*'s hallmark for over 60 years. At the end
of *Merrell Dow,* Justice Holmes was still dissenting.

Accordingly, *Merrell Dow* should be read in its entirety
as treating the absence of a federal private right of action
as evidence relevant to, but not dispositive of, the "sensi-
tive judgments about congressional intent" that §1331
requires. The absence of any federal cause of action af-
fected *Merrell Dow*'s result two ways. The Court saw the
fact as worth some consideration in the assessment of
substantiality. But its primary importance emerged when
the Court treated the combination of no federal cause of
action and no preemption of state remedies for misbrand-
ing as an important clue to Congress's conception of the
scope of jurisdiction to be exercised under §1331. The
Court saw the missing cause of action not as a missing
federal door key, always required, but as a missing wel-
come mat, required in the circumstances, when exercising
federal jurisdiction over a state misbranding action would
have attracted a horde of original filings and removal
cases raising other state claims with embedded federal
issues. For if the federal labeling standard without a
federal cause of action could get a state claim into federal

court, so could any other federal standard without a fed-
eral cause of action. And that would have meant a tre-
mendous number of cases.

One only needed to consider the treatment of federal
violations generally in garden variety state tort law. "The
violation of federal statutes and regulations is commonly
given negligence per se effect in state tort proceedings."[6]
Restatement (Third) of Torts (proposed final draft) §14,
Comment *a*. See also W. Keeton, D. Dobbs, R. Keeton, &
D. Owen, Prosser and Keeton on Torts, §36, p. 221, n. 9
(5th ed. 1984) ("[T]he breach of a federal statute may
support a negligence per se claim as a matter of state law"
(collecting authority)). A general rule of exercising federal
jurisdiction over state claims resting on federal mislabel-
ing and other statutory violations would thus have her-
alded a potentially enormous shift of traditionally state
cases into federal courts. Expressing concern over the
"increased volume of federal litigation," and noting the
importance of adhering to "legislative intent," *Merrell Dow*
thought it improbable that the Congress, having made no
provision for a federal cause of action, would have meant
to welcome any state-law tort case implicating federal law
"solely because the violation of the federal statute is said
to [create] a rebuttable presumption [of negligence] . . .
under state law." 478 U. S., at 811–812 (internal quota-
tion marks omitted). In this situation, no welcome mat
meant keep out. *Merrell Dow*'s analysis thus fits within
the framework of examining the importance of having a
federal forum for the issue, and the consistency of such a
forum with Congress's intended division of labor between
state and federal courts.

---

[6]Other jurisdictions treat a violation of a federal statute as evidence
of negligence or, like Ohio itself in *Merrell Dow Pharmaceuticals Inc.* v.
*Thompson*, 478 U. S. 804 (1986), as creating a rebuttable presumption
of negligence. Restatement (Third) of Torts (proposed final draft) §14,
Comment *c*. Either approach could still implicate issues of federal law.

Opinion of the Court

As already indicated, however, a comparable analysis yields a different jurisdictional conclusion in this case. Although Congress also indicated ambivalence in this case by providing no private right of action to Grable, it is the rare state quiet title action that involves contested issues of federal law, see n. 3, *supra.* Consequently, jurisdiction over actions like Grable's would not materially affect, or threaten to affect, the normal currents of litigation. Given the absence of threatening structural consequences and the clear interest the Government, its buyers, and its delinquents have in the availability of a federal forum, there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of the state-law title claim.[7]

IV

The judgment of the Court of Appeals, upholding federal jurisdiction over Grable's quiet title action, is affirmed.

*It is so ordered.*

_____

[7] At oral argument Grable's counsel espoused the position that after *Merrell Dow,* federal-question jurisdiction over state-law claims absent a federal right of action, could be recognized only where a constitutional issue was at stake. There is, however, no reason in text or otherwise to draw such a rough line. As *Merrell Dow* itself suggested, constitutional questions may be the more likely ones to reach the level of substantiality that can justify federal jurisdiction. 478 U. S., at 814, n. 12. But a flat ban on statutory questions would mechanically exclude significant questions of federal law like the one this case presents.

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 04–603

## GRABLE & SONS METAL PRODUCTS, INC., PETITIONER v. DARUE ENGINEERING & MANUFACTURING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 13, 2005]

JUSTICE THOMAS, concurring.

The Court faithfully applies our precedents interpreting 28 U. S. C. §1331 to authorize federal-court jurisdiction over some cases in which state law creates the cause of action but requires determination of an issue of federal law, *e.g.*, *Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180 (1921); *Merrell Dow Pharmaceuticals Inc.* v. *Thompson*, 478 U. S. 804 (1986). In this case, no one has asked us to overrule those precedents and adopt the rule Justice Holmes set forth in *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U. S. 257 (1916), limiting §1331 jurisdiction to cases in which federal law creates the cause of action pleaded on the face of the plaintiff's complaint. *Id.*, at 260. In an appropriate case, and perhaps with the benefit of better evidence as to the original meaning of §1331's text, I would be willing to consider that course.[*]

---

[*]This Court has long construed the scope of the statutory grant of federal-question jurisdiction more narrowly than the scope of the constitutional grant of such jurisdiction. See *Merrell Dow Pharmaceuticals Inc.* v. *Thompson*, 478 U. S. 804, 807–808 (1986). I assume for present purposes that this distinction is proper—that is, that the language of 28 U. S. C. §1331, "[t]he district courts shall have original jurisdiction of all *civil actions arising under* the Constitution, laws, or treaties of the United States" (emphasis added), is narrower than the

2      GRABLE & SONS METAL PRODUCTS, INC. *v.* DARUE
ENGINEERING & MFG.
THOMAS, J., concurring

Jurisdictional rules should be clear. Whatever the virtues of the *Smith* standard, it is anything but clear. *Ante*, at 4 (the standard "calls for a 'common-sense accommodation of judgment to [the] kaleidoscopic situations' that present a federal issue, in 'a selective process which picks the substantial causes out of the web and lays the other ones aside'" (quoting *Gully* v. *First Nat. Bank in Meridian*, 299 U. S. 109, 117–118 (1936))); *ante*, at 5 ("[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities"); *ante*, at 9 ("'[D]eterminations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system'"; "the absence of a federal private right of action [is] evidence relevant to, but not dispositive of, the 'sensitive judgments about congressional intent' that §1331 requires" (quoting *Merrell Dow, supra*, at 810)).

Whatever the vices of the *American Well Works* rule, it is clear. Moreover, it accounts for the "'vast majority'" of cases that come within §1331 under our current case law, *Merrell Dow, supra*, at 808 (quoting *Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for Southern Cal.*, 463 U. S. 1, 9 (1983))—further indication that trying to sort out which cases fall within the smaller *Smith* category may not be worth the effort it entails. See R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 885–886 (5th ed. 2003). Accordingly, I would be willing in appropriate circumstances to reconsider our interpretation of §1331.

---

language of Art. III, §2, cl. 1, of the Constitution, "[t]he judicial Power shall extend to all *Cases*, in Law and Equity, *arising under* this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . " (emphases added).